LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzlawnv.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170
Fasx: (702) 382-1169

Proposed Attorneys for Debtor

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>ARUZE GAMING AMERICA, INC.,<br><br>               Debtor. | Case No. 23-10356-abl<br>Chapter 11 |

### OMNIBUS DECLARATION OF YUGO KINOSHITA IN SUPPORT OF THE DEBTOR'S INITIAL EMERGENCY MOTIONS AND RELATED RELIEF

I, Yugo Kinoshita, hereby declare as follows:

1.     I am over the age of 18 and am mentally competent.  I make this Declaration in support of the initial emergency motions requesting various types of immediate relief (collectively, the "Initial Motions") filed by Aruze Gaming America, Inc., a Nevada corporation (as applicable, "AGA" or the "Debtor") and as detailed herein in its chapter 11 bankruptcy case (the "Chapter 11 Case"), as well as such other relief as may be requested hereinafter during the case.

2.     I am the Debtor's Global Chief Executive Officer, and also its Treasurer, and a Director.  I have worked for AGA or an affiliate in various capacities since May 2012.  Based upon my position and experience with the Debtor, I am readily familiar with its business, operations, and financial affairs.  All facts set forth in this Declaration are based upon my own personal knowledge, or information learned from my review of relevant documents maintained in the ordinary course of the Debtor's business, and which are business records, and in consultation with

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

the company's legal and financial advisors.  If called upon to testify as to the contents of this Declaration, I would do so as set forth herein.

3.       This Declaration provides the Court with some background information regarding the Debtor, as well as the context for various emergency relief requested in its Chapter 11 Case. Accordingly, this Declaration is organized into two parts:  first, a brief overview of the Debtor's business and the events leading to its Chapter 11 Case, and second, an explanation of the relief sought in the Debtor's Initial Motions.[1]  The relief sought in the Initial Motions is critical to the Debtor's operations, will allow for a smooth transition into chapter 11, and will maximize its chances for success in its reorganization, or the sale of its assets as a going concern, and thus also the ultimate recoveries for creditors.

## I.       BACKGROUND

## A.       General Overview of the Debtor's Business.

4.       The Debtor is a Nevada corporation that was originally incorporated in 1983 under the name Universal Distributing of Nevada, Inc., but changed its name in 2005 to AGA.  Kazuo Okada ("Mr. Okada") is the Debtor's sole shareholder.  Mr. Okada is a Japanese businessman who co-founded and is a former chairman of what is now known as Universal Entertainment Corporation ("Universal").  Universal has been a major supplier of machines to the Japanese pachinko and casino equipment industry since 1969.  In the early 2000's, Mr. Okada invested in Wynn Resorts in order to allow it to open its first casino in 2005 in Las Vegas, and a second one in 2006 in Macau.  In 2008, Mr. Okada also invested in the development of a hotel, resort and casino in the Philippines.

5.       AGA is a developer of gambling entertainment solutions for the global casino market, including video and mechanical stepper slots, traditional and electronic table games, and associated products.  As of the Petition Date, AGA has active gaming licenses in approximately 200 jurisdictions, including numerous countries, states, provinces, and tribal authorities.  AGA has a corporate headquarters operating out of leased space located at 6900 S. Decatur Boulevard, Las

---

[1] All capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the relevant Initial Motions, all of which are being filed at the same time as this Omnibus Declaration.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Vegas, Nevada.

6.      The Debtor has various affiliates located in foreign jurisdictions that are also owned or controlled by Mr. Okada, including but not limited to Aruze Gaming Technologies Co. Ltd., which handles maintenance, research and development for AGA, Aruze Phils Mfg. Inc., which runs a factory that manufactures AGA's machines and associated equipment, and Aruze Gaming (Hong Kong) Ltd., which owns and manages most of the foreign affiliates.  A chart depicting the corporate structure is attached as **Exhibit 1**.  These affiliate relationships are absolutely critical to the Debtor's success and without the support of these entities, and the Debtor's continuing to pay them, it will be difficult for the Debtor to continue as a going concern.  The foregoing chart was not updated to reflect the resignations that occurred shortly before the Petition Date.

7.      The Debtor's year end 2022 balance sheet indicated approximately $71 million in assets (excluding amounts due from related parties, investments, and intangibles), which consisted principally of about $16.3 million in accounts receivable (net), $23.2 million in inventory (net), $14.1 million in gaming equipment leased (net), $4.8 million in prepaid expenses and other current assets, and $4.1 million in other non-gaming property and equipment (net).  The Debtor's year end 2022 profit and loss statement indicated total revenues of approximately $97.1 million, but which ultimately generated a net loss of $2.4 million for the year.

8.      As hereinafter detailed, the Debtor has three (3) secured creditors:  a Bank Group (as hereinafter defined), which is owed approximately $20,789,496, and which is secured in substantially all of the Debtor's contracts and equipment placed in use at casinos and other gaming establishments; PDS Gaming, LLC ("PDS"), which is owed approximately $1,600,171.17, and which is secured in other inventory consisting of various gaming machines and related equipment generally not in service, as well as receivables pursuant to a separate agreement; and NextStep Gaming, LLC ("NSG"), which is owed approximately $2,000,000, and which was secured in all of the Debtor's "Roll To Win Craps" Tables (the "RTWC Tables").

9.      The Debtor's alleged unsecured creditors include Bartlt Beck, LLP ("Bartlit Beck"), which is a law firm that had previously represented Mr. Okada in unrelated litigation having nothing to do with AGA, and who had obtained a Judgment (as hereinafter defined) against

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Mr. Okada personally in 2021 in the amount of $54,641,079.48, and who very recently obtained a Garnishment Order (as hereinafter defined) in January 2023 allowing it rights to $27,365,120 that AGA owed Mr. Okada, which was the principal reason for AGA's bankruptcy filing. Additionally, as of the Petition Date, the Debtor owed in excess of $3 million of general unsecured trade debt incurred in the ordinary course of its business as well.

**B.**     **The Bank Group's Loans.**

    **1.**     **The Series A-B Loan.**

10.     On October 30, 2020, the Debtor, as borrower, and First Savings Bank ("FSB"), as lender, entered into a Loan Agreement (the "Series A-B Loan Agreement") for a Route Pool 2020-A-B Loan in the original principal amount of $15,000,000 (the "Series A-B Loan"), which debt was provided for in a separate Promissory Note (the "Series A-B Note"). True and correct copies of the Series A-B Loan Agreement and the Series A-B Note are attached as **Exhibit 2** and **Exhibit 3**, respectively.

11.     Pursuant to a Security Agreement (the "Series A-B Security Agreement")[2] of the same date, the Series A-B Loan was secured in all Contracts, which included AGA's contracts for equipment with any gaming enterprise, including the right to receive Payments under those Contracts, and the right to exercise the Debtor's rights and remedies upon default thereunder; all Equipment, which included all gaming device equipment owned by AGA and that was actively leased in a Route Pool, and to the extent directly proceeding from, or required to create or enforce the security interest of the secured party therein, all cash, chattel paper, contract rights, documents, money and payment intangibles pertaining to the Contracts and the Equipment; all Contract Security for each Contract, which included every guaranty, security interest, mortgage or other security for payment and performance of the obligor's obligations under the Contracts; all warranties and related rights with respect to such Contracts and the related Equipment; all awards of damages payable to the Debtor on account of the Equipment or Contracts; and all books and records pertaining to any of the foregoing; but excluding the proceeds of any Excluded Assets,

---

[2] All capitalized terms used in this paragraph have the same meanings as in the Series A-B Security Agreement.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

which excluded out any of the Debtor's rights and remedies under any Contract that was not Equipment (collectively, the "Bank Group Collateral").[3]  A true and correct copy of the Series A-B Security Agreement is attached as **Exhibit 4**.  Upon information and belief, on November 2, 2020 (as amended on June 8, 2021), FSB filed a UCC-1 financing statement with the Nevada Secretary of State to perfect its security interests in and to the Bank Group Collateral.[4]

2.    **The Series C Loan.**

12.    On January 26, 2021, the Debtor, as borrower, and National Servicing and Administration, LLC ("NSA"), as original lender, entered into a Loan Agreement (the "Series C Loan Agreement") for a Route Pool 2021-C-1 Loan in the original principal amount of $3,750,000 (the "Series C Loan"), which debt was provided for in a separate Promissory Note (the "Series C Note").  Pursuant to a Security Agreement of the same date (the "Series C Security Agreement"), in order to secure repayment of the Series C Loan, the Debtor granted a security interest in the same Bank Group Collateral to secure repayment of the Series C Loan, which also provided that that interest was *pari passu* with the prior interests under the Series A-B Loan as well. Northwestern Bank apparently is now the sole participant in the Series C Loan.  True and correct copies of the Series C Loan Agreement, the Series C Note, and the Series C Security Agreement are attached as **Exhibit 5**, **Exhibit 6**, and **Exhibit 7**, respectively.  Upon information and belief, on January 26, 2021 (as amended on June 8, 2021), NSA filed a UCC-1 financing statement with the Nevada Secretary of State to perfect its security interests in and to the Bank Group Collateral as granted in the Series C Security Agreement.

3.    **The Series D Loan.**

13.    On April 21, 2021, the Debtor, as borrower, and NSA, as original lender, entered into a Loan Agreement (the "Series D Loan Agreement") for a Route Pool 2021-D-1 Loan in the

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

---

[3] All capitalized terms used in this paragraph have the same meanings as given them in the Series A-B Security Agreement.

[4] The Debtor has ordered a copy of the UCC report from the Nevada Secretary of State, but is advised that it is over 1,000 pages long and costs more than $3,200, and thus apparently will not be delivered for up to a week.  Accordingly, the Debtor does not include any of those documents as exhibits herein, and thus cannot confirm whether and to the extent any security interests were properly perfected.

original principal amount of $1,000,000 (the "<u>Series D Loan</u>"), which debt was evidenced by a separate Promissory Note (the "<u>Series D Note</u>").  Pursuant to a Security Agreement of the same date (the "<u>Series D Security Agreement</u>"), in order to secure repayment of the Series D Loan, the Debtor granted a security interest in the same Bank Group Collateral, and which also provided that that interest was *pari passu* with the prior Series' interests as well.  Woodlands National Bank apparently is now the sole participant in the Series D Loan.  True and correct copies of the Series D Loan Agreement, the Series D Note, and the Series D Security Agreement are attached as **Exhibit 8**, **Exhibit 9**, and **Exhibit 10**, respectively (collectively, the "<u>Series D Loan Documents</u>"). Upon information and belief, on May 12, 2021 (as amended on June 8, 2021), NSA filed a UCC-1 financing statement with the Nevada Secretary of State to perfect its security interest in and to the Bank Group Collateral as granted in the Series D Security Agreement.

4.    <u>**The Series E Loan.**</u>

14.    On June 25, 2021, the Debtor, as borrower, and NSA, as original lender, entered into a Loan Agreement (the "<u>Series E Loan Agreement</u>") for a Route Pool 2021-E Loan in the original principal amount of $2,000,000 (the "<u>Series E Loan</u>"), which debt was evidenced by a separate Promissory Note (the "<u>Series E Note</u>").  Pursuant to a Security Agreement of the same date (the "<u>Series E Security Agreement</u>"), in order to secure repayment of the Series E Loan, the Debtor granted a security interest in the same Bank Group Collateral, and which also provided that that interest was *pari passu* with the prior Series' interests as well.  Bank of George apparently is now the sole participant in the Series E Loan.  True and correct copies of the Series E Loan Agreement, the Series E Note, and the Series E Security Agreement are attached as **Exhibit 11**, **Exhibit 12**, and **Exhibit 13**, respectively (collectively, the "<u>Series E Loan Documents</u>").  Upon information and belief, on June 29, 2021, NSA filed a UCC-1 financing statements with the Nevada Secretary of State to perfect its security interest in and to the Bank Group Collateral as granted in the Series E Security Agreement.

5.    <u>**The Series F Loan.**</u>

15.    On September 15, 2021, the Debtor, as borrower, and NSA, as original lender, entered into a Loan Agreement (the "<u>Series F Loan Agreement</u>") for a Route Pool 2021-F Loan in

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

the original principal amount of $1,000,000 (the "Series F Loan"), which debt was evidenced by a separate Promissory Note (the "Series F Note"). Pursuant to a Security Agreement of the same date (the "Series F Security Agreement"), in order to secure repayment of the Series F Loan, the Debtor granted a security interest in the same Bank Group Collateral, and which also provided that that interest was *pari passu* with the prior Series' interests as well. Bank of George apparently is now the sole participant in the Series F Loan. True and correct copies of the Series F Loan Agreement, the Series F Note, and the Series F Security Agreement are attached as **Exhibit 14**, **Exhibit 15**, and **Exhibit 16**, respectively (collectively, the "Series F Loan Documents"). Upon information and belief, on September 21, 2021, NSA filed a UCC-1 financing statement with the Nevada Secretary of State to perfect its security interest in and to the Bank Group Collateral as granted in the Series F Security Agreement.

  **6.**  **The Series G Loan.**

  16.  On October 28, 2021, the Debtor, as borrower, and NSA, as original lender, entered into a Loan Agreement (the "Series G Loan Agreement") for a Route Pool 2021-G Loan in the original principal amount of $1,000,000 (the "Series G Loan"), which debt was evidenced by a separate Promissory Note (the "Series G Note"). Pursuant to a Security Agreement of the same date (the "Series G Security Agreement"), in order to secure repayment of the Series G Loan, the Debtor granted a security interest in the same Bank Group Collateral, which also provided that that interest was *pari passu* with the prior Series' interests as well. Bank of George apparently is now the sole participant in the Series G Loan. True and correct copies of the Series G Loan Agreement, the Series G Note, and the Series G Security Agreement are attached as **Exhibit 17**, **Exhibit 18**, and **Exhibit 19**, respectively (collectively, the "Series G Loan Documents"). Upon information and belief, on November 1, 2021, NSA filed a UCC-1 financing statement with the Nevada Secretary of State to perfect its security interests in and to the Bank Group Collateral as granted in the Series G Security Agreement.

  **7.**  **The Series H Loan.**

  17.  On November 23, 2021, the Debtor, as borrower, and NSA, as original lender, entered into a Loan Agreement (the "Series H Loan Agreement") for a Route Pool 2021-H Loan

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

in the original principal amount of  $1,000,000 (the "Series H Loan"), which debt was evidenced by a separate Promissory Note (the "Series H Note").  Pursuant to a Security Agreement of the same date (the "Series H Security Agreement"), in order to secure repayment of the Series H Loan, the Debtor granted a security interest in the same Bank Group Collateral, which also provided that that interest was *pari passu* with the prior Series' interests as well.  True and correct copies of the Series H Loan Agreement, the Series H Note, and the Series H Security Agreement are attached as **Exhibit 20**, **Exhibit 21**, and **Exhibit 22**, respectively (collectively, the "Series H Loan Documents").  Upon information and belief, on November 29, 2021, NSA filed a UCC-1 financing statement with the Nevada Secretary of State to perfect its security interests in and to the Bank Group Collateral as granted in the Series H Security Agreement.

**8.    The Series 2022-A Loan.**

18.    On August 17, 2022, the Debtor, as borrower, and FSB, as lender, entered into a Loan Agreement (the "Series 2022-A Loan Agreement") for a Route Pool 2022-A Loan in the original principal amount of $8,000,000 (the "Series 2022-A Loan"), which debt was evidenced by a separate Promissory Note (the "Series 2022-A Note").  Pursuant to a Security Agreement of the same date (the "Series 2022-A Security Agreement"), in order to secure repayment of the Series 2022-A Loan, the Debtor granted a security interest in the same Bank Group Collateral, which also provided that that interest was *pari passu* with the prior interests as well.  FSB apparently remained as lead bank on the Series 2022-A Loan in the amount of $4 million, and four (4) other banks were also participants in the remaining balance, including Security State Bank, Commercial Bank, First State Bank, First Bank and Trust Company, and First Central Bank.  True and correct copies of the Series 2022-A Loan Agreement, the Series 2022-A Note, and the Series 2022-A Security Agreement are attached as **Exhibit 23**, **Exhibit 24**, and **Exhibit 25**, respectively (collectively, the "Series 2022-A Loan Documents").  Upon information and belief, NSA thereafter filed a UCC-1 financing statement with the Nevada Secretary of State to perfect its security interests in the Bank Group Collateral as granted by the Series 2022-A Security Agreement.

19.    The lenders for all of the foregoing Series loans are hereinafter collectively referred to as the "Bank Group."  The Bank Group does not have a deposit account control agreement with

AGA to provide it with control over any of AGA's bank accounts; rather, the proceeds received from the Bank Group Collateral are deposited into AGA's general operating account at Wells Fargo Bank, N.A. ("Wells Fargo"), and thus are not segregated from other general corporate funds. Additionally, the funds in AGA's general operating account at Wells Fargo is also not in the possession, custody or control of the Bank Group because Wells Fargo is not a member of the Bank Group.

**C.    The PDS Loans.**

**1.    The Inventory Sale and Purchase.**

20.    On September 22, 2020, the Debtor, on the one hand, and PDS Gaming, LLC, PDS Gaming-Nevada, LLC ("PDS Nevada"), PDS Gaming-Mississippi, LLC, and PDS Gaming-LA, LLC (collectively, "PDS"), on the other hand, entered into an Inventory Sale and Purchase Agreement (the "PDS Agreement").  The PDS Agreement provided that PDS is the owner of certain used, off-line gaming equipment that was acquired from the Debtor, as manufacturer of the equipment, pursuant to prior agreements between the parties, which equipment was currently out of service and located in PDS's warehouse in Las Vegas, Nevada.  The PDS Agreement further provided that the Debtor is the owner of certain similar, off-line gaming equipment that was also then currently out of service.  The parties agreed that the Debtor would purchase PDS's inventory and combine it with the Debtor's inventory as a single pool and to share, in an equitable manner as agreed to by the parties, the net proceeds derived from each such remarketing efforts out of that inventory pool, and regardless of whether such equipment was from the Debtor's or PDS's pool of inventory.  The PDS Agreement further provided that in order to accomplish the inventory pool, PDS would sell all of its current inventory, and for a designated time period, all subsequent inventory of the Debtor-manufactured equipment acquired by PDS that is off-line and returned to PDS from various end users of the equipment, at an agreed upon price to the Debtor, which purchase price the Debtor would pay by delivery of a non-recourse, interest-bearing promissory note secured by a first perfected lien and security interest in and to all of the Debtor's right, title and interest in and to the PDS inventory acquired thereunder, and all of the Debtor's other inventory.  The parties further agreed to use their best efforts to sell, lease, or otherwise place in

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

the ordinary course of its business the Pooled Inventory (as defined therein) and to distribute all proceeds derived from the remarketing of the Pooled Inventory, net of certain agreed upon costs, such that the portion attributable to PDS would be applied to pay accrued interest and principal due under the PDS Note, and the portion attributable to the Debtor would be retained by it.  A true and correct copy of the PDS Agreement is attached as **Exhibit 26**, which included a Schedule 1 No. A001 reflecting the inventory.

21.    The PDS Agreement was accompanied by a Bill of Sale detailing the inventory transferred (the "PDS Bill of Sale"), and the Debtor's obligation to repay PDS was set forth in a separate Non-Recourse Promissory Note (the "PDS Note") in the original principal amount of $1,972,205.00.  The PDS Note, and all amendments thereto as hereinafter referenced, are all non-recourse, and thus PDS can look only to the specific collateral for satisfaction, and a sum is payable only when machines from the specified group of inventory.  True and correct copies of the PDS Bill of Sale and the PDS Note are attached as **Exhibit 27** and **Exhibit 28**, respectively.

22.    The obligations owing by the Debtor to PDS under the PDS Agreement were secured by a separate Security Agreement (the "PDS Security Agreement") dated as of the same date, pursuant to which the Debtor granted PDS a security interest in identified PDS Inventory acquired by AGA, and any additional PDS Inventory acquired by AGA, as supplemented by various security agreement supplements; the AGA Inventory owned on the Closing Date and any Additional AGA Inventory that, from time to time, that becomes part of the Pooled Inventory, and as supplemented by each Security Agreement Supplement; and any installment sales contract, lease or other participation agreement entered into as a result of, or in furtherance of the remarketing of any such Pooled Inventory and all payments due thereunder; all equipment necessary for the commercial operation of the Pooled Inventory including but not limited to, software copyrights licensing rights, networking software licensing rights and hardware, communications equipment, and other technology licensing rights; and all accessions, replacements, products and proceeds thereof (collectively, the "PDS Collateral").[5]  A true and

---

[5] All capitalized terms in this paragraph are defined as they appear in the PDS Security Agreement.

correct copy of the PDS Security Agreement is attached as **Exhibit 29**. Upon information and belief, on September 24, 2020, PDS filed a UCC-1 financing statement with the Nevada Secretary of State to perfect its security interest in and to the PDS Collateral.

23.    On January 22, 2021, the Debtor and PDS entered into an Amended and Restated Non-Recourse Promissory Note (the "First Amended PDS Note"), which amended the prior obligation to reflect a sale of inventory in the amount of $181,645.18, thus leaving a remaining amount of $2,064,711.56 owing by the Debtor to PDS. The adjusted inventory post-sale was set forth in a Supplement No. 002A to the PDS Security Agreement. True and correct copies of the First Amended PDS Note, the Supplement No. 002A to PDS Security Agreement are attached as **Exhibit 30** and **Exhibit 31**, respectively.

24.    On April 23, 2021, the Debtor and PDS Nevada entered into an Amended and Restate Non-Recourse Promissory Note (the "Second Amended PDS Note"), which amended the prior obligation to reflect a sale of inventory in the amount of $91,253.49, thus leaving a remaining amount of $1,970,894.53 owing by the Debtor to PDS. The adjusted inventory post-sale was set forth in a Supplement No. 003A to the PDS Security Agreement. True and correct copies of the Second Amended PDS Note, the Supplement No. 003A to PDS Security Agreement are attached as **Exhibit 32** and **Exhibit 33**, respectively.

25.    On May 11, 2021, the Debtor and PDS Nevada entered into another Amended and Restated Non-Recourse Promissory Note (the "Third Amended PDS Note"), which amended the prior obligation to $1,817,718.11. A true and correct copy of the Third Amended PDS Note is attached as **Exhibit 34**.

26.    On July 31, 2021, the Debtor and PDS Nevada entered into another Amended and Restated Non-Recourse Promissory Note (the "Fourth Amended PDS Note"), which amended the prior obligation to reflect a sale of $5,023.00 of inventory, plus other payments, thus leaving a remaining principal amount owing by the Debtor to PDS of $1,600,171.17. The adjusted inventory post-sale was set forth in a Supplement No. 004A to PDS Security Agreement. True and correct copies of the Fourth Amended PDS Note, the Supplement No. 004A to PDS Security Agreement are attached as **Exhibit 35** and **Exhibit 36**, respectively.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

**2.      The Master Receivables Purchase Agreement**

27.      Also on September 22, 2020, the Debtor, as seller and servicer, and PDS Special Purpose I, LLC, as the purchaser, which is a wholly-owned subsidiary of PDS Gaming, LLC, entered into a Master Receivables Purchase Agreement (the "Receivables Purchase Agreement"), and a related Service Agreement (the "Receivables Service Agreement"), which provided the Debtor with the ability to offer financing to its customers to pay for its gaming machines and related contracts.   The Receivables Purchase Agreement was accompanied subsequently by approximately fifteen (15) Receivables Purchase Supplements (AGA01-AGA015), although certain of those have since been paid and closed, and accompanying Bills of Sale and Assignments for various tranches of receivables owed to the Debtor from its customers.  Although initial starting out as non-recourse to the Debtor, they later shifted to recourse in exchange for certain better terms. True and correct copies of the Receivables Purchase Agreement and Receivables Service Agreement are attached as **Exhibit 37** and **Exhibit 38**, respectively.

**D.      The NSG Loan.**

28.      NSG is an entity that was formed in 2021 to establish an alliance between the Debtor and NextStep Capital, LLC ("NextStep Capital") for the purpose of manufacturing, licensing, and sharing revenues in RTWC Tables.  NSG is owned 35% by the Debtor, and the remaining 65% is owned by NextStep Capital, which in turn is owned or controlled, directly or indirectly by Johan Finley and Rich Pennington.  Mr. Pennington is a former Director with AGA, but resigned shortly before the Petition Date.

29.      On June 1, 2021, as later amended and erestated, the Debtor and NSG entered into an Intellectual Property License Agreement (the "RTWC License Agreement"), and a RTWC Manufacture & License Agreement (the "RTWC Agreement"), pursuant to which AGA granted an exclusive license to NSG with respect to intellectual property related to the RTWC Tables.  The Debtor, in turn, contributed its rights under the RTWC License Agreement to NSG as its capital contribution, and NextStep was to contribute $7.5 million as its own capital contribution to NSG. True and correct copies of the RTWC License Agreement and the RTWC Agreement are attached as **Exhibit 39** and **Exhibit 40**.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

30.     At the same time, the Debtor, as assignor, and NSG, as assignee, entered into a Collateral Assignment of Table Games and Revenue Stream (the "NSG Collateral Assignment") for the purpose of securing the Debtor's obligations under the RTWC License Agreement and RTWC Agreement, and to create a security interest in favor of NSG in and to (a) all of the Debtor's lease agreements with casinos and other gaming establishments for its electronic table games during the term of the RTWC Agreement, (ii) all of the Debtor's electronic table games under the leases with customers under the RTWC Agreement, (iii) all payments due and to become due to the Debtor under the foregoing, (iv) all the Debtor's servers that are installed for the use of the electronic gaming tables under the foregoing, and (v) and to give NSG rights to insurance proceeds from the foregoing.  A true and correct copy of the NSG Collateral Assignment is attached as **Exhibit 41**.

31.     Also at the same time, the Debtor, as borrower, and NSG, as lender, entered into a Loan and Security Agreement (the "NSG Loan & Security Agreement") for a loan in the original principal amount of $2,000,000, which debt was evidenced by a Promissory Note (the "NSG Promissory Note"), which had a maturity date of April 1, 2024.  Pursuant to the NSG Loan & Security Agreement, and to secure repayment of its obligations under their arrangement, NSG was granted a security interest in all of the Debtor's now owned and hereafter acquired RTWC Tables not placed into service, as well as all proceeds, products, and books and records related to the foregoing, as well as all of the distributions the Debtor was entitled to receive as a member of NSG (collectively, the "NSG Collateral").  True and correct copies of the NSG Loan Agreement and the NSG Promissory Note are attached as **Exhibit 42** and **Exhibit 43**, respectively.  Upon information and belief, on June 16, 2021, as amended on July 20, 2021, NSG filed various UCC-1 financing statement with the Nevada Secretary of State to perfect its security interests granting under the NextStep Loan & Security Agreement.

### E.     The Bartlit Beck Judgment.

32.     Bartlit Beck, LLP ("Bartlit Beck") is a law firm with offices in Chicago and Denver, which had previously represented Mr. Okada personally in a multi-party, multi-billion-dollar lawsuit against Wynn Resorts and its then-CEO, Steve Wynn.  Wynn Resorts Limited v. Okada,

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Case No. A-12-646701-B.  AGA was not a party or involved in this litigation.  When the Wynn litigation settled, however, Mr. Okada refused to pay a $50 million "success" fee in Bartlit Beck's engagement agreement.

33.    On December 20, 2019, an arbitration panel entered an award in favor of Bartlit Beck and against Mr. Okada in the amount of $54,641,079.48, as well as post-award interest in the amount of $12,242.83 for each calendar day until he paid in full the amount awarded.

34.    On March 12, 2021, the U.S. District Court for the Northern District of Illinois, Case No. 19-cv-08508, confirmed the arbitration award and entered judgment in favor of Bartlit Beck and against Mr. Okada (the "Judgment").  This Judgment was not and has never been against AGA, but rather only against Mr. Okada personally.

35.    On or around April 21, 2021, Bartlit Beck began the domestication process of its Judgment in Nevada by filing an application for the same with the Eighth Judicial District Court, Clark County, Nevada (the "Nevada State Court"), as Case No. A-21-833071-B.

36.    On February 8, 2022, the U.S. Court of Appeals for the Seventh Circuit affirmed the Judgment in favor of Bartlit Beck.  Bartlit Beck LLP v. Okada, 25 F.4th 519 (7th Cir. 2022).

37.    On August 27, 2021, the Nevada State Court entered an order granting Bartlit Beck a charging order under NRS 78.746 as to all of Mr. Okada's dividends and proceeds owing from his ownership of stock in AGA (the "Charging Order"), but also directed that Bartlit Beck "must not interfere in the operations of AGA."  A true and correct copy of the Charging Order is attached as **Exhibit 44**.

38.    Not being satisfied with its Charging Order, on October 21, 2022, Bartlit Beck filed an *Application for Judgment Against Garnishee Aruze Gaming America, Inc.* (the "Garnishment Application"), which sought to garnish the monies AGA had on its books as being owed to Mr. Okada as a lender, and in partial satisfaction of its Judgment against Mr. Okada.

39.    On January 25, 2023, the Nevada State Court entered *Findings of Fact, Conclusions of Law, and Order* (the "Garnishment Order"), which granted Bartlit Beck's Garnishment Application, thereby effectively allowing it to seek to collect the sum of $27,365,120 that AGA carried on its books as being owed to Mr. Okada.  A true and correct copy of the Garnishment

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

Order is attached as **Exhibit 45**.

40.     AGA, separately from Mr. Okada, and through its own workout counsel, thereafter sought a forbearance or similar arrangement with Bartlit Beck to try to avert a bankruptcy filing, however, Bartlit Beck was noncommittal and indeed indicated that it would proceed with collection forthwith, thus leaving AGA seriously concerned that an execution on its bank accounts was imminent, which if permitted to happen, could have shut AGA down, or at least caused serious dislocation and damage to its business, as well as to all of the company's other creditors and parties in interest.  The Debtor also advised the Bank Group of this issue as well, who was also rightfully concerned about the same issues and the potential harm Bartlit Beck's actions could have on the Bank Group Collateral.

41.     On January 26, 2023, which was the day after the Nevada State Court entered the Garnishment Order in favor of Bartlit Beck, the Bank Group issued a Notice of Default to the Debtor, which asserted that various non-monetary events of default occurred under their loan documents.  A true and correct copy of this Notice of Default is attached as **Exhibit 46**.

42.     On January 31, 2023, AGA filed a *Motion to Alter or Amend Judgment or for Reconsideration* (the "Reconsideration Motion") of the Garnishment Order with the Nevada State Court, which argued, among other matters, that the monies on AGA's books payable to Mr. Okada were only payable to him on demand, and that Mr. Okada never called those loans due and indeed would not do so for many years because he knew that AGA did not have the ability to pay them. AGA's Reconsideration Motion was pending as of the Petition Date.  The Debtor reserves all rights and remedies in this regard.

43.     On the same date, the Bank Group issued a Notice of Acceleration to the Debtor under its loan documents, which also indicated that the entire sum of $20,789,496.00 under all of the Series' loan were immediately due and payable.  Additionally, the Bank Group also issued a letter to Wells Fargo, AGA's depository bank, which directed Wells Fargo to turn over all cash in AGA's bank accounts to the Bank Group, and to direct all future receipts to the Bank Group as well.  True and correct copies of the foregoing letters are attached as **Exhibit 47** and **Exhibit 48**, respectively.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

15

44.     Accordingly, faced with the imminent possibility that Bartlit Beck could enforce its Judgment directly against Mr. Okada's amounts owed to him by AGA pursuant to the Garnishment Order, which $27.3 million sum AGA clearly lacked the ability to pay, which in turn, also triggered defaults and an acceleration of the Bank Group's loans, which caused them also to take action to protect the Bank Group Collateral as well, AGA was left with no other choice but to seek bankruptcy protection in order to stop such actions by operation of the automatic stay and to allow it to continue in business.  AGA's bankruptcy thus was filed for the benefit of all creditors and parties in interest, to preserve value and sustain operations, and maintain its employees' jobs, thus also allowing it the ability either to restructure its financial affairs, or pursue a sale of its assets as a going concern, which should maximize the value of a recovery for all creditors.

45.     Upon information and belief, Bartlit Beck has been pursuing collection of its Judgment against Mr. Okada by various means and in other forums, other than Nevada State Court.  Rather frustratingly for all of AGA's other creditors and its employees, but for Bartlit Beck's unrelated Judgment against Mr. Okada, the Debtor was otherwise a financially healthy company generally paying all of its third-party, non-insider obligations as they became due in the ordinary course.  Additionally, at no time in at least the last decade of owning AGA did Mr. Okada ever receive any salary, dividend, or other distribution from AGA, and indeed he had specifically agreed not to seek payment of his loan to the company, and thus he was not ever diverting money out the company to avoid paying Bartlit Beck.  Instead, all of AGA's creditors and parties in interest are really "caught in the middle" between Bartlit Beck and Mr. Okada, and have now become collateral damage as a result given the Garnishment Order.

46.     Additionally, the shareholder debt owed to Mr. Okada on AGA's books is a debt to an insider, and thus likely will be subordinated to all other general unsecured non-insider claims and/or recharacterized as equity in this Chapter 11 Case.  Accordingly, Bartlit Beck, who through its Garnishment Order could only "step into the shoes" of Mr. Okada's lowest priority position -- and indeed subordinate to all other creditors in this case -- thus has little, if any, actual chance of being repaid as a result, yet it is Bartlit Beck's targeting of AGA for collection that left the company with no other choice but to file bankruptcy in the first place.  AGA obviously cannot

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

16

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

force Mr. Okada to pay the Judgment to Bartlit Beck, so why sacrifice AGA, and the interests of all of AGA's other creditors and parties in interest, with such a tactic?  Simply put, this is a "scorched earth" and ultimately counterproductive collection tactic by Bartlit Beck that will have the ultimate effect of forcing all of AGA's other creditors and parties in interest -- all of whom have a higher priority in payment than Bartlit Beck -- to bear the cost and expense of the Chapter 11 Case, thus also, quite ironically, likely leaving no recovery for Bartlit Beck as a result as well.

## II.    INITIAL MOTIONS

### A.    Introduction.

47.    On February 1, 2023 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-referenced Chapter 11 Case.  The Debtor's transition into Chapter 11 must be effectively organized to ensure that it will be able to operate smoothly in bankruptcy.  Accordingly, it is critical that the Debtor maintain its business, and minimize the distractions to its operations that could result from petitioning for Chapter 11 relief.

48.    I have reviewed and am generally familiar with the contents of each of the Initial Motions as hereinafter described.  With the assistance of the explanations provided to me by the Debtor's bankruptcy counsel at Larson & Zirzow, and its restructuring advisors at B. Riley Financial, the relief sought in each of the Initial Motions is necessary to enable the Debtor to operate in its Chapter 11 Case with minimal disruption and loss of value, and must be approved on an emergency basis in order to avoid immediate and irreparable harm to the Debtor's business.

### B.    Designation of Responsible Person Motion.

59.    As previously noted, I am the Debtor's Global Chief Executive Officer, and its Treasurer and a Director.  Accordingly, I am readily familiar with the Debtor's finances and operations.  Additionally, the Debtor's corporate resolution authorizing it to file bankruptcy attached to its *Voluntary Petition* [ECF No. 1] appointed me as the Debtor's responsible person in this Chapter 11 Case, and thus the Debtor seeks to implement the foregoing.  Accordingly, I am suitable for serving as a designated responsible person on the Debtor's behalf in its Chapter 11 Case, and my service as such is necessary and appropriate.

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

## C.    Cash Collateral Motion.

49.    In the case at hand, in the emergency, interim period consisting of the Petition Date of February 1, 2023 through February 24, 2023 -- the Debtor can survive on cash existing in its Bank Accounts at Wells Fargo as of the Petition Date.  With respect to such cash in the Debtor's Wells Fargo general operating account as of the Petition Date, the Bank Group does not have a deposit account control agreement with the Debtor to provide it with control over any of the Debtor's Bank Accounts; rather, the proceeds received from the Bank Group Collateral are deposited into the Debtor's general operating account at Wells Fargo, and thus are not segregated from other corporate funds.  Additionally, the funds in the Debtor's general operating account at Wells Fargo as of the Petition Date were also not in the possession, custody or control of the Bank Group because Wells Fargo is not a member of the Bank Group.  Accordingly, the Bank Group is not perfected in the Debtor's cash on hand in its general operating account as of the Petition Date, and thus the Debtor does not need the Bank Group's consent or Court approval to use such funds, but still files this Motion out of an abundance of caution, and also to provide its Budget for proposed use.

50.    The Debtor is proposing only this limited Budget through February 24, 2023, and not a longer term like a typical 13-week budget, because its professionals were only very recently retained within a matter of days prior to the Petition Date, and they need more time to prepare and analyze a longer-term budget.  The Debtor has proposed to send this draft longer term budget to the Bank Group by mid-next week so the parties can have a more intelligent discussion about it after the professionals have been more fully informed about the Debtor's situation, and also because the Debtor will need access to cash collateral after February, and indeed hopes that it will be able to negotiate a cash collateral stipulation with the Bank Group, and other potential secured creditors and/or parties requesting adequate protection, in the remainder of the month of February.

51.    The Debtor's Budget was carefully tailored and stripped down to only what is absolutely necessary to avoid immediately and irreparable harm pending a final hearing.  The Debtor is only seeking to use cash collateral to preserve, maintain and operate its business in the ordinary course and on an emergency basis until a Final Hearing.  Each expense included in the

Budget is a necessary and appropriate to the operation of the business. The Debtor's Budget projects that, through February 24, 2023 only, there will be a significant cash build for that period, starting from approximately $2.3 million as of the Petition Date, and rising to $4.6 million at the close of the month. This Budget includes no payments to any of the Debtor's foreign affiliates and also does not include certain other costs that will certainly be needed to be paid in March 2023 and onward, and thus the Debtor does not expect this position to improve after February. Regardless, at least for the emergency, interim period, all alleged secured creditors are adequately protected given this increase in the Debtor's cash position.

52.     The Debtor proposes to make one-time adequate protection payments to the Bank Group in the amount of $112,603, and to PDS in the amount of $5,674, for a total of $118,674 (collectively, the "Adequate Protection Payments"), which is approximately the interest that accrued on those debts at the contractual non-default basis, within five (5) business days of the entry of an order approving this Motion on an emergency, interim basis.

53.     Accordingly, the Debtor should be granted authority to use (alleged) cash collateral consistent with the Budget and the other terms and conditions as set forth herein, as such use to maintain the business, which provides any secured creditors, including the Bank Group and PDS, with adequate protection, to the extent they have interests entitled to protection.

54.     Finally, the Debtor's continued use of (alleged) cash collateral will generate additional revenue, which can be used to maintain its business, and thus based on the equities of the case, the Debtor should be granted authorization to use cash collateral in accordance with the Budget, and subject to making the Adequate Protection Payments to the Bank Group and PDS.

55.     If the Debtor is unable to obtain the immediate use of cash collateral and is denied the ability to use the income generated from the business pending the Final Hearing, it will be unable to maintain and operate its business and the Debtor will be forced to cease business operations with a resulting immediate and irreparable harm to the value of its business, and ultimately to the estate and its creditors.

**D.     Employee Compensation Motion.**

56.     As of the Petition Date, the Debtor had 112 employees (the "Employees") in the

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

ordinary course of its business whose continued service is vital to its ongoing operations and reorganization effort.  As of the Petition Date, the Employees were owed or had accrued in their favor various sums for wages, salaries, commissions, paid time off, employee benefit contributions, and business expense reimbursements all incurred in the ordinary course of the Debtor's business (collectively, the "Employee Obligations").  The Debtor seeks authorization to pay all of these Employee Obligations in the ordinary course of business, as more specifically detailed herein.

57.    The Debtor pays its Employees every two (2) weeks, and about one (1) week in arrears, with the most recent pay period running from January 22, 2023 through February 4, 2023, and which is payable on February 10, 2023.  The total gross amount of Employee Obligations that accrued on a pre-petition basis for this period (from January 22, 2023 through January 31, 2023), and with no single Employee being paid more $15,150.00 attributable to a pre-petition period, was $411,156.87 (the "Employee Compensation").

58.    A detailed payroll report and spreadsheet of all of the foregoing sums identifying the applicable employee and specific amount per Employee will be shared with the Office of the United States Trustee, and the Debtor will also still list all such claims on its bankruptcy Schedule E (Unsecured Priority Claims) when those are filed as well, and even though they are proposed to be paid immediately herein.

59.    The Debtor is required by law to withhold from the Employee Compensation amounts related to federal and state income taxes, as well as social security and Medicare taxes and to remit the same to the appropriate taxing authorities.  To the extent that the Debtor has deducted funds from the Employees' paychecks sufficient to pay prepetition taxes, withholding taxes and FICA contributions attributable to the Employee Compensation, which are due but have not been paid yet to any governmental entity, the Debtor seeks authorization to continue to deduct these funds and pay them to such governmental entities in the ordinary course of business.  In addition, the Debtor is required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the taxing authorities for, among other things, state

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

and federal unemployment insurance. The Debtor seeks authorization to continue to pay or turn over these funds to the applicable authorities in the ordinary course of business.

60.    In the ordinary course of its business, the Debtor also accrues amounts for contributions to health and benefit programs, pertaining to services rendered by the Employees prior to the Petition Date, which benefits include health plans (*i.e.* medical, dental, vision) and a 401(k) retirement plan.    These employee benefit contributions (the "Employee Benefit Contributions") are an integral part of the compensation to which the Employees are entitled.  The amount of Employee Benefit Contributions that will have accrued, but will remain unpaid, prior to the Petition Date and for this same pre-petition period (January 22, 2023 through January 31, 2023) is $63,948.67.  The Debtor seeks authorization to continue to pay such Employee Benefit Contributions in the ordinary course of business.

61.    In the ordinary course of their employment, certain authorized Employees have used their own personal credit cards or expended their own personal funds on behalf of and for the benefit of Debtor (the "Reimbursable Business Expenses").  The Chapter 11 Case was filed during the Debtor's normal reimbursement cycle for Reimbursable Business Expenses.  Accordingly, the Employees incurred Reimbursable Business Expenses in anticipation of receiving their standard reimbursements in accordance with the company's policies; however, as of the Petition Date, such obligations remain unreimbursed.  The total amount of Reimbursable Business Expenses that have not been reimbursed as of the Petition Date is $48,668.73.  Accordingly, the Debtor seeks authorization to pay such Reimbursable Business Expenses in the ordinary course of business and in accordance with its stated policies.

62.    Finally, under the laws of the State of Nevada, the Debtor is required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising from or related to their employment with the Debtor.  The Debtor currently maintains an annual workers' compensation policy (the "Workers' Comp Policy") pursuant to which it provides workers' compensation insurance coverage up to the statutory limits and up to $1,000,000 per occurrence for employer liability.  The current term of the Debtor's Workers' Comp Policy runs through December 31, 2023, and costs $37,626 per month, and the Debtor still needs to pay the

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

current month.  Accordingly, the Debtor seeks authority to maintain its Workers' Comp Policy in accordance with applicable law post-petition and to pay the current premium installment in the ordinary course of business.

63.    If Debtor is unable to take the necessary steps to ensure that wages, employee compensation, and taxes are paid for the pay period commencing immediately prior to the Petition Date, there is a significant risk that Employees will resign and that those Employees that do remain will be discontented and demoralized.  As such, continued payment of Employee Obligations and the Worker's Comp Policy is essential to maintain positive relations between Debtor and its Employees, as well as to comply with applicable State law.  If the relief requested herein is not granted, the success of Debtor's operations and reorganization will be placed in substantial jeopardy, and the Debtor will be in violation of various State laws.  Thus, the relief requested herein in the best interests of the estate, its creditors, and all parties in interest.

**E.    Cash Management Motion.**

64.    To manage its business efficiently, the Debtor utilizes a cash management system (the "Cash Management System") to collect and transfer funds generated by its operations and disburse those funds to satisfy the obligations required to operate its business.  The Debtor's Cash Management System facilitates its cash monitoring, forecasting, and reporting.

65.    In the ordinary course of business prior to the Petition Date, the Debtor used its Cash Management System to collect, transfer, and distribute funds generated by its business operations efficiently, and the Debtor accurately recorded such collections, transfers, and disbursements as they were made.  Given the existing Cash Management System and the confusion and inefficiency that would be caused by trying to change it, the Debtor has determined, in its business judgment, to continue its prepetition cash management practices in the post-petition period to a large extent.

66.    The Debtor's Cash Management System constitutes ordinary course, essential business practices providing significant benefits to Debtor including, *inter alia*, the ability to (i) control corporate funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

timely and accurate account balance information.  Any disruption of the Cash Management System could have a severe and adverse impact upon Debtor's value and reorganization effort.

67.    The Debtor will maintain its books and records relating to the Cash Management System to the same extent the books and records were maintained before the Petition Date.  In this way, all transfers and transactions will be properly documented, and accurate balances will be maintained.  As a result, the Debtor will be able to accurately document and record the transactions occurring within the Cash Management System for the benefit of all parties in interest.  Based on the foregoing, the Debtor believes that maintenance of the existing Cash Management System is in the best interests of its estate, and all creditors and parties in interest.

68.    Prior to the Petition Date, the Debtor maintained the following four (4) bank accounts all at Wells Fargo: (a) an account for collections related to its arrangement with PDS Gaming, LLC, Account No. *0281; (b) a zero balance account used for Payroll Sweep, Account No. *4149; (c) a general operating account, which is used for general operations, Account No. *7863; and (d) a certificate of deposit, Account No. *2792, an account for a commercial card security agreement for credit card program obligations (collectively, the "Bank Accounts").

69.    Wells Fargo is on the list of authorized depositories permitted by the Office of the United States Trustee for the District of Nevada for debtors to open debtor in possession accounts. Additionally, Wells Fargo has been provided notice of the Debtor's Chapter 11 Case, and as a result, and as is the Bank's common practice, has imposed a debit restraint on the Debtor's accounts until an appropriate order is entered approving cash management procedures. Additionally, in consultation with Wells Fargo's Deposits Bankruptcy Department, this Motion and the terms of the attached proposed form of order include appropriate language as required by Wells Fargo in order to allow the conversion of the Debtor's existing Bank Accounts into debtor in possession accounts, and also remove the debit restraint.

70.    Rigid adherence to the U.S. Trustee's "Operating Guidelines and Reporting Requirements For Debtors in Possession and Trustees" (the "Guidelines") would require, as of the Petition Date, the closure of Debtor's prepetition Bank Accounts, the opening of completely new accounts, and the immediate printing of new checks with a "Debtor in Possession" designation on

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

them.  The Debtor believes, however, that its transition to chapter 11 will be smoother, less costly, and more orderly, and disruption and harm to its Cash Management System will be minimized, if the Bank Accounts are continued following the commencement of its case with the same account numbers; *provided*, *however*, that checks issued or dated prior to the Petition Date will not be honored absent a prior order of the Court.

71.    Unless otherwise ordered by this Court, the Bank shall not honor or pay any check issued on account of a prepetition claim.  The Bank may honor any checks issued on account of prepetition claims only where this Court has specifically authorized such checks to be honored, such as pursuant to the separately filed motion regarding the payment of employee wages and independent contractor payments.  Furthermore, notwithstanding anything to the contrary in any other emergency and interim order or other order of this Court, the Debtor requests that the Bank be authorized to accept and honor all representations from the Debtor as to which checks should be honored or dishonored consistent with any order(s) of this Court, whether or not the checks are dated prior to, on, or subsequent to the Petition Date.  The Debtor further requests that the Bank should not be liable to any party for following the Debtor's instructions or representations regarding which checks should be honored.

72.    By preserving business continuity and avoiding disruption and delay to the Debtor's disbursement obligations, including in particular an employee payroll that is due shortly after the Petition Date and which is the subject of a separate "first day" motion herein, that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and customers, will be best-served.

73.    Accordingly, the Debtor requests authority to maintain its Bank Accounts at Wells Fargo in the ordinary course of business, to continue utilizing the Cash Management System to manage cash in a manner consistent with prepetition practices, and to pay any ordinary course bank fees and service charges that may be incurred in connection with the Bank Accounts or any other new bank account that may be opened pursuant to an order of this Court following the Petition Date.

74.    Finally, to minimize expenses, the Debtor also requests that it be authorized to

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

24

continue to use its existing check stock and wire/ACH payment forms, without alteration.  If the Debtor is not permitted to maintain and utilize its existing business forms, the resultant prejudice will include significant disruption to its ordinary financial affairs and business operations, delay in the administration of the estate, and cost to the estate value time -- and at a very important time in the case that will be highly prejudicial -- in setting up new systems and forms.

F.    **Utilities Motion.**

75.    In the ordinary course of operating its business, the Debtor incurs utility expenses for electricity (NV Energy), natural gas (Southwest Gas), water (Las Vegas Valley Water District), water reclamation (Clark County Water Reclamation District/City of Las Vegas), internet (Cox Communications), recycling (Nevada Recycling Henderson), and refuse removal (Republic Services) (collectively, the "Utility Providers").  In particular, the Debtor leases certain commercial real estate for its operations, which lease terms require the Debtor to be responsible for the payment of its own utility charges.

76.    On average, the Debtor expends approximately $12,800 in the aggregate and on average each month on utility costs.  As of the Petition Date, the Debtor is current on all of its utility obligations owed to its utility providers, except for current accrued amounts that have not been billed as of yet in the middle of the applicable billing cycle.

77.    Preserving utility services on an uninterrupted basis is essential to the Debtor's ongoing operations and, therefore, to the success of its reorganization.  Any interruption of utility services, even for a brief period of time, would disrupt the Debtor's ability to continue maintaining its business, thereby negatively affecting customer relationships, revenues and profits.  Such a result could jeopardize the Debtor's reorganization efforts and, ultimately, value and creditor recoveries.  It is therefore critical that utility services continue uninterrupted during the Chapter 11 Case.

78.    The Debtor intends to pay its post-petition utility obligations owed to the Utility Providers in a timely manner and keep them current on a go forward basis from and after the Petition Date.  The Debtor expects that it will have access to such funds from operations to pay post-petition obligations to the Utility Providers.  Given the relatively minor monthly obligations

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

usually owing to Utility Providers as compared with the Debtor's cash flow generated from operations, and the long account history spanning several years without issues, the Debtor asserts that there is no need to provide any additional assurance of payment for future services to the Utility Providers.

79.    Notwithstanding the foregoing, if the Utility Providers are not satisfied that they have received adequate assurance of future payment, the Debtor proposes the procedures (the "Procedures") outlined in the Motion under which such dissatisfied Utility Provider may make additional requests for adequate assurance.  The Debtor further requests that all Utility Providers be prohibited from altering, refusing, or discontinuing utility services to the Debtor absent further order of the Court.

80.    The Debtor believes it will have sufficient resources to pay, and intends to pay, all valid post-petition utility obligations for utility services in a timely manner.  In addition, the Debtor has a powerful incentive to stay current on its utility obligations because of the Debtor's reliance on utility services for the operation of its business.  These factors, which the Court may (and should) consider when determining the amount of any adequate assurance payments, justify a finding that no adequate assurance payment is required in this Chapter 11 Case.  In light of the foregoing, the Debtor respectfully submits that the existing arrangements for the Utility Providers are more than sufficient to assure the Utility Providers of future payment.

81.    Moreover, if a Utility Provider disagrees with the Debtor's analysis, the Procedures will enable the parties to negotiate and, if necessary, seek Court intervention without jeopardizing the Debtor's continuing operations.  If a Utility Provider fails to timely file a Request in accordance with the Procedures, however, such Utility Provider should be deemed to consent to the Procedures and shall be bound by any order approving this Motion.

82.    The proposed Procedures are necessary for the Debtor to carry out its reorganization efforts.  If such Procedures are not approved, the Debtor could be forced to address a volume of requests by its Utility Providers during the critical first weeks of its reorganization. Moreover, the Debtor could be blindsided by a Utility Provider unilaterally deciding -- on or after the 30th day following the Petition Date -- that it is not adequately protected and discontinuing

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

service or making an exorbitant demand for payment to continue service.  Discontinuation of utility service would force operations to cease, and such disruption of operations could place the Debtor's bankruptcy case in jeopardy.

I declare under penalty of perjury that these facts are true and correct to the best of my knowledge and belief.

DATED:  February 6, 2023.

*/s/ Yugo Kinoshita*
YUGO KINOSHITA

LARSON & ZIRZOW, LLC
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169