LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ.
Nevada Bar No. 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
E-mail: mzirzow@lzlawnv.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: (702) 382-1170

Attorneys for Debtor

SCHWARTZ LAW, PLLC
SAMUEL A. SCHWARTZ, ESQ., NVB 10985
Email:  saschwartz@nvfirm.com
GABRIELLE A. HAMM, ESQ., NVB 11588
Email:  ghamm@nvfirm.com
601 East Bridger Avenue
Las Vegas, NV 89101
Tel: (702) 802-2207

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
ORI KATZ, ESQ. (*pro hac vice*), CBN 209561
E-mail:  okatz@sheppardmullin.com
JEANNIE KIM, ESQ. (*pro hac vice*), CBN 270713
Email: jekim@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Tel: (415) 434-9100

JENNIFER L. NASSIRI, ESQ.
  (pro hac vice), CBN 209796
Email:  jnassiri@sheppardmullin.com
1901 Avenue of Stars, Suite 1600
Los Angeles, CA 90067
Tel: (310) 228-3700

Attorneys for the Official Committee of Unsecured
Creditors of Aruze Gaming America, Inc.

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

In re:

ARUZE GAMING AMERICA, INC.,

Debtor.

Case No. 23-10356-abl
Chapter 11

## COMBINED CHAPTER 11 PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT JOINTLY PROPOSED BY DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................... 1

EXECUTIVE SUMMARY .......................................................................................... 1

Article 1 RULES OF INTERPRETATION, COMPUTATION OF TIME,  GOVERNING LAW AND DEFINED TERMS .................................... 1

    A.    Rules of Interpretation, Computation of Time and Governing Law ................................. 1

    B.    Defined Terms ....................................................................................... 2

    C.    Computation of Time ............................................................................ 2

Article 2 DISCLOSURES REGARDING THE DEBTOR ........................................ 2

    A.    Debtor's Historical Background ........................................................... 2

    B.    The Debtor's Prepetition Capital Structure ......................................... 3

    C.    Events Precipitating the Bankruptcy Case ........................................... 6

    D.    Main Events in the Bankruptcy Case .................................................... 8

    E.    Committee Standing and D&O Litigation .......................................... 17

    F.    The Debtor's Assets and Liabilities .................................................... 17

Article 3 TREATMENT OF UNCLASSIFIED CLAIMS, ADMINISTRATIVE CLAIMS,  PRIORITY TAX CLAIMS AND PROFESSIONAL FEE CLAIMS ............ 18

    A.    General .............................................................................................. 18

    B.    Administrative Claims and Administrative Claims Bar Date ............... 18

    C.    Priority Tax Claims ........................................................................... 19

    D.    Professional Fee Claims and Final Fee Applications ......................... 19

Article 4 CLASSIFICATION AND TREATMENT  OF CLASSIFIED CLAIMS AND INTERESTS ................................................. 19

    A.    Summary ............................................................................................ 19

    B.    Classification and Treatment of Classified Claims and Equity Interests ......................... 20

Article 5 ACCEPTANCE OR REJECTION OF THE PLAN ................................. 22

    A.    Acceptance by an Impaired Class ....................................................... 22

    B.    Nonconsensual Confirmation ............................................................. 22

Article 6 MEANS FOR IMPLEMENTATION OF THE PLAN ............................. 22

    A.    Sale of Assets and Funding of Distributions Under the Plan ............. 22

    B.    Continued Existence of the Debtor ..................................................... 23

    C.    Incorporation of Prior Agreements Approved During the Bankruptcy Case ................ 23

    D.    Establishment of, and Vesting of Assets in, the Liquidating Trust ................ 23

    E.    Duties, Rights and Powers of the Liquidating Trustee ...................... 23

    F.    Binding Effect of Plan. ....................................................................... 24

| | | |
|---|---|---|
| G. | Non-Discharge of the Debtor; Injunction. | 24 |
| H. | Exculpation and Limitation of Liability. | 24 |
| I. | Term of Injunctions or Stays. | 25 |
| J. | Dissolution of the Debtor | 25 |
| K. | No Agency Relationship and Limitation of Liability of the Liquidating Trustee | 25 |
| L. | Establishment of Liquidating Trust and Vesting of Liquidating Trust Assets | 26 |
| M. | Cancellation of Notes, Instruments, Debentures and Equity Securities | 27 |
| N. | Dissolution of the Committee | 27 |
| O. | Closing of the Debtor's Chapter 11 Case | 27 |

Article 7 PROVISIONS GOVERNING DISTRIBUTIONS .......................................... 28

| | | |
|---|---|---|
| A. | Timing and Delivery of Distributions on General Unsecured Claims | 28 |
| B. | Objections to and Resolution of Disputed Claims | 28 |
| C. | Estimation of Claims | 28 |
| D. | Time-Barred Claims and Amendments to Claims | 29 |
| E. | Interest on Distributions | 29 |
| F. | Delivery of Distributions | 29 |
| G. | Unclaimed Distributions | 29 |
| H. | Means of Cash Payment | 30 |
| I. | Compliance with Tax Requirements | 30 |
| J. | Distribution Record Date | 30 |
| K. | Fractional Cents | 30 |
| L. | Insurance Policies | 30 |

Article 8 CONDITIONS TO CONFIRMATION AND EFFECTIVENESS ......................... 30

| | | |
|---|---|---|
| A. | Conditions to Confirmation | 30 |
| B. | Conditions to Plan Effectiveness | 31 |
| C. | Waiver of Conditions | 31 |

Article 9 TREATMENT OF EXECUTORY CONTRACTS AND LEASES ........................ 31

| | | |
|---|---|---|
| A. | Contracts and Leases Not Specifically Assumed and Assigned are Rejected | 31 |
| B. | Bar Date for Filing Claim for Rejection Damages | 32 |
| C. | Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired Leases | 32 |

Article 10 RETENTION OF JURISDICTION ............................................................. 32

| | | |
|---|---|---|
| A. | Jurisdiction over Claims and Actions | 32 |
| B. | Retention of Jurisdiction | 32 |

Article 11 NOTICE PROVISIONS ........................................................................... 34

| | | |
|---|---|---|
| A. | Notices | 34 |

B.      Limitation on Notice ..................................................................................... 35

Article 12 MISCELLANEOUS PROVISIONS ......................................................................... 35

A.      U.S. Trustee Fees ........................................................................................... 35

B.      Post-Effective Date Injunctions or Stays ...................................................... 35

C.      Setoffs/Counterclaims .................................................................................... 35

D.      Amendment or Modification of the Plan ....................................................... 36

E.      Revocation and Withdrawal of the Plan ........................................................ 36

F.      Severability .................................................................................................... 36

G.      Exemption from Certain Taxes and Fees ...................................................... 37

H.      Business Days ................................................................................................. 37

I.       Governing Law ............................................................................................... 37

J.       Headings ......................................................................................................... 37

K.      Exhibits .......................................................................................................... 37

L.      Entire Agreement ........................................................................................... 38

## INTRODUCTION

Aruze Gaming America, Inc., a Nevada corporation and the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 bankruptcy case, and the Official Committee of Unsecured Creditors of Aruze Gaming America, Inc. (the "Committee," and together with the Debtor, the "Plan Proponents"), jointly propose this combined chapter 11 plan of liquidation and disclosure statement (the "Plan") for resolving outstanding Claims against, and Interests in, the Debtor.  The Debtor and Committee are joint proponents of the Plan within the meaning of Bankruptcy Code section 1129.

A hearing on Confirmation of the Plan will be held on **November 28, 2023, at 1:30 p.m.**, as described in the enclosed notice (the "Confirmation Hearing Notice").  The date the Bankruptcy Court enters its order confirming the Plan will be the Confirmation Date.  The Effective Date of the Plan will be the first Business Day after the Confirmation Date when all the conditions precedent to effectiveness in Article XIII of this are satisfied or waived.

You may be entitled to vote on the Plan, or to object to Confirmation of the Plan.  Enclosed in the package containing this Plan are (1) a Ballot that may be used to vote on the Plan, along with (2) the Confirmation Hearing Notice.  Please refer to the Confirmation Hearing Notice for the deadline to return the Ballot and the deadline to file objections to Confirmation of the Plan.

Whether the Plan is confirmed is subject to complex legal rules that cannot fully be described here.  You are strongly encouraged to read the Plan carefully and to consult an attorney to help you determine how to vote and whether to object to Confirmation of the Plan.

### EXECUTIVE SUMMARY

The Plan provides for the liquidation of the Debtor and is premised on the establishment of a Liquidating Trust.  On the Effective Date, all Assets of the Debtor's Estate will vest in the Liquidating Trust.  The ultimate recovery to Creditors beyond the funds that will be available from the Initial Trust Assets will depend almost entirely on (1) the enforcement and collection related to certain accounts receivable of the Debtor; (2) the Debtor's rights and remedies against certain former and current directors and officers of the Debtor; and (3) prosecution of Disputed Claims.  No such recovery is guaranteed.

The Plan Proponents believe, each in its respective business judgment, that the terms of this Plan provide a better recovery to Creditors of the Debtor's Estate than recovery under a chapter 7 liquidation if the Bankruptcy Case were to convert to a case under chapter 7 that will be filed with the Plan Supplement (the "Liquidation Analysis").  Therefore, the Plan Proponents believe that Confirmation of the Plan is the superior outcome in this Bankruptcy Case.

### ARTICLE 1
### RULES OF INTERPRETATION, COMPUTATION OF TIME,
### GOVERNING LAW AND DEFINED TERMS

**A.    Rules of Interpretation, Computation of Time and Governing Law**

For purposes of this document: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the

masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions or as may have been amended under its terms; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles in this Plan; (e) unless otherwise stated, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in Bankruptcy Code section 102 shall apply; (h) any term used in capitalized form in this Plan and not defined in the Plan (including in the Appendix) but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (i) all references to amounts to be paid from the Liquidating Trustee or the Debtor mean amounts to be paid from such parties under the Plan.

**B.    Defined Terms**

As used in the Plan, capitalized terms have the meanings stated in the Appendix appended to this Plan and are incorporated into the Plan by this reference.

**C.    Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

**ARTICLE 2**
**DISCLOSURES REGARDING THE DEBTOR**

**A.    Debtor's Historical Background**

The Debtor is a Nevada corporation originally incorporated in 1983 under the name Universal Distributing of Nevada, Inc., but which changed its name in 2005 to Aruze Gaming America, Inc. Kazuo Okada ("Mr. Okada") is the Debtor's sole shareholder. Mr. Okada is a Japanese businessman who co-founded and is a former chairman of what is now known as Universal Entertainment Corporation ("Universal"). Universal has been a major supplier of machines to the Japanese pachinko and casino equipment industry since 1969. In the early 2000's, Mr. Okada invested in Wynn Resorts to allow it to open its first Las Vegas casino in 2005, and then a second casino in Macau in 2006. In 2008, Mr. Okada also invested in the development of a hotel, resort and casino in the Philippines.

As of the Petition Date, AGA was a developer of gambling entertainment solutions for the global casino market, including video and mechanical stepper slots, traditional and electronic table games, and associated products. As of the Petition Date, AGA had active gaming licenses in approximately 200 jurisdictions, including numerous countries, states, provinces, and tribal authorities. As a result of certain events that have transpired during the Bankruptcy Case, including the sale of a significant portion of AGA's Assets used to operate its prepetition business of developing, manufacturing, selling, and distributing gambling entertainment solutions for the global

casino market, the Debtor maintains a small staff of independent contractors to wind down its operations as described in this Plan.

As of the Petition Date, the Debtor had various affiliates in foreign jurisdictions that Mr. Okada also owns or controls, including but not limited to Aruze Gaming Technologies Co. Ltd., which handles maintenance, research and development for AGA, Aruze Phils Mfg. Inc., which runs a factory that manufactures AGA's machines and associated equipment, and Aruze Gaming (Hong Kong) Ltd., which owns and manages most of the foreign affiliates. On February 6, 2023, AGA filed with the Bankruptcy Court the Kinoshita First Day Declaration, describing in greater detail the Debtor's historical corporate structure and financial affairs.

**The Plan Proponents recommend that all Creditors and parties in interest review the Kinoshita First Day Declaration and the supporting exhibits attached to the Kinoshita First Day Declaration for additional information and details, including primary documents, described in this Plan to provide Creditors and parties in interest with enough information to information to allow a Creditor to make an "informed judgment" on whether to approve or object to the Plan.** *See* 11 U.S.C. § 1125(a).

The Debtor's year end 2022 balance sheet indicated approximately $71 million in assets (excluding amounts due from related parties, investments, and intangibles), which consisted principally of about $16.3 million in accounts receivable (net), $23.2 million in inventory (net), $14.1 million in gaming equipment leased (net), $4.8 million in prepaid expenses and other assets, and $4.1 million in other non-gaming property and equipment (net). The Debtor's year end 2022 profit and loss statement indicated total revenues of approximately $97.1 million, but which ultimately generated a net loss of $2.4 million for the year.

**B. The Debtor's Prepetition Capital Structure**

As described below, the Debtor had three Secured Creditors as of the Petition Date: (1) the Bank Group, which was owed approximately $20,789,496, in the aggregate, and secured in substantially all of the Debtor's contracts and equipment placed in use at casinos and other gaming establishments; (2) PDS Gaming, which asserted Claims of approximately $2,510,669, in the aggregate, and secured in other inventory consisting of various gaming machines and related equipment generally not in service, as well as receivables under a separate agreement; and (3) NSG, a joint venture of which the Debtor owned a 35% membership interest, which was owed approximately $2,000,000, and secured in all of the Debtor's "Roll To Win Craps" (RTWC) Tables.

1. <u>The Bank Group Secured Claims.</u> As described in greater detail in the Kinoshita First Day Declaration, as of the Petition Date, AGA, as borrower, owed to certain financial institutions including, among others, First Savings Bank and National Servicing and Administration, LLC (NSA), amounts totaling, in the aggregate, $20,789,496, under those certain loan agreements and promissory notes that comprise the Bank Group Loans. In connection with the Bank Group Loans, AGA granted to the Bank Group a security interest in certain personal property. Below is a summary of the various loan agreements and the collateral securing AGA's obligations to the Bank Group. Detailed descriptions of AGA's obligations to the Bank Group and the Bank Group Collateral are set forth in the Appendix, under the definitions of the Bank Group Loans listed below.

SMRH:4890-7774-3491.7
101223
89BG-371272

| Loan | Original Lender | Principal Amount | Collateral |
|------|-----------------|------------------|------------|
| Series A-B Loan | FSB | $15,000,000 | Bank Group Collateral |
| Series C Loan | NSA | $3,750,000 | Bank Group Collateral |
| Series D Loan | NSA | $1,000,000 | Bank Group Collateral |
| Series E Loan | NSA | $2,000,000 | Bank Group Collateral |
| Series F Loan | NSA | $1,000,000 | Bank Group Collateral |
| Series G Loan | NSA | $1,000,000 | Bank Group Collateral |
| Series H Loan | NSA | $1,000,000 | Bank Group Collateral |
| Series 2022-A Loan | FSB | $8,000,000 | Bank Group Collateral |

2.     The PDS Secured Claims.  AGA has relationships with certain PDS Entities, which transactional relationships the PDS Entities contend entitles the relevant PDS Entity to either (a) ownership of the proceeds of certain contractual arrangements with the Debtor, or (b) a properly perfected first priority security interest in the proceeds of such respective transactions.  On June 7, 2023, PDS Gaming, LLC filed the PDS Claim, and thereby asserted a total alleged Secured Claim of $2,442,562.87 under the prepetition agreements documenting the following transactional relationships between the Debtor and the relevant PDS Entity:

(a)     *Route Equipment Serviced by Debtor*.  Under that certain *Sale and Purchase Agreement* dated December 26, 2018 (the "SPA"), between AGA and PDS Gaming, AGA sold to PDS Gaming (on its own behalf and on behalf of its wholly owned subsidiaries), certain equipment (400+ games) subject to leases or participation agreements between PDS Gaming and its wholly owned subsidiaries and gaming operators.  Full title to and ownership of the equipment transferred to PDS Gaming upon shipment by AGA to the gaming operator.  PDS Gaming purchased the lease and participation agreements with the equipment and is paid by the gaming operators under the leases.  Any Cash received by AGA with respect to this equipment and the associated leases is the property of PDS Gaming (on its own behalf and on behalf of its wholly owned subsidiaries) and AGA is merely acting as a servicer collecting proceeds on behalf of PDS Gaming.

(b)     *Used Games*.  Under that certain *Inventory Sale and Purchase Agreement* dated September 22, 2020 (the "ISPA"), between AGA and PDS Gaming, PDS Nevada, PDS Mississippi, and PDS LA, AGA purchased from these PDS Entities certain used, off-line gaming equipment owned by the PDS Entities, for resale, leasing, or otherwise placing with gaming operators, together with used, off-line equipment.  The ISPA provides for the distribution of the net proceeds from these gaming operator transactions to be distributed between the Debtor and the PDS

Entities, with the PDS Entities' payments evidenced by a promissory note (as amended from time) executed by the Debtor in favor of the PDS Entities. PDS alleged that the note(s) are secured by a first perfected Lien and security interest in all of AGA's interest in (i) "PDS Inventory" acquired by AGA, (ii) "AGA Inventory" owned by AGA, (iii) all leases, sales contracts or participation agreements related to the "Remarketing" of the "Pooled Inventory," collaterally assigned by AGA to the PDS Entities, and (iv) all proceeds, products, substitutions and replacements thereof. As of September 14, 2023, the PDS Entities alleged that the amounts due and owing by AGA to PDS Gaming was $373,589.96 in Cash collected by AGA, and $61,140 for equipment sold but not yet collected.

(c)    *White Label Program*.   Under that certain *Master Receivables Purchase Agreement and Receivables Service Agreement* dated September 20, 2022 ("MRPA"), PDS SP1 is the "purchaser" and finances sales or leases of new gaming equipment by AGA to AGA's customers.   PDS SP1 provides financing options to AGA's customers by purchasing the *Sales Contracts and Finance Contracts* from AGA.   As a result, PDS Gaming has acquired twelve contracts of AGA, resulting in payables due and owing to PDS Gaming under its contract rights.   The Cash derived from these receivables belongs to PDS SP1/PDS Gaming and AGA merely collected those receivables on behalf of PDS SP1 and PDS Gaming.

(d)    *Receivables*.   Additionally, AGA sold other games receivables to PDS Gaming for which compensation the PDS Entities allege was due and owing to PDS Gaming as of September 14, 2023.

3.    <u>The NSG Loan</u>.   NSG was formed in 2021 to establish an alliance between AGA and NSC to manufacture, license and share revenues generated from the RTWC Tables.   In establishing NSG, AGA contributed to NSG as its capital contribution its rights under the RTWC License Agreement (described below), and NSC contributed to NSG $7,500,000 as its own capital contribution.   As of the Petition Date, NSG was owned 35% by AGA, and 65% by NSC.

As of the Petition Date, AGA and NextStep were parties to the various NextStep Agreements, resulting in the NextStep Outstanding Balance, which NextStep alleged constitute Secured Claims totaling not less than $1,829,940.   The NextStep Outstanding Balance is based on the NextStep Agreements described below and in the Appendix:

(a)    *RTWC License Agreement*.   Under the RTWC License Agreement, AGA granted to NSG an exclusive license to use certain intellectual property related to the RTWC Tables.   The RTWC License Agreement further provides that, among other things, NSG has the exclusive right to sublicense the intellectual property for manufacturing the RTWC Table Games and use of the RTWC Table Game.   Additionally, under the RTWC License Agreement, NSG appointed AGA as the exclusive third-party RTWC Table Games sublicensee for any jurisdiction in which AGA has the necessary gaming approval or otherwise is authorized by the applicable gaming authority to place RTWC Tables.   In exchange, among other obligations, AGA had monthly payment obligations (including License Fees as defined under the

RTWC License Agreement) to NSG dependent on whether the RTWC Tables are still generating revenue, and if not generating revenues, for a specified period.

(b)     *NSG Promissory Note*.  Under the NSG Promissory Note, AGA had an obligation to repay to NSG $2,000,000 by April 1, 2024.

(c)     *June 2022 Purchase Agreement*.  Under the June 2022 Purchase Agreement, AGA sold to NSC for a purchase price of $700,000 the distributions that AGA was entitled to receive from NSG.  As a result, AGA pays to NSG those certain distributions to which AGA was entitled as a member of NSG.  If actual distributions to AGA were insufficient to pay to NSC the stated distribution amounts listed on that June 2022 Distribution Schedule (defined in the Appendix), AGA was responsible for paying such deficiencies to NSC.

(d)     *September 2022 Purchase Agreement*.  AGA and NSC also were parties to the September 2022 Purchase Agreement, under which AGA sold to NSC for a purchase price of $600,000, the distributions to which AGA was entitled to receive from NSG.  If actual distributions to AGA were insufficient to pay to NSC the stated distribution amounts listed on that September 2022 Distribution Schedule (defined in the Appendix), AGA was responsible for paying such deficiencies to NSC.

(e)     *NSG Collateral Assignment*.  AGA and NSG are parties to the NSG Collateral Assignment, which: (1) secures AGA's obligations under the RTWC License Agreement and the RTWC Agreement, and (2) creates a security interest in favor of NSG in and to (i) all of AGA's Leases (as defined in the NSG Collateral Assignment), (ii) all of the Debtor's Tables under the Leases, (iii) all payments due and to become due to the Debtor under the Leases, and (iv) all the Debtor's servers installed for the Tables.  The NSG Collateral Assignment also grants NSG rights to insurance proceeds as set forth therein.

(f)     *PDS Obligation*.  Postpetition, on or around June 12, 2023, NSG paid to the PDS Entities $650,000 because of amounts due and owing by NSG to the PDS Entities under that certain loan agreement between NSG and PDS.

C.     **Events Precipitating the Bankruptcy Case**

1.     <u>The Bartlit Beck Judgment Against Mr. Okada</u>.  Prepetition, Bartlit Beck represented Mr. Okada personally in a multi-party, multi-billion-dollar lawsuit against Wynn Resorts and its then-CEO, Steve Wynn, in the Wynn Litigation.  AGA was not a party or involved in the Wynn Litigation.  When the Wynn Litigation settled, however, Mr. Okada refused to pay to Bartlit Beck a $50 million "success" fee as agreed under the Bartlit Beck Engagement Agreement.

To enforce amounts due and owing from Mr. Okada to Bartlit Beck, Bartlit Beck pursued and obtained the following remedies:  (a) the Arbitration Award; (b) the BB Judgment; (c) the Domestication; (d) the Charging Order; (e) the Garnishment Application; and (f) the Garnishment Order.

Once AGA learned of the Garnishment Application, AGA, separately from Mr. Okada and through its own workout counsel, sought a forbearance or similar arrangement with Bartlit Beck to avert a bankruptcy filing. As Bartlit Beck indicated that it would proceed with collection and enforcement of its garnishment proceedings, AGA had serious concerns about Bartlit Beck's imminent execution on AGA's Bank Accounts, which if permitted, could have forced AGA to cease operations, or at a minimum, caused serious damage to AGA's business operations, thereby potentially harming all of AGA's other Creditors and parties in interest.

After entry of the Garnishment Order but before the Petition Date, AGA filed a *Motion to Alter or Amend Judgment or for Reconsideration* (the "Reconsideration Motion") of the Garnishment Order with the Nevada State Court on January 31, 2023. The Reconsideration Motion argued, among other matters, that the monies on AGA's books payable to Mr. Okada were only payable to him on demand, and that Mr. Okada never called those loans due and would not do so for many years because he knew that AGA could not repay Mr. Okada. The Reconsideration Motion was pending as of the Petition Date.

2.    The Bank Group's Acceleration of AGA's Debt. Prepetition, AGA had advised the Bank Group of the Bartlit Beck issue, and the Bank Group was rightfully concerned about the same issues and the potential harm Bartlit Beck's actions could have on the Bank Group Collateral.

On January 31, 2023, the Bank Group issued a Notice of Acceleration to the Debtor under its loan documents, which also indicated that the entire sum of $20,789,496 under the Bank Group Loans were immediately due. Additionally, the Bank Group also issued a letter to Wells Fargo Bank, N.A. ("Wells Fargo"), AGA's depository bank, directing Wells Fargo to turn over all Cash in AGA's Bank Accounts to the Bank Group, and to direct all future receipts to the Bank Group.

As a result, AGA faced the imminent possibility that Bartlit Beck could enforce the BB Judgment directly against the amounts owed to Mr. Okada by AGA under the Garnishment Order (which required AGA to pay to Bartlit Beck $27,300,000 – an amount AGA lacked the ability to pay), which triggered defaults and an acceleration of the Bank Group Loans, which caused the Bank Group to take action to protect the Bank Group Collateral. AGA therefore had no other choice but to seek relief and protections under chapter 11 of the Bankruptcy Code on February 1, 2023 (the "Petition Date") to stop Bartlit Beck and the Bank Group from proceeding to enforce their respective remedies and collections efforts.

AGA sought bankruptcy protection to benefit all Creditors and parties in interest, to preserve value and sustain operations, and maintain its employees' jobs, thus also allowing it the ability either to restructure its financial affairs or pursue a sale of its Assets as a going concern, which should maximize the value of a recovery for all Creditors.

3.    AGA's Alleged Monies Owed to Mr. Okada. Upon information and belief, AGA understands that prepetition, Bartlit Beck has been pursuing collection of the BB Judgment by various means and in other forums, other than Nevada State Court.

At no time in at least the last decade of owning AGA has Mr. Okada received any salary, dividend, or other distribution from AGA. AGA's books and records show he specifically agreed not to seek repayment of the monies allegedly owed him as a shareholder or equity contribution. Thus, AGA does not believe that Mr. Okada has diverted money from AGA to avoid paying Bartlit Beck. Further, AGA's books and records reflect that the shareholder debt owed to Mr. Okada has been scheduled as a debt to an insider.

**D.     Main Events in the Bankruptcy Case**

1.     <u>First Day Motions</u>.  On February 1, 2023, AGA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On February 10, 2023, the Bankruptcy Court held "first day hearings," on an emergency, interim basis, to consider routine, "first day relief" requested by AGA regarding the following issues:

(a)     *Designation of Responsible Person*.  The Bankruptcy Court approved the designation of Yugo Kinoshita, the Debtor's Global Chief Executive Officer, Treasurer, and Director, as a "Responsible Person" under Bankruptcy Rule 9001(5).

(b)     *Use of Cash Collateral*.  The Debtor sought interim and final authority to use alleged "Cash Collateral" of the Bank Group, PDS, NSC and NSG (collectively, the "<u>Lenders</u>"), on an emergency basis.  Before the initial Cash Collateral hearing, PDS and NextStep advised that they did not consent to the Debtor's request to use Cash Collateral.  Initially, the Debtor, on the one hand, and the Bank Group, PDS, and NSG and NSC, on the other hand, stipulated, on an interim basis, to allow the Debtor to use the then-alleged secured Creditors' respective Cash Collateral, on the terms in that certain interim order, granting, in part, the Cash Collateral Motion, and approving the stipulation among the Debtor and Lenders regarding Cash Collateral. *See* ECF No. 66.  After the initial Cash Collateral hearing, the Committee was appointed, and the parties engaged in fervent negotiations, over the course of nearly one month, regarding the terms on which the Lenders would consent to the Debtor's use of Cash Collateral.

Eventually, the Debtor, the Lenders, and the Committee agreed that the Debtor could use the Lenders' respective Cash Collateral, under the negotiated terms, including, among other things, that certain 13-week budget attached to the Final Cash Collateral Order entered by the Bankruptcy Court on March 16, 2023, the Debtor's payment of adequate protection payments to the Lenders, and the Debtor's commitment to achieving certain milestones to the marketing and sale of substantially all of the Debtor's Assets, as a going concern. *See* ECF No. 160.

The Final Cash Collateral Stipulation also provided an Investigation Period (as defined in the Final Cash Collateral Stipulation) extending through March 31, 2023, for any potential Challenge (as defined in the Final Cash Collateral Stipulation) to the validity, priority or extent of any Pre-petition Liens (as defined in the Final Cash Collateral Stipulation) of the applicable secured parties, including without limitation as to NextStep.

(c)    *Employee Obligations*.    On an interim, and ultimately final, basis, the Bankruptcy Court authorized the Debtor to pay and honor, in the ordinary course of its business, $561,400.27, in the aggregate because of various sums for wages, salaries, commissions, paid time off, employee benefit contributions, and business expense reimbursements all incurred in the ordinary course of the Debtor's business (collectively, the "Employee Obligations"), including Employee Compensation, Employee Benefit Contributions, Reimbursable Business Expenses, and Workers' Comp Policy premium installments (each as defined in the Employee Obligations Motion) accrued and due prepetition but not yet paid as of the Petition Date.

(d)    *Cash Management*.    On an interim, and ultimately final, basis, the Bankruptcy Court authorized the Debtor to (i) maintain and continue use of its (1) cash management system, which the Debtor used to collect and transfer funds generated in its ordinary course of business to disburse those funds to satisfy ongoing operating expenses in its ordinary course of business, (2) Bank Accounts (defined below), provided that the Bank Accounts were converted to debtor in possession accounts in compliance with the U.S. Trustee's "Operating Guidelines and Reporting Requirements For Debtor in Possession and Trustees," (ii) pay any ordinary course bank fees and service charges that may be incurred in connection with the Bank Accounts or any other new bank account that may be opened under Court order; and (iii) continue to use its existing check stock and wire/ACH payment forms, without alteration.

The Debtor's Cash Management System included use of the following four (4) bank accounts all at Wells Fargo: (a) an account for collections related to its arrangement with PDS Gaming, LLC, Account No. *0281; (b) a zero-balance account used to fund (via sweep) the Debtor's payroll obligations, Account No. *4149; (c) a general operating account, which is used for general operations, Account No. *7863; and (d) a certificate of deposit, Account No. *2792, an account for a commercial card security agreement for credit card program obligations (collectively, the "Bank Accounts"). The Debtor also used its Cash Management System to monitor, forecast, and report its financial affairs.

(e)    *Utilities*.    On an interim, and ultimately final, basis, the Bankruptcy Court authorized the Debtor to establish procedures to provide adequate assurance of future payment to Utility Providers that might require such assurance notwithstanding the Debtor's commitment to remain current with its postpetition obligations to Utility Providers on account of ongoing utility expenses for electricity (NV Energy), natural gas (Southwest Gas), water (Las Vegas Valley Water District), water reclamation (Clark County Water Reclamation District/City of Las Vegas), internet (Cox Communications), recycling (Nevada Recycling Henderson), and refuse removal (Republic Services), and should any Utility Provider challenge the Debtor's proposed adequate assurance, to negotiate with such challenging Utility Provider.

2.    Committee.    On February 17, 2023, the U.S. Trustee appointed these unsecured Creditors to the Committee:  (a) Bartlit Beck; (b) Gaming Laboratories International; (c)

Klarquist Sparkman, LLC;[1] and (d) JCM American Corporation.  On February 22, 2023, the Committee determined to retain Sheppard Mullin as its bankruptcy counsel to advise and represent it in the Bankruptcy Case, Schwartz Law as the Committee's Nevada counsel, and Province as its financial advisor.  The Committee has been engaged and active throughout this Bankruptcy Case.

3.      Employment of the Retained Professionals.  Before the Petition Date, the Debtor employed and retained Larson Zirzow as its Bankruptcy Counsel, B. Riley as its financial advisor, and postpetition, Armory as its investment banker, among others.  *See* ECF Nos. 90, 94, and 104, respectively.  After the Petition Date, the Debtor sought Court approval of its selected professionals.  The U.S. Trustee objected to certain of the Debtor's applications to employ the professionals of its choice.  Ultimately, on April 3, 2023, after notice and a hearing, the Bankruptcy Court approved the employment of Larson Zirzow, B. Riley, and Armory, on modified terms agreed to on the record.  *See* ECF Nos. 203, 204, 205.

On March 22, 2023, the Committee applied to the Bankruptcy Court for authority to retain and employ the professionals of its choice.  *See* ECF Nos. 171, 173, and 175.  The Bankruptcy Court approved the Committee's applications to retain and employ Sheppard Mullin, Schwartz Law and Province, after notice and a hearing on the Committee's respective applications and the U.S. Trustee's objections and reservation of rights thereto, on April 25, 2023.  *See* ECF Nos. 257, 258, and 259.  Each of the professionals retained by the Debtor and the Committee under Bankruptcy Code sections 327, 328, 363 or 1103, as applicable, are hereinafter referred to collectively, as the "Retained Professionals."

In connection with the employment of the Retained Professionals, the Bankruptcy Court approved certain procedures to govern compensation of certain Retained Professionals on an interim monthly basis, subject to interim and final Court approval of the Retained Professionals' respective interim and final fee applications (the "Interim Compensation Procedures").  *See* ECF No. 205.

4.      The Committee Action.  The Final Cash Collateral Order approving the Final Cash Collateral Stipulation provided the Committee with a brief window (the Investigation Period) to bring any potential challenge to the validity, priority or extent of any prepetition Liens of the applicable secured parties, including without limitation, as to each of NSG and NSC (NextStep).

Although NextStep shared various information and documents with the Committee, as of the March 31, 2023, expiration of the Investigation Period under the Final Cash Collateral Stipulation, the Committee was not yet in a position to waive any potential Challenge to NextStep's position, and thus the Debtor stipulated to grant the Committee Standing [ECF No. 199].  The Committee filed the NextStep Complaint and commenced the Committee Action to, among other things, avoid and recover potential fraudulent transfers from the Debtor to NextStep.

---

[1] After the Committee's formation and selection of counsel, the Committee's formation and selection of counsel, the U.S. Trustee filed the *Amended Appointment of Official Committee of Unsecured Creditors* [ECF No. 103], which removed Klarquist Sparkman, LLC from the Committee.

On May 3, 2023, NextStep moved to dismiss the NextStep Complaint and terminate the Committee Action. The Motion to Dismiss asserted that the NextStep Complaint failed to state a claim upon which relief can be granted as a matter of law. While the Bankruptcy Court had set a hearing on the Motion to Dismiss, the Committee and NextStep ultimately settled the Committee Action as described in the below description of the Settlement Agreement.

5.    <u>Resolution of the Universal Entertainment Corporation Dispute</u>. From about August 2017, the Debtor has been embroiled in a series of active litigations, defending against actions commenced by Universal and prosecuting counterclaims against Universal. Universal previously was the Debtor's parent corporation. However, in 2008-2009, Universal and Mr. Okada, in his capacity as Universal's then-Chairman, completed a series of transactions by which Mr. Okada purchased all of the ownership rights in AGA, which Mr. Okada has owned as sole shareholder since April 1, 2009.

As of the Petition Date, there were three active pieces of litigation: two pending in the United States District Court for the District of Nevada (together, the "<u>Nevada Litigation</u>") and one pending in the Tokyo District Court (the "<u>Japanese Litigation</u>"). The Debtor asserted that the automatic stay imposed by the Bankruptcy Case stayed the Nevada Litigation, as well as the Japanese Litigation, but understands that there may be issues related to the extraterritorial operation of the stay in the Japanese Litigation. The Debtor also asserted that Universal made certain filings in the Japanese Litigation post-petition that may have violated the automatic stay and/or otherwise upset the status quo, however, Universal disputed those allegations.

In furtherance of the Debtor's commitment to meet those certain milestones established under the Final Cash Collateral Stipulation and Order, and to ensure a robust sale process, the Debtor determined to resolve its disputes with Universal in connection with not just the pending Nevada and Japanese Litigation, but any and all other claims, disputes, and causes of action between the Debtor and Universal. Thus, on June 1, 2023, the Debtor sought Court approval of its settlement agreement (the Universal Settlement) resolving claims against Universal and vice versa.

The Universal Settlement provides for, among other things, (a) dismissal of the Nevada and Japanese Litigation; (b) an Allowed General Unsecured Claim in the amount of $3,000,000, in the aggregate, (d) mutual releases, and notably, (e) Universal agreed to (i) transfer and assign to the Debtor certain AGA trademarks; (ii) assign to the Debtor all remaining interests in certain Joint Patents (as defined in the Nevada and Japanese Litigation) owned by Universal and the Debtor; and (iii) grant to the Debtor a perpetual, royalty-free, fully-paid license for the use of all of Universal's patent rights.

On June 12, 2023, the Bankruptcy Court entered an order approving the Universal Settlement. *See* ECF No. 375. As a result, the Debtor was able to preserve and maximize the value of its Assets in furtherance of the proposed sale process. Indeed, Empire ultimately purchased associated rights in the Debtor's intellectual property as described below.

6.  Assets Sales, Including Main and Miscellaneous Asset Sales.

(a)  *Marketing and Bid Procedures*.  Consistent with the Debtor's commitment to market and sell substantially all of its Assets as a going concern as a condition of the Lenders' consent to the Debtor's use of Cash Collateral, the Debtor retained Armory as its investment banker.  To facilitate a value-maximizing sale of the Debtor's Assets, the Debtor sought and obtained Bankruptcy Court approval of certain Bid Procedures to govern such sale, subject to overbid.  *See* Bid Procedures Order [ECF No. 328].

After marketing the Debtor's Assets as a going concern for approximately three months, on June 15, 2023, the Debtor held the Auction for the sale of its Assets.

(b)  *KEIP/KERP and Kinoshita Stipulation*.  To preserve and maximize the value of substantially all of the Debtor's Assets as a going concern, the Debtor, with the Committee's support, sought and obtained approval of certain Key Employee Incentive Program (the "KEIP") and Key Employee Retention Programs (the "KERP").  *See* ECF Nos. 295 and 327.  The Debtor also agreed to modify certain terms of Mr. Kinoshita's employment agreement to ensure the Debtor's uninterrupted operations to facilitate a going concern sale (the "Kinoshita Stipulation").  *See* ECF Nos. 283 and 314.

By the KEIP, the Debtor proposed to incentivize certain Senior Leadership Employees (as defined in the KEIP) essential to preserving and maximizing the value of the Debtor's Assets by promising certain conditional payments upon the satisfaction of certain metrics tied to the Debtor's continued operation through the closing of a sale of substantially all of its Assets or confirmation of a chapter 11 plan. By the KERP, the Debtor proposed simply to retain and encourage certain Non-Insider Employees (as defined in the KERP) essential to any value-maximizing transaction to continue providing services to the Debtor through the closing of a substantially all Asset sale transaction or confirmation of a chapter 11 plan.

The U.S. Trustee objected to the KEIP and KERP.  *See* ECF No. 321.  The Debtor and the Committee argued extensively in support of the proposed programs at the hearing on the Debtor's motion to approve the programs.  The Bankruptcy Court authorized the KEIP and KERP, which preserved and maximized the value of the Debtor's Assets.  *See* ECF No. 327; *see also* the Bank Group, Empire, and Interblock Sale Orders.  The Debtor has since paid all amounts due and owing under the KEIP and KERP.

(c)  *Auction*.  At the Auction, the Debtor did not receive a bid for the purchase and sale of substantially all of its Assets as a going concern, and thus entertained bids for certain subsets of its Assets.  After consultation with the Consultation Parties (as defined in the Bid Procedures Order), the Debtor determined that the highest and best offers received for its Assets the three transactions described below in the summary chart described in Section 2(D)(4)(d).

(d)    *Sale Documentation*.    After the Auction concluded, the Debtor, in consultation with the Committee, worked with Buyers (i) Empire; (ii) Interblock; and (iii) the Bank Group to document and memorialize the purchase and sale agreements between the Debtor, on the one hand, and the respective Buyer for their respective subset of purchased assets, on the other hand (collectively, the Main Asset Sales).

During the documentation process, the Debtor through Armory and its Bankruptcy Counsel, and in consultation with the Committee, negotiated with the Buyers for the purchase and sale of other miscellaneous assets for which the Buyers had not originally submitted bids.

The documentation process was arduous and lengthy because multiple Buyers sought to purchase different subsets of assets that were difficult to untangle from a single enterprise into multiple, distinct and delineated business lines for sale. Specifically, Empire and Interblock, in their respective capacities as Buyer, had to review, negotiate and document the agreement finally reached between them to account for the terms under which Interblock enjoys a right to use or license the intellectual property Empire purchased.

For the avoidance of doubt, the Debtor retained certain assets for potential collection or further sale, including accounts receivable.

Below is a summary of the final results of the Debtor's sale process:

| Buyer | Purchase Price | Assets |
|---|---|---|
| Empire | $7,200,000, less $362,098[2]<br><br><br><br>$550,000 | • Certain electronic gaming and slot machines, together with associated intellectual property and branding<br>• I-Gaming assets<br>• 25 motor vehicles |
| Interblock | $14,000,000<br><br><br><br><br><br><br><br>$820,000, plus satisfaction of $31,138 Decatur Landlord Cure Claim<br><br>$245,915 | • Debtor's membership interest in NextStep Gaming, LLC<br>• All assets related to the Debtor's RTWC assets, including electronic table games on route and certain collateral interests of the Bank Group, together with associated intellectual property rights<br>• Assumption and assignment of Decatur Leasehold and the sale of certain miscellaneous personal property located therein to Interblock<br>• 8 motor vehicles |

---

[2] Empire withheld this amount as payment of other obligations owed by the Debtor to Empire.

| Buyer | Purchase Price | Assets |
|---|---|---|
| FSB and NSA | $6,000,000 (credit bid) | • Approximately 940 electronic gaming and slot machines on route and certain collateral interests of the Bank Group, together with associated intellectual property rights |

On August 10 and 15, 2023, after notice and a hearing, the Bankruptcy Court entered the Bank Group, Empire, and Interblock Sale Orders, and approved the Main Asset Sales, as reflected in those certain purchase and sale agreements appended to the Buyers' respective sale orders.

On August 22 and 30, 2023, the Bankruptcy Court entered the Empire and Interblock Vehicle Sale Orders (as amended from time to time) authorizing the Interblock and Empire Vehicle Sales.

(e)     *The Debtor's Post-Closing Operations*.  After the Auction, the Debtor gave notice to its employees and staff, as required under the WARN Act, that AGA would cease operating upon closing the Main Asset Sales.  Although the Debtor attempted to retain a reduced staff to assist with winding down AGA, preserving and maximizing the value of the Debtor's Assets, and guiding AGA through the chapter 11 plan process, the Debtor only retained a handful of employees.  Nearly all of the Debtor's other employees and staff either resigned from their respective positions between the time of the Auction and August 18, 2023, or on August 18, 2023.

7.     Global Settlement.  Concurrent with the marketing and sale of the Debtor's Assets, the Committee, together with the Debtor and on behalf of the Estate, spent substantial time negotiating a global compromise of the Lenders' Claims against the Debtor, including prepetition Secured Claims and postpetition Administrative Claims for adequate protection.  After weeks of negotiating, including at an in-person settlement conference among the Debtor, Committee, Bank Group, and NextStep (collectively, the "Settlement Parties"), until the Auction and after, given the actual Auction results, the Debtor, Committee, Bank Group, and NextStep agreed to resolve the disputes by and among them on the terms and conditions set forth in that certain Settlement Agreement.

On July 24, 2023, the Debtor moved for entry of an order approving the Global Settlement Agreement under Bankruptcy Rule 9019.  *See* ECF Nos. 461, 464, and 474.  The Bankruptcy Court approved the Global Settlement Agreement by entry of an order to such effect on July 31, 2023.  *See* ECF No. 480.

Under the Global Settlement Agreement, the Settlement Parties agreed, among other things, that subject to Bankruptcy Court approval and closing of the various Asset sales, the Debtor's Estate would pay to the following secured Creditors the below amounts for full and complete satisfaction of their various respective Claims against the Debtor, including any Secured and Administrative Claims.  In exchange for the below consideration, the Settlement Parties agreed to compromise their respective Claims (Secured, Administrative or otherwise) as set forth in this summary:

| **Settlement Party** | **Consideration Received** | **Compromise Made** |
|---|---|---|
| Bank Group | • $10,000,000, plus any EGM Machine Shortfall under the formula set forth in the Settlement Agreement<br>• Segregation and turnover of all EGM Revenue for the benefit of the Bank Group effective as of July 21, 2023 | • Satisfaction of Allowed Bank Group Secured Claims, up to $10,000,000.<br>• Subordination of Allowed Bank Group Unsecured Claims to all other holders of Allowed General Unsecured Claims<br>• Deferral of Bank Group adequate protection payments from June 2023 to January 2024 |
| NextStep | • $3,650,000<br><br><br><br><br><br>• $150,000<br>• $650,000 | • Sale, by NSC, to Debtor of all of NSC's membership interests in NSG and authority to sell thereafter 100% of Debtor's membership interest in NSG to Interblock<br>• Deferral of adequate protection payments due to NSC for the period May 2023 to January 2024<br>• Satisfaction of NSC Claims<br>• Distribution of NSG Reserve Account<br>• Reimbursement of payment made by NSC to the PDS Entities on account of the PDS Obligation |
| PDS Entities | • $662,499.82<br><br>• At least $448,436,21, subject to final reconciliation | • Satisfaction of remaining balance due and owing to PDS Entities on account of the PDS Obligation<br>• Satisfaction of alleged Secured Claims arising under the PDS Receivables Purchase Agreement |
| Committee | • All Debtor Net Proceeds remaining after payments to the Bank Group, NextStep, and PDS under the Global Settlement Agreement, for the benefit of all other holders of Allowed Administrative, Priority, and General Unsecured Claims not otherwise resolved and satisfied under the Settlement Agreement, including, but not limited to, the Bank Group on account of the Bank Group Deficiency Claim. | • Dismissal of the Committee Action against NSG and NSC, with each party to bear its own fees and costs |

| Settlement Party | Consideration Received | Compromise Made |
|---|---|---|
| | • Estate preservation of claims against certain Directors and Officers | |

8.     PDS Resolution.  In addition to that portion of the PDS Claim resolved by the Global Settlement Agreement, the Debtor, the PDS Entities, and the Committee had to reconcile and resolve, on a final basis after the Main Asset Sales closed and payments due to the Bank Group and NSC under the Global Settlement Agreement, all other claims and disputes by and between the Debtor's Estate and the PDS Entities.

Although the Debtor had paid to the PDS Entities $662,499.82 to satisfy the remaining balance due and owing to the PDS Entities under that certain loan agreement between PDS and NSG, the PDS Entities asserted that additional amounts were due and owing from the Debtor's Estate to the PDS Entities.  After numerous exchanges of information by and between the Debtor, on the one hand, and the PDS Entities, on the other hand, the Debtor and the PDS Entities finally resolved their disputes as to the PDS Claim.

Under the PDS Stipulation, the Debtor agreed, among other things, to (1) reject the MRPA and the Receivables Services Agreement included as party of the MRPA, SPA, and ISPA; (2) abandon all contracts, route equipment, property and/or collateral related to the SPA, securing the ISPA, or otherwise, including without limitation the games on route, Used Games that remain in inventory at the Debtor's Decatur headquarters; (3) consent to relief from the automatic stay under Bankruptcy Code section 362(a) of the to effectuate all the above, such that the Debtor has no remaining right, title or interest in the SPA or the ISPA whatsoever, as to the property and/or collateral under the SPA and ISPA, in exchange for (a) payment to the PDS Entities $1,229,493.94 in addition to those payments previously made by the Debtor to the PDS Entities during the Bankruptcy Case, in satisfaction of the Debtor's obligations under the MRPA, Receivables Services Agreement, SPA and ISPA, including any rejection damages Claims; (b) turnover of information, books, records contracts, notices, invoices and any and all documents, including email correspondence and electronic information regarding outstanding receivables under the ISPA (currently in the amount of $61,140.08), for servicing and collection by the PDS Entities; (c) a promise to pay promptly to the PDS Entities any monies paid to the Debtor under the SPA and ISP; (d) an Allowed Administrative Claim for $50,000 in favor of the PDS Entities on account of attorney's fees and costs; (e) an Allowed General Unsecured Claim for $30,000 for the PDS Entities on account of attorney's fees and costs; and (f) an Allowed General Unsecured Claim for $260,504 in favor of the PDS Entities on account of the total remaining deficiency under the PDS Claim.

Further, under the PDS Stipulation, the Debtor retained all of its ownership interests in the twelve (12) contracts and all receivables under the rejected MRPA, including but not limited to all rights and remedies available to the Debtor to enforce and collect amounts due and owing under those twelve contracts, free of any Lien or Claim by any of the PDS Entities,

and assumed any Liens or Claims therein or to the underlying route equipment of the PDS Entities, which the PDS Entities assigned to the Debtor.

9.    <u>The Bartlit Beck Claims</u>.  On May 26, 2023, Bartlit Beck filed the Bartlit Beck Claims, thereby asserting an unknown, unliquidated claim against the Debtor's Estate that includes an alleged Secured Claim in the amount of $27,365,120 per the Garnishment Judgment, plus interest.  The Debtor believes there may be a dispute as to whether (a) Bartlit Beck is properly classified and treated as a Creditor holding a Claim against the Debtor and its Estate, (b) any such associated Lien is avoidable and recoverable as a preference under Bankruptcy Code sections 547 and 550, and (c) the Bartlit Beck Claims should be (re)characterized, subordinated or otherwise receive payment in priority as a holder of an Interest, and thus junior in priority to Allowed General Unsecured Claims.  Bartlit Beck disputes these assertions.

**E.    Committee Standing and D&O Litigation**

The Committee believes that the Estate has interests in certain claims and/or causes of action arising before the Petition Date (the D&O Claims) against certain third party former or current directors, officers or insiders of the Debtor (the Potential D&O Defendants).  After engaging in discussions regarding the investigation and pursuit of the D&O Claims, the Committee and Debtor determined and agreed that it is in the Estate's best interest for the Debtor to grant to the Committee leave, standing, and authority to investigate, assert, prosecute, and/or settle the D&O Claims (the "<u>Committee Standing</u>").

On September 14, 2023, the Bankruptcy Court approved the Debtor's and Committee's request for Committee Standing by entry of an order approving that certain stipulation regarding the same.  *See* ECF No. 585.

On September 25, 2023, the Committee asserted against certain Potential D&O Defendants the D&O Claims by sending to each demand letters.  On the same date, the Debtor, through its Bankruptcy Counsel, notified the Debtor's directors and officers liability insurance carriers of circumstances.  The Plan Proponents believe that all of the Estate's rights and interests in its directors and officers liability insurance policies, and the proceeds thereof, have been properly preserved for the benefit of the Debtor's Estate and its Creditors.

**F.    The Debtor's Assets and Liabilities**

1.    <u>Assets</u>.  The Debtor's Assets include:

(a)    *Cash on Hand*.  As of September 30, 2023, the Debtor holds Cash in the approximate amount of $11,600,000.

(b)    *Accounts Receivable*.  In the aggregate, as of September 30, 2023, the face value of the Debtor's uncollected net accounts receivable is approximately $9,000,000.  Of this amount, the Plan Proponents conservatively estimate that approximately $6,000,000 are aged receivables that may not be recoverable.

(c)    *Estate Claims and Causes of Action*.  The Debtor or its Estate owns or holds the D&O Claims against third parties, including the Potential D&O Defendants and

certain parents, subsidiaries, and affiliates of the Debtor (the Intercompany Receivables), and the proceeds from such claims and Causes of Action.  The Debtor or its Estate also retains all defenses, offsets, rights of recoupment, rights of disallowance, recharacterization and/or equitable subordination with respect to the Causes of Action, and any and all interests in unexpired non-residential real property leases and personal property unsold as of the date of this Plan.

2.    <u>Liabilities</u>.  The Debtor's current liabilities include:

(a)    *Secured Claims*.  As of the Petition Date, the Debtor estimates that the total amount of Secured Claims asserted against the Debtor was $27,032,577.42.  These Secured Claims include but may not be limited to the Secured Claims of the Bank Group, PDS, and NextStep.

(b)    *Administrative Claims*.  The Debtor estimates the total amount of outstanding, unresolved and unpaid Administrative Claims that may be asserted against the Debtor's Estate as of the date of this Plan to be approximately $2,000,000. For the avoidance of doubt, the approximate amount of the Debtor's Administrative Claims liabilities does not include the Estate's liabilities on account of Professional Fee Claims.

(c)    *Priority Tax Claims*.  The Debtor estimates the total amount of Priority Tax Claims that have been scheduled or asserted against the Debtor's Estate to be $171,542.37.

(d)    *Priority Unsecured Claims*.  The Debtor estimates that, as of September 30, 2023, the total amount of Priority Unsecured Claims that have been scheduled or asserted against the Debtor's Estate to be $167,858.

(e)    *General Unsecured Claims (Non-Priority Unsecured Claims)*.  The Debtor estimates that, as of the Petition Date, the total amount of non-priority unsecured claims (i.e., General Unsecured Claims) that have been scheduled or asserted against the Debtor's Estate to be $36,368,439.99.

## ARTICLE 3
### TREATMENT OF UNCLASSIFIED CLAIMS, ADMINISTRATIVE CLAIMS, <u>PRIORITY TAX CLAIMS AND PROFESSIONAL FEE CLAIMS</u>

**A.    General**

Under Bankruptcy Code section 1123(a)(1), Claims asserted against the Debtor and described in this Article III are neither classified nor designated into Classes.  The holders of such Claims are not entitled to vote on the Plan.

**B.    Administrative Claims and Administrative Claims Bar Date**

Except if any holder of an Allowed Administrative Claim agrees to a less favorable treatment, or unless otherwise ordered by the Bankruptcy Court, each holder of an Allowed Administrative Claim shall receive, in full satisfaction of such Allowed Administrative Claim, Cash

in an amount equal to such Allowed Administrative Claim on the later of (i) the Effective Date or as soon as practicable thereafter and (ii) as soon as practicable after such Administrative Claim becomes Allowed; *provided, however*, that Allowed Administrative Claims representing obligations incurred in the ordinary course of business of the Debtor shall be paid in full under the terms and conditions of the particular transactions and any applicable agreements.

Requests for payment of Administrative Claims not paid in the ordinary course of business must be filed by the date that is thirty (30) days after the Effective Date (the Administrative Claims Bar Date). Holders of Administrative Claims that do not timely file and serve such a request shall be forever barred and enjoined from asserting any such Administrative Claims against the Debtor and its Estate.

**C.      Priority Tax Claims**

Except if any holder of an Allowed Priority Tax Claim agrees to less favorable treatment or unless otherwise ordered by the Bankruptcy Court, each holder of an Allowed Priority Tax Claim shall receive in full satisfaction of and in exchange for each Allowed Priority Tax Claim, at the option of the Debtor, (i) payment in full in Cash after such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (ii) such other treatment as agreed to by the Debtor and the holder of such Allowed Priority Tax Claim.

**D.      Professional Fee Claims and Final Fee Applications**

Except if any holder of an Allowed Professional Fee Claim agrees to a less favorable treatment or unless otherwise ordered by the Bankruptcy Court, each holder of an Allowed Professional Fee Claim shall receive, in full satisfaction of such Allowed Professional Fee Claim, Cash in an amount equal to such Allowed Professional Fee Claim on the later of (i) the Effective Date and (ii) within fourteen (14) Business Days after such Professional Fee Claim becomes Allowed.

Each holder of a Professional Fee Claim seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date must file and serve their respective final applications for allowance of such Professional Fee Claims by the date that is thirty (30) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court.

**ARTICLE 4**
**CLASSIFICATION AND TREATMENT**
**OF CLASSIFIED CLAIMS AND INTERESTS**

**A.      Summary**

The Plan Proponents set forth the below table a designating Classes of Claims against and Interests in the Debtor under Bankruptcy Code sections 1122 and 1123:

| Class | Claims | Status | Voting Rights |
|-------|--------|--------|---------------|
| 1 | Secured Claims | Unimpaired | Deemed to Accept |

| 2 | Priority Unsecured Claims | Unimpaired | Deemed to Accept |
| 3(a) | General Unsecured Claims | Impaired | Entitled to Vote |
| 3(b) | Deferred General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Intercompany Claims | Impaired | Deemed to Reject |
| 5 | Interests | Impaired | Deemed to Reject |

The classification set forth in this Plan and in this Section 3(A) shall be for all purposes including voting, confirmation and Distributions under the Plan. A Claim or Interest is placed in a particular Class only if the Claim or Interest falls within the description of that Class and is classified in other Classes if any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions under the Plan only if such Claim is an Allowed Claim in that Class, and such Claim has not been paid, released or otherwise settled before the Effective Date.

**B.    Classification and Treatment of Classified Claims and Equity Interests**

1.    Class 1:  Secured Claims.

(a)    *Classification*:  Class 1 consists of all Allowed Secured Claims.  Each Allowed Secured Claim shall be considered its own separate subclass within Class 1.

(b)    *Voting*: Class 1 is Unimpaired and presumed to have accepted the Plan. Class 1 is not entitled to vote on the Plan.

(c)    *Treatment*: Except if a holder of an Allowed Secured Claim agrees to a less favorable treatment, each holder of an Allowed Secured Claim shall be paid in full in Cash on the later of (a) the Effective Date or as soon as practicable thereafter and (b) as soon as practicable after such Claim becomes an Allowed Secured Priority Claim.

2.    Class 2:  Priority Unsecured Claims.

(a)    *Classification*:  Class 2 consists of Allowed Priority Unsecured Claims.

(b)    *Voting*:  Class 2 is Unimpaired and deemed to have accepted the Plan.  Class 2 is not entitled to vote on the Plan.

(c)    *Treatment*:  Except to the extent the holder of the Priority Unsecured Claims agrees to a less favorable treatment, each holder of an Allowed Priority Unsecured Claim shall receive, on account of, and in full and complete settlement, release and discharge of, an in exchange for such Allowed Priority Unsecured Claim, at the election of Debtor: (a) such treatment under Bankruptcy Code section 1124 as may be determined by the Bankruptcy Court; (b) payment in full, in Cash, of such Allowed Secured Claim; (c) satisfaction of any such Allowed Secured Claim by

delivering the collateral securing such Claim and paying any interest, fees, costs or other expenses required to be paid under Bankruptcy Code section 506(b); or (d) providing such holder with such treatment under Bankruptcy Code section 1129(b) as may be determined by the Bankruptcy Court.

3.  Class 3(a):  General Unsecured Claims.

    (a)  *Classification*:  Class 3(a) consists of all Allowed General Unsecured Claims.

    (b)  *Voting*:  Class 3(a) is Impaired and entitled to vote on the Plan.

    (c)  *Treatment*:  Except if a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of the Liquidating Trust Assets after satisfaction of all costs and expenses of the Liquidating Trust.

4.  Class 3(b):  Deferred General Unsecured Claims.

    (a)  *Classification*:  Class 3(b) consists of all Allowed Deferred General Unsecured Claims.

    (b)  *Voting*:  Class 3(b) is Impaired and entitled to vote on the Plan.

    (c)  *Treatment*:  Except if a holder of an Allowed Deferred General Unsecured Claim agrees to a less favorable treatment, each holder of an Allowed Deferred General Unsecured Claim shall receive its Pro Rata Share of the Liquidating Trust Assets after satisfaction of (i) all costs and expenses of the Liquidating Trust; and (ii) 100% of all Allowed General Unsecured Claims.

5.  Class 4:  Intercompany Claims.

    (a)  *Classification*:  Class 4 consists of all Allowed Intercompany Claims.

    (b)  *Voting*:  Class 4 is Impaired and is deemed to have rejected the Plan.

    (c)  *Treatment*:  All Intercompany Claims shall be cancelled and extinguished without any Distribution.

6.  Class 5:  Interests in Debtor.

    (a)  *Classification*:  Class 5 consists of all Interests in Debtor.

    (b)  *Voting*:  Class 5 is Impaired and is deemed to have rejected the Plan.

    (c)  *Treatment*:  All Interests in Debtor shall be cancelled and extinguished without any Distribution.

## ARTICLE 5
## ACCEPTANCE OR REJECTION OF THE PLAN

**A.      Acceptance by an Impaired Class**

Under Bankruptcy Code section 1126(c) and except as provided in Bankruptcy Code section 1126(e), Classes 3(a) and 3(b), which are the only Impaired Classes entitled to vote under the Plan, shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in Classes 3(a) and 3(b) have timely and properly voted to accept or reject the Plan.

**B.      Nonconsensual Confirmation**

If none of the Impaired Classes vote to accept the Plan by the requisite statutory majorities, the Debtor reserves the right to amend the Plan.  With respect to Class 5, which is deemed to reject the Plan, and any other Class of Claims that rejects the Plan, the Debtor shall request that the Bankruptcy Court confirm the Plan under Bankruptcy Code section 1129(b).

## ARTICLE 6
## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.      Sale of Assets and Funding of Distributions Under the Plan**

The Debtor has closed the Main Asset Sales and anticipates it will have consummated the Vehicle Sales before the Confirmation Hearing.  The proceeds from the Main Asset Sales and the Vehicle Sales, together with the Debtor's existing Cash on hand and collections of accounts receivable, have funded, and will fund, Distributions made, and to be made, on account of Allowed Claims under the Plan in the following order of priority:

1.      _Secured Claims_.  First, before the Effective Date, to the extent not previously paid and satisfied, and except as otherwise agreed to by the holder of the applicable Secured Claim(s), which consent shall be implied absent an objection to the contrary, any available Cash shall be used to pay and satisfy holders of Allowed Secured Claims on the terms and conditions set forth in the Global Settlement Agreement.

2.      _Reserves_.  Second, before the Effective Date, to the extent not previously funded, and except as otherwise agreed to by the holder of the applicable Claim(s), which consent shall be implied absent an objection to the contrary, any available Cash shall be used to fund the Reserves with Cash sufficient to pay in full all Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Secured Claims, Allowed Priority Tax Claims, Allowed Priority Unsecured Claims (to the extent payable in Cash).  The amount of the Reserves shall be determined and mutually agreed to by the Debtor and the Committee and shall be set forth in the Confirmation Order.

3.      _Priority Tax Claims_.  Third, on the Effective Date, the remaining Cash held by the Debtor shall be used to pay any Allowed Priority Tax Claims or establish a Priority Tax Reserve for any such Allowed Priority Tax Claims.  The amount of the Priority Tax Reserve shall be determined and mutually agreed to by the Debtor and the Committee and shall be set forth in the Confirmation Order.

SMRH:4890-7774-3491.7
101223

89BG-371272

4.      To the extent any Cash remains in the Reserves or in any Priority Tax Reserve after the allowance and payment in full of all Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Secured Claims, Allowed Priority Tax Claims and Allowed Priority Unsecured Claims, as applicable, such excess Cash shall be distributed to, and vest in, the Liquidating Trust, as more particularly described in Section 6(D) below.

**B.      Continued Existence of the Debtor**

From and after the Effective Date, the directors and officers of the Debtor existing as of the Effective Date shall be terminated and removed from any further duties and responsibilities in such capacity thereafter, except that they shall remain designated as representatives of the Debtor for examination under Bankruptcy Rule 9001.  Upon entry of the Confirmation Order, all matters provided under the Plan involving the corporate structure of the Debtor shall be deemed authorized and approved without any requirement of further action by the Debtor or its shareholders, directors or officers.  Notwithstanding the foregoing, the Debtor is authorized and directed, to the extent necessary, to amend and modify its relevant corporate documents, as necessary, to implement the Plan.

**C.      Incorporation of Prior Agreements Approved During the Bankruptcy Case**

The Plan incorporates the following agreements previously approved by the Bankruptcy Court during the Bankruptcy Case, and the related orders approving them, and except as set forth in this Plan, nothing herein is intended to alter or amend them:  the KERP and KEIP, the Kinoshita Stipulation, the Universal Settlement, the Interblock Agreements, the Empire APA, the Empire Vehicle Sale, the Bank Group APA the Global Settlement Agreement, and the PDS Stipulation.

**D.      Establishment of, and Vesting of Assets in, the Liquidating Trust**

On the Effective Date, the Debtor's Estate shall automatically be deemed the Debtor's post-confirmation estate and all right, title and interest in the Reserves and other Assets of the Debtor shall be deemed vested in and transferred to the Liquidating Trust.  If necessary, the Debtor is authorized and directed to take all necessary actions to effectuate the transfer of such rights, title and interests to its post-confirmation estate.  The post-confirmation estate shall be terminated upon entry of a Final Order closing the Bankruptcy Case under Bankruptcy Code section 350(a).

**E.      Duties, Rights and Powers of the Liquidating Trustee**

The Liquidating Trustee, together with its representatives and professionals, shall administer the Plan with respect to the Debtor and its Estate.  In such capacity, the powers of the Liquidating Trustee shall include any and all powers and authority necessary to implement the Plan and wind up the business and affairs of the Debtor, including, without limitation: (i) serving as the sole officer and director of the Debtor; (ii) liquidating and/or abandoning any Assets, including, but not limited to liquidating the Intercompany Receivables; (iii) investing Cash; (iv) taking all steps to execute all instruments and documents necessary to effectuate Distributions out of the Reserves; (v) paying Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Secured Claims, Allowed Priority Tax Claims, Allowed Priority Unsecured Claims and Allowed General Unsecured Claims as contemplated by the Plan; (vi) employing, retaining, terminating or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (vii) paying any and all reasonable fees and expenses of the post-Effective

Date Debtor; (viii) administering and paying taxes, including filing tax returns; (ix) requesting an expedited determination of any unpaid tax liability of the post-Effective Date Debtor under Bankruptcy Code section 505; (x) representing the interests of the Debtor or its post-confirmation estate before any taxing authority in all matters, including any action, suit, proceeding or audit; (xi) taking all steps reasonably necessary and practicable to terminate the corporate existence of the Debtor; (xii) having the sole authority to prosecute Causes of Action on behalf of, and for the benefit of, the post-confirmation estate and having the authority to compromise, settle, resolve, discontinue, abandon or dismiss all such actions without approval of the Bankruptcy Court; *provided*, *however*, any Causes of Action seeking a recovery in excess of $100,000 shall be approved by the Liquidating Trust Advisory Board, and any Causes of Action seeking recovery in excess of $250,000 shall be approved by the Bankruptcy Court (xiii) exercising such other powers as may be vested in the Liquidating Trust under order of the Bankruptcy Court or the Plan, or as the Liquidating Trustee reasonably deems necessary and proper to carry out the provisions of the Plan; and (iv) obtaining documents in the possession of the Committee or its counsel that are subject to any non-disclosure agreements with the Debtor, without any violation of the non-disclosure agreements by the Committee or its counsel.  On the Effective Date, the Debtor, in consultation with the Committee, shall make all payments required to be made on the Effective Date under the Plan, and shall thereafter turnover all remaining Cash to the Liquidating Trust pursuant to this Plan and the Liquidating Trust Agreement.

**F.     Binding Effect of Plan.** Upon the Effective Date, Bankruptcy Code section 1141 shall become applicable with respect to the Plan and the Plan shall be binding on all Persons to the fullest extent permitted by Bankruptcy Code section 1141(a).  Confirmation of the Plan binds each holder of a Claim or Equity Interest to all the terms and conditions of the Plan, whether or not such holder's Claim or Equity Interest is Allowed, whether or not such holder holds a Claim or Equity Interest that is in a Class that is Impaired under the Plan, and whether or not such holder has accepted the Plan.

**G.     Non-Discharge of the Debtor; Injunction.In accordance with Bankruptcy Code section 1141(d)(3)(A), the Plan does not discharge the Debtor.  Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the Assets dealt with by the Plan, are free and clear of all Liens, Claims, Interests and encumbrances against the Debtor, except as otherwise provided under the Plan.  As such, upon the Effective Date, except as provided in the Plan, no Person holding a Claim or an Equity Interest may receive any payment from, or seek recourse against, any Assets that are to be distributed under the Plan other than Assets required to be distributed to that Person under the Plan.  As of the Effective Date, all Persons are precluded, enjoined, and barred from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, Equity Interests, or other action or remedy based on any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.**

**H.     Exculpation and Limitation of Liability. The Exculpated Parties shall not have or incur any liability to any Person, including to any holder of a Claim or an Equity Interest, for any act, omission, transaction, or other occurrence in connection with, relating to, or arising out of the Bankruptcy Case, the formulation, negotiation, preparation, dissemination, solicitation of acceptances, implementation, Confirmation, or consummation of the Plan, the Disclosures, or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with the Plan, or the administration of the Plan or the property**

to be distributed under the Plan; *provided, however*, that nothing in this Section 6(H) shall release or otherwise affect any Person's rights under the Plan or the Confirmation Order; and *provided, further*, that the exculpation provisions of this Section 6(H) shall not apply to acts or omissions constituting actual fraud, willful misconduct or gross negligence by such Exculpated Party as determined by a Final Order.  For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute actual fraud, willful misconduct or gross negligence unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation, and in all respects, the Exculpated Parties shall be entitled to rely on the written advice of counsel with respect to their duties and responsibilities under, or in connection with, the Bankruptcy Case, the Plan, and administration thereof. The Confirmation Order shall serve as a permanent injunction against any Person seeking to enforce any Causes of Action against the Exculpated Parties that are encompassed by the exculpation provided by this Section 6(H) of the Plan.

**I.     Term of Injunctions or Stays.** Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in the Bankruptcy Case under Bankruptcy Code sections 105 or 362 or otherwise, and extant as of the Confirmation Hearing (excluding any injunctions or stays contained in or arising from the Plan or the Confirmation Order), shall remain in full force and effect through and inclusive of the Effective Date and thereafter shall automatically terminate unless otherwise ordered by the Bankruptcy Court.

**J.     Dissolution of the Debtor**

No later than one hundred twenty (120) days after entry of a Final Order closing the Bankruptcy Case, the Debtor shall dissolve or otherwise terminate its existence and all officers and directors of the Debtor, as appointed on and after the Effective Date, shall be deemed resigned, and shall be removed from any further duties and responsibilities in such capacities under applicable laws.  The Confirmation Order shall constitute the finding and order of the Bankruptcy Court, binding on all Creditors and other parties-in-interest, that: (a) the Debtor is due to be dissolved within one hundred twenty (120) days after the entry of Final Order closing the Bankruptcy Case under applicable law and without further action or proceedings (by stockholders, officers, directors or otherwise) or further filing, amendment or restatement of articles of incorporation; (b) to the extent necessary, the Liquidating Trustee is authorized and directed to cause such dissolution without further action or proceedings or further filings, amendments, or restatement of the underlying corporate or constitutional documents of the Debtor; and (c) a copy of the Confirmation Order, filed as an exhibit to any state or federal dissolution papers, shall satisfy any requirement under applicable statutes or other applicable non-bankruptcy law regarding the authorization of the dissolution of the Debtor.

**K.     No Agency Relationship and Limitation of Liability of the Liquidating Trustee**

The Liquidating Trustee and his or her agents shall not be deemed to be the agent for any Person in connection with the Cash held or distributed under the Plan.  The Liquidating Trustee and his or her agents shall not be liable to the Debtor or any third party for any mistake of fact or law or error of judgment or any act or omission of any kind unless it constitutes gross negligence or willful misconduct.  The Liquidating Trustee may conclusively rely, and shall be fully protected personally in acting upon, any statement, instrument, opinion, report, notice, request, consent, order or other

instrument or document that he or she believes to be genuine and to have been signed or presented by the proper party. The Liquidating Trustee may rely upon written information previously generated by the Debtor.

## L.    Establishment of Liquidating Trust and Vesting of Liquidating Trust Assets

On the Effective Date, the Liquidating Trust will be established under the Liquidating Trust Agreement and the Liquidating Trust Assets shall be deemed vested in and transferred to the Liquidating Trust free and clear of all Claims and Interests. The Liquidating Trust Assets shall be administered in accordance with the Liquidating Trust Agreement and the Plan. The Liquidating Trustee shall be compensated for his or her services from the Liquidating Trust Assets.

In accordance with Bankruptcy Code section 1123(b), after the Effective Date, the Liquidating Trustee shall have the following rights, powers, and duties: (i) the full right, power, and discretion to manage the Liquidating Trust Assets, and execute, acknowledge and deliver any and all instruments with respect thereto, as it deems appropriate or necessary in his or her discretion and to effectuate his or her obligations under the Plan and the Liquidating Trust Agreement; (iii) to administer the collection, prosecution, settlement and/or abandonment of the Causes of Action on behalf of and for the benefit of the beneficiaries of the Liquidating Trust; (iv) administer, compromise, settle, resolve, discontinue, abandon all Causes of Action or General Unsecured Claims without approval of the Bankruptcy Court (except that the compromise or settlement of all Causes of Action in excess of $100,000 shall be approved by the Liquidating Trust Advisory Board, and any Causes of Action seeking recovery in excess of $250,000 shall be approved by the Bankruptcy Court) or litigate to Final Order if necessary any Disputed General Unsecured Claims;(v) make interim and final Distributions to holders of Allowed Class 3(a) and 3(b) Claims; (vi) make any Distributions of Causes of Action, if any, to the recipients under the Plan; (vii) file all tax and regulatory forms, returns, reports and other documents required under the law with respect to the Liquidating Trust; and (viii) file suit or any appropriate motion for relief in the Bankruptcy Court or in any other court of competent jurisdiction to resolve any disagreement, conflict, dispute or ambiguity in connection with the exercise of his or her rights, powers, or duties. In accordance with Bankruptcy Code section 1123(b), any Cause of Action that a Debtor or the Estate may hold against any entity shall vest in the Liquidating Trustee on behalf of the Liquidating Trust. The Liquidating Trustee, through his or her authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Liquidating Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Before the Effective Date and in connection with the establishment of the Liquidating Trust, members of the Committee who desire to serve on the Liquidating Trust Advisory Board shall notify the Initial Liquidating Trustee of such Person's desire and intent to serve on the Liquidating Trust Advisory Board. Upon the establishment of the Liquidating Trust, those Committee members (other than Bartlit Beck) who desire to serve on the Liquidating Trust Advisory Board automatically will be appointed to the Liquidating Trust Advisory Board. Any other holder of an Allowed Class 3(a) Claim may also contact the Initial Liquidating Trustee and indicate that Person's desire to serve on the Liquidating Trust Advisory Board, provided, however, that the Liquidating Trust Advisory

Board shall not be comprised of more than five members, or less than one member, at any given time.

Notwithstanding anything in this Plan or any attachments or ancillary documents to the contrary, nothing herein is intended or should be construed as waiving or releasing any of the Bartlit Beck Claims the Debtor, its Estate, or any successor thereto, including the Liquidating Trust, may have in and to such matters, and all such matters are expressly reserved. Further, notwithstanding anything in this Plan or any attachments or ancillary documents to the contrary, any resolution or settlement of the Bartlit Beck Claims, if any, shall be presented pursuant to a noticed motion filed with the Bankruptcy Court, noticed to at least the Debtor's top twenty (20) unsecured Creditors by claim amount, as well as any Creditor who has filed a request for special notice in the Bankruptcy Case, and shall be subject to review by the Bankruptcy Court under the "fair and equitable" standard of decision applicable to compromises pursuant to Bankruptcy Rule 9019 and related applicable caselaw.

**M.    Cancellation of Notes, Instruments, Debentures and Equity Securities**

On the Effective Date, except to the extent provided otherwise in the Plan, all notes, instruments, securities, certificates and other documents evidencing Claims against the Debtor shall be canceled and deemed terminated, and the parties' rights, if any, with respect to the Debtor's post-confirmation estate shall be determined solely under the Plan. The Interests in the Debtor shall be canceled and deemed terminated upon the full implementation of the Plan and closing the Bankruptcy Case. Pending such cancellation, holders of Equity Interests shall have no economic or other rights in connection with the Debtor. Additionally, under section 1142(b) of the Bankruptcy Code, a non-Debtor entity is authorized and directed to execute or deliver or to join in the execution or delivery of any instrument required to effect a sale, assignment, transfer, abandonment or other disposal of the Debtor's Assets and to perform any other act, including the satisfaction of any encumbrance, that is necessary to effectuate a sale, assignment, transfer, abandonment or other disposal of the Assets.

**N.    Dissolution of the Committee**

On the Effective Date, the Committee shall be dissolved, and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations to and arising from and in connection with their service as members of the Committee in the Bankruptcy Case. As discussed in Section 6(L) of the Plan, any Committee member that desires to serve on the Liquidating Trust Advisory Board to be established under the Liquidating Trust Agreement shall indicate to the Initial Liquidating Trustee such desire to serve, and shall automatically be appointed to the Liquidating Trust Advisory Board upon the establishment of the Liquidating Trust, provided however, that Bartlit Beck shall not seek, nor be permitted, to serve, as members of the Liquidating Trust Advisor Board.

**O.    Closing of the Debtor's Chapter 11 Case**

When the business and affairs of the post-confirmation estate have been otherwise wound up, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Bankruptcy Case pursuant to Bankruptcy Code section 3022, Local Rule 3022, and other applicable sections of the Bankruptcy Code and Bankruptcy Rules.

# ARTICLE 7
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Timing and Delivery of Distributions on General Unsecured Claims

Except as otherwise provided or as ordered by the Bankruptcy Court or if any holder of an Allowed General Unsecured Claim agrees to different treatment, Distributions to be made on account of Allowed General Unsecured Claims as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable by the Liquidating Trustee. No Distributions shall be made on account of any Disputed General Unsecured Claims unless and until such General Unsecured Claim has become an Allowed General Unsecured Claim. Distributions on account of any General Unsecured Claim that first becomes an Allowed General Unsecured Claim after the Effective Date shall be made on the first distribution date after the end of the calendar quarter in which such Claim becomes an Allowed Claim. Any payment or Distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day. The Liquidating Trustee shall establish procedures for distributing funds to holders of Allowed General Unsecured Claims, including, without limitation, the establishment of any Disputed Claims Reserve and the making of any initial, subsequent and final Distributions.

### B.    Objections to and Resolution of Disputed Claims

After the Effective Date and through the Claim Objection Deadline, the Liquidating Trustee may make and file objections to all Claims and to withdraw such objections. Subject to the preceding sentence, all objections shall be litigated to Final Order; *provided, however*, that subject to the other provisions of this Plan, the Liquidating Trustee shall have the authority to compromise, settle or otherwise resolve any Claim; *provided further, however*, that the Liquidating Trustee reserves the right to seek relief before the Bankruptcy Court with respect to any Disputed Claim.

After the Effective Date, the Liquidating Trustee on behalf of the Liquidating Trust shall have the sole right and authority to file, settle, compromise, withdraw or litigate to judgment objections to Claims. The Liquidating Trustee shall have the authority to settle or otherwise resolve any Claims without approval or order of the Bankruptcy Court or notice to any party except the affected holder of the Claim. Any Claim that has been paid, satisfied or superseded may be expunged from the Claims Register by the direction from the Liquidating Trustee and without the need for Bankruptcy Court order, and any Claim that has been amended may be adjusted on the Claims Register.

### C.    Estimation of Claims

After the Effective Date, the Liquidating Trustee may at any time request that the Bankruptcy Court estimate, or establish procedures for the estimation or arbitration of, any contingent Claim, unliquidated Claim or Disputed Claim under Bankruptcy Code section 502(c) of the whether or not the Debtor or any other Person previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time. If the Bankruptcy Court estimates any contingent Claim, unliquidated Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidating Trustee may pursue supplementary proceedings to object to the

allowance of such Claim.  The aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**D.      Time-Barred Claims and Amendments to Claims**

Except as otherwise agreed by the Debtor, any and all Proofs of Claim filed after the applicable Bar Date shall be deemed Disallowed and expunged as of the Effective Date with no further notice to or action, order or approval of the Bankruptcy Court, and holders of such Claims may receive no Distributions on account of such Claims, unless such late Proof of Claim is deemed timely filed by a Final Order.  On or after the Effective Date, except as otherwise provided, a Claim may not be amended without the prior authorization of the Bankruptcy Court, and any such amended Claim filed shall be deemed Disallowed and expunged with no further notice to or action, order or approval of the Bankruptcy Court.

**E.      Interest on Distributions**

Except as otherwise specifically provided for in the Plan, the Confirmation Order or any other order of the Bankruptcy Court, or as otherwise required by bankruptcy or on bankruptcy law, post-petition interest shall not accrue or be paid on any Claims and no holder of a Claim shall be entitled to the payment of interest accruing on or after the Petition Date on any Claim.  If a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest thereon.

**F.      Delivery of Distributions**

Cash Distributions by check shall be mailed to each holder of an Allowed Claim entitled to such Distributions under the Plan at the distribution address of such Creditor on its Proof of Claim or at the address of such Creditor in the Debtor's filed Schedules, or absent that, its books and records.  If any Claim holder's Distribution is returned as undeliverable, no further Distributions to such holder shall be made unless and until the Liquidating Trustee is notified of such holder's then current address, at which time all missed Distributions shall be made to such holder without interest. Any notification of a Claim holder's then current address must be received by the Liquidating Trustee within ninety (90) days after the Distribution was originally made, after which time such Claim holder's Distribution shall be forfeited and treated as an Unclaimed Distribution as defined in under Section 7(G) of the Plan.  Nothing in the Plan shall require the Liquidating Trustee to attempt to locate any holder of an Allowed Claim.

**G.      Unclaimed Distributions**

All Distributions made under the Plan unclaimed for ninety (90) days after the Distribution thereof shall be deemed unclaimed property under Bankruptcy Code section 347(b) and any entitlement of any holder of any Claims to such Distributions shall be forfeited, extinguished and forever barred (the "Unclaimed Distributions").  Any Unclaimed Distributions shall (a) with respect to Class 3(a) (General Unsecured Claims), be returned to the Liquidating Trust to be distributed in accordance with the Liquidating Trust Agreement; or (b) with respect to all other Classes of Claims and unclassified Claims, be distributed under Article V of this Plan.

**H.     Means of Cash Payment**

Cash Distributions made under the Plan shall be in United States funds, by check drawn on a bank, or, if the Liquidating Trustee so elects in his or her sole discretion, by wire transfer from a bank.

**I.     Compliance with Tax Requirements**

In connection with the consummation of the Plan, the Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions under the Plan and the Liquidating Trust Agreement shall be subject to any such withholding and reporting requirements.  Notwithstanding the foregoing, each holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution.  The Liquidating Trustee shall be entitled in his or her sole discretion to withhold any Distributions to a holder of an Allowed Claim that fails to provide tax identification or social security information upon written request and such Distribution shall be treated as an Unclaimed Distribution under Section 7(G) of this Plan.

**J.     Distribution Record Date**

The Liquidating Trustee shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and shall be entitled for all purposes hereof to recognize and distribute only to those holders of Allowed Claims that actually held such Claims as of the close of business on the Distribution Record Date.

**K.     Fractional Cents**

When any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent (rounding down in the case of less than $0.005 and rounding up in the case of $0.005 or more).

**L.     Insurance Policies**

For the avoidance of doubt, nothing in this Plan shall constitute a waiver of the rights of the Debtor, its Estate, or any successor or assign thereof, under any policies of insurance or claims made thereunder, and nothing in this Plan alters or modifies the duty, if any, that any insurers have to pay claims covered by any applicable insurance policies.

**ARTICLE 8**
**CONDITIONS TO CONFIRMATION AND EFFECTIVENESS**

**A.     Conditions to Confirmation**

The following are conditions precedent to the occurrence of Confirmation of the Plan, each of which may be satisfied or waived.

1.      The Bankruptcy Court shall have entered an order, in a form reasonably acceptable to the Plan Proponents, conditionally approving the adequacy of the Disclosures in this Plan; and

2.      The Confirmation Order approving and confirming the Plan, as such Plan may have been modified, amended or supplemented, shall have been entered in a form reasonably acceptable to the Plan Proponents.

**B.      Conditions to Plan Effectiveness**

Notwithstanding anything herein to the contrary, the Plan may not be consummated, and the Effective Date shall not occur, unless and until each of the following conditions shall have been either satisfied or waived:

1.      The Bankruptcy Court has entered an order confirming the Plan in form and substance satisfactory to the Plan Proponents;

2.      No stay of the Confirmation Order is in effect;

3.      All documents, instruments and agreements, in form and substance satisfactory to the Plan Proponents or other party thereto, provided for under or necessary to implement the Plan have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby;

4.      The Reserves have been funded, unless otherwise agreed to by the holder of the applicable Claim, the consent for which shall be implied unless otherwise objected to in writing; and

5.      The Debtor shall have received all authorizations, consents, regulatory approvals, rulings, opinions or other documents that are determined by the Debtor to be necessary to implement the Plan.

**C.      Waiver of Conditions**

The Plan Proponents may jointly waive any of the conditions set forth in this Article VIII of the Plan.  The failure to satisfy any condition may be asserted by the Plan Proponents regardless of the circumstances giving rise to the failure of such condition to be satisfied.  If the Plan Proponents fail to assert the nonsatisfaction of any such conditions, such failure shall not be deemed a waiver of any other rights thereunder.

**ARTICLE 9**
**<u>TREATMENT OF EXECUTORY CONTRACTS AND LEASES</u>**

**A.      Contracts and Leases Not Specifically Assumed and Assigned are Rejected**

All unexpired leases and executory contracts of the Debtor not previously expressly assumed, rejected or terminated by order of the Bankruptcy Court or by the terms of any such unexpired lease or executory contract, or which are not subject of a pending application to assume on the Effective Date, shall be deemed rejected on the Effective Date.  Notwithstanding anything to

the contrary herein, any directors and officers liability or errors and omissions insurance policies running to the benefit of the Debtor, including, but not limited to the Estate's right to recovery thereunder, shall be deemed to vest in the Liquidating Trust in accordance with the provisions of Section 6(L) of the Plan and the Liquidating Trust Agreement.

**B.      Bar Date for Filing Claim for Rejection Damages**

If the rejection of an executory contract or unexpired lease by the Debtor under Article VIII hereof results in damages to the counterparty to such contract or lease, then a Claim for damages or any other amounts related in any way to such contract or lease shall be forever barred and shall not be enforceable against the Debtor, its successor and assign or its property, unless a Proof of Claim is filed as prescribed in the applicable order rejecting such contract or lease, or if not otherwise prescribed in any such rejection order, then no later than thirty (30) days from the Effective Date.

**C.      Preexisting Obligations to the Debtor Under Executory Contracts and Unexpired Leases**

Rejection or repudiation of any executory contract or unexpired lease under the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtor under such contract or lease as modified, amended, supplemented, or restated.   Notwithstanding any non-bankruptcy law to the contrary, the Liquidating Trustee expressly reserves and waives no right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtor from counterparties to rejected or repudiated executory contracts or unexpired leases.

**ARTICLE 10**
**RETENTION OF JURISDICTION**

**A.      Jurisdiction over Claims and Actions**

The Bankruptcy Court shall retain jurisdiction over the Bankruptcy Case, including such jurisdiction as is necessary to ensure that the purposes and intent of the Plan are implemented.  The Bankruptcy Court shall also expressly retain jurisdiction for purposes of classification of Claims or Interests and to hear and determine all Claims against the Debtor or its Estate and hear and determine all objections as may be filed with respect to the Claims and Interests.

**B.      Retention of Jurisdiction**

The Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Bankruptcy Case and the Plan, under Bankruptcy Code sections 105(c) and 1142, to the fullest extent permitted by law, including, without limitation, for these purposes:

1.      To resolve any matters related to the assumption and assignment or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner;

2.      To determine any and all Causes of Action, adversary proceedings, applications and contested matters;

3.    To allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests and to ensure that Distributions to holders of Allowed Claims are accomplished under the provisions of the Plan;

4.    To enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified or vacated;

5.    To issue orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

6.    To consider any amendments to or modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order, including the Confirmation Order;

7.    To hear and determine all applications for compensation and reimbursement of expenses of Retained Professionals;

8.    To decide and resolve any and all matters that may arise in connection with or relate to any previous order of the Bankruptcy Court and to enforce any such orders;

9.    To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated in the foregoing, any agreement, instrument, or other document governing or relating to any of the foregoing, or any settlement approved by the Bankruptcy Court;

10.    To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any Person or entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

11.    To recover all Assets of the Debtor, wherever located;

12.    To hear and determine disputes arising in connection with, or otherwise related to, the collection of outstanding accounts receivable of the Debtor;

13.    To hear and determine matters concerning state, local and federal taxes under Bankruptcy Code sections 346, 505 and 1146 of the (including any request by the Debtor, the Liquidating Trustee for an expedited determination of tax under Bankruptcy Code section 505(b));

14.    To hear and determine all disputes involving the existence, scope and nature of the releases, injunctions and exculpations granted under the Plan, the Confirmation Order or the Bankruptcy Code;

15.    To resolve any disputes concerning the Liquidating Trust Agreement;

16.     To adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters;

17.     To ensure that Distributions to holders of Allowed Claims are accomplished under the provisions of the Plan;

18.     To enter a Final Decree closing the Bankruptcy Case; and

19.     To hear any other matter not inconsistent with the Bankruptcy Code, including the entry and implementation of orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosures in this Plan.

**ARTICLE 11**
**NOTICE PROVISIONS**

A.     **Notices**

Except as otherwise set forth in the Plan, all notices or requests in connection with the Plan shall be in writing and will be deemed to have been given when received by personal delivery, facsimile, e-mail, overnight courier or first-class mail and addressed to:

**If to the Debtor:**
Larson & Zirzow, LLC
850 E Bonneville Ave.
Las Vegas, NV 89101
Attn: Matthew C. Zirzow
E-mail: mzirzow@lzlawnv.com
Telephone:  (702) 382-1170

**If to the Committee:**
Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center, Seventeenth Floor
San Francisco, CA 94111
Attn:   Ori Katz
E-mail: okatz@sheppardmullin.com
Telephone:  (415) 434-9100

**If to the Liquidating Trustee:**
Province, LLC
16255 Ventura Blvd., Suite 440
Encino, CA 91436
Attn:  Amanda Swift
E-mail: ademby@provincefirm.com
Fax: (310) 974-6353

**B.**      **Limitation on Notice**

The Debtor shall give the following notice with regard to the following matters, which notice shall be deemed good and sufficient notice of such matters with no requirement for any additional or further notice:

1.      Notice of Entry of Confirmation Order and Effective Date

Notice of the entry of the Confirmation Order and the occurrence of the Effective Date shall be sufficient when filed with the Bankruptcy Court and mailed to all holders of Claims and Interests.

2.      Post-Confirmation Date Service

After the Effective Date, notices of appearances and demands for service of process filed with the Bankruptcy Court before such date shall no longer be effective.  After the Effective Date, no further notices shall be required to be sent to any entities or Persons, except to the Liquidating Trustee, the U.S.  Trustee and any Creditor who files a renewed request for service of pleadings and whose Claim has not been fully satisfied.

3.      General Notice to Creditors

All notices and requests to Creditors of any Class shall be sent to them at the addresses set forth on their Proofs of Claim or, if no Proof of Claim was filed, to their last known address as reflected in the Debtor's records.  Any Creditor may designate in writing any other address for purposes of this Article, which designation shall be effective when filed with the Bankruptcy Court.

## ARTICLE 12
## MISCELLANEOUS PROVISIONS

**A.**      **U.S. Trustee Fees**

U.S. Trustee shall be paid when due under applicable law and the Liquidating Trustee shall continue to file post-confirmation quarterly reports to show the calculation of such fees for the Estate until a Final Decree is entered closing the Bankruptcy Case or dismissal or conversion of the Bankruptcy Case.

**B.**      **Post-Effective Date Injunctions or Stays**

All injunctions or stays that are in effect in these Bankruptcy Case on the Confirmation Date, whether by operation of law (including, without limitation, section 362 of the Bankruptcy Code) or by order of the Bankruptcy Court, shall continue and remain in full force and effect through and including the Effective Date.

**C.**      **Setoffs/Counterclaims**

The Debtor may, but shall not be required to, set off or counterclaim against any Claim and the payments or other Distributions to be made under the Plan in respect of the Claim, claims of any nature whatsoever the Estate may have against the holder of the Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of

any claim that the Estate may have against the holder; *provided*, *however*, that the Debtor will not seek to set off or counterclaim for any obligation that is not yet due. Setoffs or counterclaims arising from events after the Petition Date shall reduce the payouts under any Allowed Claim dollar for dollar. Setoffs or counterclaims arising from prepetition events shall only reduce the Allowed Claim and therefore, shall only reduce the payout amount proportionally with the reduction in the Allowed Claim. If any counterclaim or setoff asserted by the Debtor exceeds any Claim, the holder of such Claim shall not be entitled to any Distribution under the Plan, and the Debtor will reserve the right to recover any such excess counterclaim or set-off from the holder of the applicable Claim. After the Effective Date, the rights afforded to the Debtor under this paragraph shall apply to the Liquidating Trustee.

**D.    Amendment or Modification of the Plan**

The Plan Proponents may jointly modify, and reserve the right to jointly modify, the Plan at any time before or at the Confirmation Hearing, provided that the Plan, as altered, amended or modified, satisfies the conditions of Bankruptcy Code section 1127.

A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Before the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan, subject to prior approval by the Committee, without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims.

**E.    Revocation and Withdrawal of the Plan**

The Plan Proponents reserve the right to revoke or withdraw the Plan at any time before entry of a Confirmation Order. If the Plan Proponents revoke or withdraw the Plan before the Confirmation Date, if the Confirmation Date does not occur, or the Effective Date does not occur within one hundred twenty (120) days after the Confirmation Date, then the Plan shall be deemed to be null and void. In such event, nothing contained herein relating to the Plan shall be deemed to constitute an admission of validity, waiver or release of any Claims by or against the Debtor or any Person or to prejudice in any manner the rights of the Debtor or any Person in any proceeding involving the Debtor.

**F.    Severability**

If the Bankruptcy Court determines, before the Confirmation Date, that any provision in the Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the holder or holders of such Claims or Interests as to which the provision is determined to be invalid, void or unenforceable. The invalidity, voidness or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

**G.    Exemption from Certain Taxes and Fees**

Pursuant to, and to the fullest extent permitted by, Bankruptcy Code section 1146(a), any transfers of property pursuant to, in contemplation of, or in connection with, the Plan or pursuant to: (i) the issuance, Distribution, transfer, or exchange of any debt, equity security interest, or other Interest in the Debtor; (ii) the creation, modification, consolidation, assumption, termination, refinancing and/or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment or recording of any lease or sublease; or (iv) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall, and shall be directed to, forgo the collection of any such tax, recordation fee or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment.  The Bankruptcy Court shall retain specific jurisdiction with respect to these matters.

**H.    Business Days**

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then making such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

**I.    Governing Law**

Except to the extent the Bankruptcy Code, the Bankruptcy Rules and/or the Local Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Nevada, without giving effect to the principles of conflict of laws thereof.

**J.    Headings**

Headings are used in the Plan for convenience and reference only and shall not constitute a part of the Plan for any other purpose.

**K.    Exhibits**

All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

**L.      Entire Agreement**

The Plan and the Confirmation Order supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan, other than the previous orders entered in the Bankruptcy Case.

*[Rest of page intentionally left blank]*

1    Dated: October 12, 2023                ARUZE GAMING AMERICA, INC.,
                                            a Nevada corporation,
2

3                                           By:  /s/_____
                                            Yugo Kinoshita, Chief Executive Officer
4

5
     Prepared and Submitted:
6

7    By:  /s/ Matthew C. Zirzow            By:  /s/ Gabrielle A. Hamm
     LARSON & ZIRZOW, LLC                   SCHWARTZ LAW, PLLC
8    ZACHARIAH LARSON, ESQ.                 SAMUEL A. SCHWARTZ, ESQ., NVB 10985
     Nevada Bar No. 7787                    Email: saschwartz@nvfirm.com
9    E-mail: zlarson@lzlawnv.com            GABRIELLE A. HAMM, ESQ., NVB 11588
     MATTHEW C. ZIRZOW, ESQ.                Email: ghamm@nvfirm.com
10   Nevada Bar No. 7222                    601 East Bridger Avenue
     E-mail: mzirzow@lzlawnv.com            Las Vegas, NV 89101
11   850 E. Bonneville Ave.
     Las Vegas, Nevada 89101                SHEPPARD, MULLIN, RICHTER
12                                          & HAMPTON LLP
     Attorneys for Debtor                   ORI KATZ, ESQ. (pro hac vice), CBN 209561
13                                          E-mail:  okatz@sheppardmullin.com
                                            JEANNIE KIM, ESQ. (pro hac vice), CBN 270713
14                                          Email: jekim@sheppardmullin.com
                                            Four Embarcadero Center, 17th Floor
15                                          San Francisco, California 94111-4109
16
                                            JENNIFER L. NASSIRI, ESQ. (pro hac vice).
17                                          CBN 209796
                                            Email:  jnassiri@sheppardmullin.com
18                                          1901 Avenue of Stars, Suite 1600
                                            Los Angeles, CA 90067
19
20                                          Attorneys for the Official Committee of Unsecured
                                            Creditors of Aruze Gaming America, Inc.
21

22

23

24

25

26

27

28

SMRH:4890-7774-3491.7                              -39-
101223                                                                          89BG-371272

**Appendix**

**Definitions**

"**Administrative Claim**" means a Claim, to the extent not previously paid, otherwise satisfied, or withdrawn, for costs and expenses of administration of the Bankruptcy Case pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date, until and including the Effective Date, of preserving the Estate and operating the Debtor's business; (b) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code; and (c) all Claims pursuant to Bankruptcy Code section 503(b)(9), *provided*, *however*, that Administrative Claims shall not include Professional Fee Claims allowed under Bankruptcy Code section 507(a)(2).

"**Administrative Claims Bar Date**" means the last date by which any Person must file a request for payment of an Administrative Claim other than a Professional Fee Claim, which date shall be the first Business Day that is at least thirty (30) calendar days after the Effective Date. For the avoidance of doubt, post-petition statutory tax Claims shall not be subject to the Administrative Claims Bar Date. U.S. Trustee Fees are not subject to the Administrative Claims Bar Date.

"**AGA**" means Aruze Gaming America, Inc., or the Debtor.

"**Allowed**" means (a) with respect to Claims or Interests, a Claim or Interest (i) which has been scheduled as undisputed, non-contingent and liquidated in the Schedules (subject to the Debtor's right to amend the Schedules) and as to which no objection or request for estimation has been filed by the applicable Claim Objection Deadline set by the Bankruptcy Court or the expiration of such other period fixed by the Bankruptcy Court, (ii) as to which a Proof of Claim has been properly and timely filed and either (x) no objection thereto has been timely filed, or if an objection has been timely filed, such portion of which is not subject to such objection, or (y) such Claim has been allowed (but only to the extent allowed) by a Final Order, (iii) which is compromised, settled or otherwise resolved under the authority granted to the Debtor before the Effective Date, and thereafter by the Liquidating Trustee, under the authority granted under the Plan or (iv) which has been expressly allowed under the provisions of the Plan; and (b) with respect to any Administrative Claim (i) a Claim that represents an actual and necessary expense of preserving the Debtor's Estate or operating the businesses of the Debtor, to the extent such Claim is determined by the Liquidating Trustee to constitute an Administrative Claim; or (ii) a Claim that is Allowed in whole or in part by a Final Order, and only if such Allowed portion is determined under Final Order to constitute a cost or expense of administration under Bankruptcy Code section 503(b); and (iii) a Claim that represents a Professional Fee Claim to the extent such Professional Fee Claim is Allowed by an order of the Bankruptcy Court. An Allowed Claim shall not, for purposes of computation of Distributions under the Plan, include interest on such Claim from and after the Petition Date.

"**Arbitration Award**" means that award, entered on December 20, 2019, by an arbitration panel in favor of Bartlit Beck and against Mr. Okada, in the amount of $54,641,079.48, as well as post-award interest in the amount of $12,242.83 for each calendar day until he paid in full the amount awarded.

"**Armory**" means Armory Securities, LLC, the Debtor's investment banker and a Retained Professional.

"**Assets**" means collectively, (a) any and all right, title, and interest of the Debtor and its Estate in and to property of whatever type or nature, including, but not limited to, the Debtor's books and records, interests in unexpired non-residential real property leases, all Avoidance Actions and Causes of Action as of the Petition Date; and (b) any assets acquired, collected, or recovered by the Estate during the Bankruptcy Case.

"**Avoidance Actions**" means any Causes of Action that arise under Bankruptcy Code sections 502(d), 544,545,547, 548, 549 and 550.

"**B. Riley**" means GlassRatner Advisory & Capital Group, LLC d/b/a B. Riley Advisory Services, the Debtor's financial advisor and a Retained Professional.

"**Ballot**" means the ballot form distributed to each holder of a Claim entitled to vote to accept or reject the Plan.

"**BB Judgment**" means that judgment entered in favor of Bartlit Beck and against Mr. Okada by the U.S. District Court for the Northern District of Illinois, on March 12, 2021, in Case No. 19-cv-08508, confirming the Arbitration Award in favor of Bartlit Beck and against Mr. Okada.  For the avoidance of doubt, the BB Judgment was only against Mr. Okada personally, and not against the Debtor.

"**Bank Group**" means FSB and NSA, in their capacities as the original lenders and agents under the Bank Group Loans, and, as may be applicable under the documents associated with the Bank Group Loans, include Northwestern Bank, Woodlands National Bank, Bank of George, Security State Bank, Commercial Bank, First State Bank, First Bank and Trust Company, and First Central Bank.

"**Bank Group Collateral**" means all Contracts (as defined in the underlying Bank Group Loans), which included AGA's contracts for equipment with any gaming enterprise, including the right to receive Payments (as defined in the underlying Bank Group Loans) under those Contracts, and the right to exercise the Debtor's rights and remedies upon default thereunder; all Equipment, which included all gaming device equipment owned by AGA and that was actively leased in a Route Pool, and to the extent directly proceeding from, or required to create or enforce the security interest of the secured party therein, all cash, chattel paper, contract rights, documents, money and payment intangibles pertaining to the Contracts and the Equipment; all Contract Security for each Contract, which included every guaranty, security interest, mortgage or other security for payment and performance of the obligor's obligations under the Contracts; all warranties and related rights with respect to such Contracts and the related Equipment; all awards of damages payable to the Debtor on account of the Equipment or Contracts; and all books and records pertaining to any of the foregoing; but excluding the proceeds of any Excluded Assets (as defined in the underlying Bank Group Loans), which excluded out any of the Debtor's rights and remedies under any Contract that was not Equipment.  Capitalized terms used in this definition have the same meanings ascribed to them in the Series A-B Security Agreement, the Series D Security Agreement, the Series E Security Agreement, and the Series F Security Agreement.

"**Bank Group Deficiency Claim**" means the Deficiency Claim (or that portion of the Bank Group Claim that is unsecured, as the amount of the Bank Group Claim, in the aggregate, exceeds

the value of the Bank Group Collateral held by the Bank Group as of the date of the entry of the Bank Group Sale Order).

"**Bank Group Loans**" means, collectively, the Series 2022-A Loan, Series A-B Loan, Series C Loan, Series D Loan, Series E Loan, Series F Loan, Series G Loan, and the Series H Loan.

"**Bank Group Sale**" means that sale, free and clear of all Liens, Claims, and encumbrances, of that subset of the Debtor's Assets to the Bank Group, in exchange for the Bank Group's credit bid in the amount of Six Million Dollars ($6,000,000), and other consideration as more specifically set forth in that Bank Group APA attached to the Bank Group Sale Order.

"**Bank Group Sale Order**" means that certain *Order (A) Approving Asset Purchase Agreement with First Savings Bank and National Servicing and Administration, LLC, or Their Designee, (B) Authorizing the Sale of Assets, (C) Authorizing the Assumption and Assignment of Contracts and Leases, and (D) Granting Related Relief* entered on August 10, 2023, approving that certain Asset Purchase Agreement appended as Exhibit A (the "Bank Group APA") to the Bank Group Sale Order.

"**Bankruptcy Case**" means the voluntary chapter 11 bankruptcy case the Debtor commenced, which is captioned as *In re Aruze Gaming America Inc.*, Case No. 23-10356-abl (Bankr. D. Nev.).

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as in effect on the Petition Date, together with any amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Case.

"**Bankruptcy Counsel**" means Larson Zirzow.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Nevada, the Honorable August B. Landis, United States Bankruptcy Judge, presiding.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as in effect on the Petition Date, together with any amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Case.

"**Bar Date**" means: (a) June 6, 2023, for non-governmental units; and (b) July 31, 2023, for governmental units.  The Plan establishes an Administrative Claims Bar Date that is thirty (30) days after the Effective Date, as described in Article III of the Plan, as well as a Bar Date for rejection damages Claims that also is thirty (30) days after the Effective Date, as described in Section 9(B) of the Plan.

"**Bartlit Beck**" means Bartlit Beck, LLP, a law firm with offices in Chicago and Denver, which had previously represented Mr. Okada personally in the Wynn Litigation.

"**Bartlit Beck Claims**" means, collectively, those Claims asserted by Bartlit Beck pursuant to that Proof of Claim, filed with the Bankruptcy Court on May 26, 2023, and assigned no. 52 on the Claims Register, by which Bartlit Beck asserts a Claim, for an amount unknown but including a Secured Claim in the amount of $27,365,120 per the Garnishment Judgment, plus interest.

"**Bid Procedures**" means those certain bidding procedures appended to the Bid Procedures Order as Exhibit A thereto, to govern the marketing and sale of substantially all of the Debtor's Assets, subject to Court approval and overbid.

"**Bid Procedures Order**" means that certain *Order Approving and Authorizing (A) Bidding Procedures in Connection with the Purchase of the Assets of the Debtor, (B) Form and Manner of Notice of the Sale Hearing and (C) Related Relief* entered by the Bankruptcy Court on May 4, 2023 [ECF No. 277], approving the Bid Procedures.

"**Business Day**" means any day, other than a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

"**Buyers**" means the Bank Group, Empire, and Interblock.

"**Cash**" means lawful currency of the United States and its equivalents; *provided*, *however*, that any Distributions under the Plan will be deemed to be made in Cash if made by check drawn on any United States bank.

"**Causes of Action**" means any Claims, actions, refunds, causes of action including but not limited to Avoidance Actions, suits, proceedings, rights of recovery, rights of setoff, rights of recoupment or other similar rights, and the Bartlit Beck Claims.

"**Charging Order**" means that order, entered by the Nevada State Court on August 27, 2021, granting Bartlit Beck a charging order under NRS 78.746 as to all of Mr. Okada's dividends and proceeds owing from his ownership of stock in AGA, but also directing that Bartlit Beck "must not interfere in the operations of AGA." A true and correct copy of the Charging Order is attached as Exhibit 44 to the Kinoshita First Day Declaration.

"**Claim**" means a "claim" as defined in Bankruptcy Code section 101(5) and, except as otherwise provided in the context, means a claim against the Debtor or its Estate.

"**Claim Objection Deadline**" means the date by which the Liquidating Trustee shall file and serve all objections to Claims, which date shall be the later of (a) one hundred and twenty (120) days after the Effective Date or (b) thirty (30) days after the filing of any Claim, including any Claim for damages arising from the Debtor's rejection of an executory contract or unexpired lease; *provided*, *however*, that the Claim Objection Deadline shall not apply to any Claim filed after the applicable Bar Date. The Claim Objection Deadline may be extended for one ninety (90) day period by the Liquidating Trustee by filing a notice of the extended Claim Objection Deadline with the Bankruptcy Court. Thereafter, the Claim Objection Deadline may be further extended only by an order of the Bankruptcy Court.

"**Claims Register**" means the official Claims Register for this Bankruptcy Case as maintained by the Clerk of the Bankruptcy Court.

"**Class**" means any of the categories of Claims or Interests established under the Plan under Bankruptcy Code sections 1122 and 1123(a).

"**Committee**" means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case.

"**Committee Action**" means that certain adversary proceeding, styled *Official Committee of Unsecured Creditors of Aruze Gaming America, Inc. v. NextStep Capital, LLC and NextStep Gaming, LLC (In re Aruze Gaming America, Inc.)*, assigned Adversary Proceeding No. 23-1075.

"**Compromise Motion**" means that certain *Motion for Approval of Global Compromise Among the Debtor, First Savings Bank, National Servicing and Administration, LLC, NextStep Gaming, LLC, NextStep Capital, LLC, and the Official Committee of Unsecured Creditors Pursuant to Fed. R. Bankr. P. 9019* [ECF Nos. 461, 464 and 474], filed on July 24, 2023, whereby the Debtor sought Court approval of the Global Settlement Agreement.  The Bankruptcy Court entered an order approving the Compromise Motion on July 31, 2023 [ECF No. 480].

"**Confirmation**" means entry by the Bankruptcy Court of the Confirmation Order.

"**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order.

"**Confirmation Hearing**" means the hearing or hearings held by the Bankruptcy Court to consider Confirmation of the Plan as required by Bankruptcy Code section 1128(a), as such hearing may be continued from time to time.

"**Confirmation Hearing Notice**" means notice given by the Plan Proponents of the Confirmation Hearing.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

"**Creditor**" means a "creditor" as defined in Bankruptcy Code section 101(10), and, except as otherwise provided in context, means a creditor of the Debtor or its Estate.

"**D&O Claims**" means the Estate's interest in certain claims and/or Causes of Action, arising before the Petition Date, against the Potential Defendants.

"**Debtor**" means Aruze Gaming America, Inc., a Nevada corporation, the debtor and debtor in possession in the Bankruptcy Case.

"**Debtor Net Proceeds**" means the balance of the Gross Proceeds after payment of amounts due to the Bank Group, NSC, and PDS, to be distributed from the proceeds of the Main Asset Sales, as provided under Section 3.1 of the Global Settlement Agreement.

"**Decatur Landlord**" means Beltway Business Park Warehouse No. 9, LLC, as landlord, under the Decatur Lease.

"**Decatur Landlord Cure Claim**" means the Decatur Landlord's Claim for Thirty-One Thousand, One Hundred Thirty-Eight Dollars ($31,138), for amounts the Decatur Landlord alleged as due and owing under the Decatur Lease as and for a cure to the Decatur Landlord.

"**Decatur Leasehold**" means the Debtor's leasehold interest in that that certain unexpired lease, dated on or about October 12, 2021, as amended from time to time, of non-residential real

property located at 6900 S. Decatur Blvd., Suites 100/100, Las Vegas, Nevada 89118 (the "Decatur Lease"), or the Debtor's prepetition headquarters.

"**Deferred General Unsecured Claims**" means that the Bank Group's Deficiency Claim.

"**Deficiency Amount**" means the amount by which the total amount of a Claim exceeds the value of the property securing such Claim as of the date of the valuation of the property for purposes of allowance of such Claim.

"**Deficiency Claim**" means a Claim on account of a Deficiency Amount.

"**Disallowed**" means, as it relates to any type of Claim, all or any portion thereof that (a) has been disallowed by Final Order, (b) is scheduled as zero or as contingent, disputed or unliquidated and as to which no Proof of Claim has been timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order establishing a Bar Date, (c) is not scheduled and as to which no Proof of Claim has been timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order establishing a Bar Date, (d) has been withdrawn by agreement of the holder thereof and the Debtor, before the Effective Date, or thereafter has been withdrawn by agreement of the Liquidating Trustee and the holder thereof, (e) has been withdrawn by the holder thereof or (f) is not an Allowed Claim.

"**Disclosures**" means that portion of the Plan that provides to Creditors and other parties in interest entitled to vote on the Plan adequate information to enable such voting Creditor to make an informed decision whether to accept or reject the Plan.  As the Plan Proponents have proposed a combined plan and disclosure statement, the Plan Proponents will seek preliminary approval of the Disclosures set forth in Article II of the Plan, to be approved on a final basis by the Bankruptcy Court in accordance with Bankruptcy Code section 1125, as it may be altered, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules, at the Confirmation Hearing.

"**Disputed**" means, with reference to any Claim, any such Claim (a) to the extent neither (x) an Allowed Claim or a Disallowed Claim under the Plan or a Final Order nor (y) deemed an Allowed Claim under the Plan or under Bankruptcy Code section 502, 503 or 1111,(b) which has been or hereafter is listed by the Debtor on its Schedules as unliquidated, disputed or contingent and which has not been resolved by written agreement of the parties or a Final Order or (c) as to which the Debtor, the Liquidating Trustee or any other party in interest has interposed a timely objection and/or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order.  Because holders of Allowed Interests will not receive any Distribution on account of such Interests, it is unnecessary to characterize any Interests, or part thereof, as Disputed.

"**Distribution**" means any initial or subsequent issuance, payment, or transfer of consideration made under the Plan or Liquidating Trust Agreement.

"**Distribution Agent**" means (i) the Liquidating Trustee solely in his, her or its capacity as distribution agent under the Plan with respect to Distributions to holders of Administrative Claims (including Professional Fee Claims), Priority Tax Claims, and Claims in Classes 1, 2, 3(a), 3(b) and 4 on account of such Allowed Claims, or (ii) any party designated by the Liquidating Trustee to serve in such capacity.

"**Distribution Date(s)**" means the date(s) on which the Liquidating Trustee determines that Distributions to holders of Allowed General Unsecured Claims should be made under the Plan.

"**Distribution Record Date**" means the Confirmation Date.

"**Effective Date**" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the Effective Date have been either satisfied or waived.

"**EGM Machine Shortfall**" means, if the number of EGM Machines on route (based on the methodology and assumptions used by the Debtor in the ordinary course of its business) is less than 940 EGM Machines as of the earlier of (i) the closing of the Bank Group Sale, or (ii) August 4, 2023, then the Debtor's Estate shall provide to the Bank Group value equivalent to the EGM Machine Shortfall in the following priority, assuming the following valuations: (x) first, from EGM Machines from inventory held and segregated for the Bank Group's benefit (each, an "Inventory EGM Machine"), and (y) second, Cash, in an amount not to exceed Three Hundred Thousand Dollars ($300,000) in any event.  For the purpose of calculating any EGM Machine Shortfall, the value of each EGM Machine on route will be Ten Thousand Dollars ($10,000) and the value of each Inventory EGM Machine will be Four Thousand Dollars ($4,000).  If the total number of EGM Machines on route as of (i) the closing of the Bank Group Sale, or (ii) August 4, 2023, whichever is earlier, is greater than 940 EGM Machines, there will not be any cash adjustment in favor of the Estate.  In no event shall the total amount of gross proceeds from the Main Asset Sales to be distributed to the Bank Group be less than Ten Million Dollars ($10,000,000).

"**EGM Machines**" means the 940 electronic gaming and slot machines on route and certain collateral rights of the Bank Group.

"**EGM Revenue**" means all revenues associated with the EGM Machines as of July 21, 2023, which EGM Revenue the Debtor placed into a segregated account for the benefit of the Bank Group and released to the Bank Group upon the closing of the Bank Group Sale.  For the avoidance of doubt, the EGM Revenue shall be in addition to all other amounts due and owing to the Bank Group under the Global Settlement Agreement.

"**Empire**" means Empire Technological Group Limited d/b/a Play-Synergy.

"**Empire Sale**" means that sale, free and clear of all Liens, Claims, and encumbrances, of that subset of the Debtor's Assets to the Bank Group, in exchange for Seven Million, Two Hundred Thousand Dollars ($7,200,000), less amounts owed by the Debtor to Empire, in exchange for certain electronic gaming and slot machines, together with associated intellectual property and branding and certain "I-Gaming" assets and other consideration as more specifically set forth in that Empire APA attached to the Empire Sale Order.

"**Empire Sale Order**" means that certain *Order (A) Approving Asset Purchase Agreement with First Savings Bank and National Servicing and Administration, LLC, or Their Designee, (B) Authorizing the Sale of Assets, (C) Authorizing the Assumption and Assignment of Contracts and Leases, and (D) Granting Related Relief* entered on August 10, 2023, approving that certain Asset Purchase Agreement appended as Exhibit A (the "Empire APA") to the Empire Sale Order.

"**Empire Vehicle Sale**" means that sale, free and clear of all Liens, Claims, and encumbrances, of that subset of the Debtor's Assets to the Bank Group (25 motor vehicles), in exchange for Five Hundred Fifty Thousand Dollars ($550,000), as more specifically set forth in that Empire APA and approved by the Empire Vehicle Sale Order.

"**Empire Vehicle Sale Order**" means that certain *Order (A) Approving Asset Purchase Agreement with First Savings Bank and National Servicing and Administration, LLC, or Their Designee, (B) Authorizing the Sale of Assets, (C) Authorizing the Assumption and Assignment of Contracts and Leases, and (D) Granting Related Relief* entered on August 10, 2023 [ECF No. 535, as amended by ECF No. 641], approving the sale of those vehicles appended as Exhibit 1.

"**Employee Obligations Motion**" means *Debtor's Emergency Motion for Order Authorizing, but not Directing, the Debtor to: (I) Pay Prepetition Employee Wages, Salaries, and Compensation, Employee Benefit Contributions, and Reimbursable Business Expenses; and (II) Authorizing All Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations* filed by the Debtor on February 6, 2023 [ECF No. 11].

"**Equity Interests**" means all previously issued and outstanding common stock, preferred stock, membership interests, or other ownership interests, including without limitation pursuant to Bankruptcy Code section 101(16) in the Debtor, including restricted stock, treasury stock, and all options, warrants, calls, rights, puts, awards, commitments, appreciation rights, or any other agreements of any character to convert, exchange, exercise for, or otherwise receive any such common stock, preferred stock, membership interests, or other ownership interests.  For the avoidance of doubt, as of the Petition Date, the Debtor's sole shareholder was Mr. Okada.

"**Estate**" means all legal or equitable interests of the Debtor in property as of the Petition Date, including all property in which the Debtor has an interest, even if owned or held by another Person, created by Bankruptcy Code section 541(a) on the Petition Date.

"**Exculpated Parties**" means, collectively, and in the Bankruptcy Case in its capacity as such:  (a) the Debtor, and its current and former officers, directors, employees and independent contractors, but only to the extent they served between the Petition Date and through the Effective Date of the Bankruptcy Case, and *further excepting and excluding* therefrom the Excluded Parties (as hereinafter defined) and the D&O Claims, or any available insurance available as to the D&O Claims; (b) the Committee and its respective members, but only with respect to such Committee members' duties and responsibilities in each member's capacity as a member of the Committee during the Bankruptcy Case; (c) the Retained Professionals.  The "Excluded Parties" include Mr. Okada and any of his relatives.  For the avoidance of doubt, the Excluded Parties are not Exculpated Parties and thus the Debtor and its Estate, or any successor thereto, shall fully retain without any limitation:  (i) all Causes of Action against such Excluded Parties; (ii) the D&O Claims and any available insurance available as to the D&O Claims; (iii) any challenges to the validity, priority or extent of any Liens or Claims asserted by the Bartlit Beck Claims.

"**Final Cash Collateral Order**" means that *Final Order (I) Granting, in Part, the Debtor's Emergency Motion for Entry of Interim and Final Orders (A)(I) Authorizing the Use of Alleged Cash Collateral and (II) Granting Adequate Protection, and (B) Scheduling a Final Hearing; and (II) Approving Stipulation by and Among the Debtor, Various Secured Creditors and the Official*

*Committee of Unsecured Creditors Resolving the Debtor's Motion for Final Use of Cash Collateral*, entered by the Bankruptcy Court on March 16, 2023 [ECF No. 160].

"**Final Cash Collateral Stipulation**" means that *Stipulation by and Among the Debtor, Various Secured Creditors and the Official Committee of Unsecured Creditors Resolving the Debtor's Motion for Final Use of Cash Collateral* attached to the Final Cash Collateral Order and that *Notice of Proposed Final Cash Collateral Stipulation and Order* filed by the Debtor on March 14, 2023 [ECF No. 156], as amended from time to time.

"**Final Decree**" means an order entered pursuant to Bankruptcy Code section 350, Bankruptcy Rule 3022, and Local Rule 3022 closing the Bankruptcy Case; *provided*, *however*, that the Plan shall not be deemed fully administered pursuant to Local Rule 3022 automatically as of the date that is 180 days after Confirmation, and the Clerk shall not enter a final decree without further notice pursuant to that rule, and instead a final decree shall only be entered upon application of the Liquidating Trustee.

"**Final Distribution Date**" means the last date on which a final Distribution is made to holders of Allowed General Unsecured Claims under the terms of the Plan.

"**Final Order**" means a judgment, order, ruling or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal having jurisdiction over the subject matter thereof which judgment, order, ruling or other decree has not been reversed, stayed, modified or amended and as to which (a) the time to appeal or petition for review, rehearing or certiorari or move for re-argument has expired or shall have been waived in writing in form and substance satisfactory to the Debtor, before the Effective Date, and thereafter to the Liquidating Trustee and as to which no appeal or petition for review, rehearing or certiorari or motion for re-argument is pending or (b) any appeal or petition for review, rehearing, certiorari or re-argument has been finally decided and no further appeal or petition for review, rehearing, certiorari or re-argument can be taken or granted; *provided*, *however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

"**FSB**" means First Savings Bank.

"**Garnishment Application**" means that certain *Application for Judgment Against Garnishee Aruze Gaming America, Inc.* filed by Bartlit Beck on October 21, 2022, seeking to garnish the monies AGA had on its books as being due and owing to Mr. Okada as a lender, and in partial satisfaction of the BB Judgment against Mr. Okada.

"**Garnishment Order**" means that certain *Findings of Fact, Conclusions of Law, and Order*, entered on January 25, 2023, by the Nevada State Court, granting Bartlit Beck's Garnishment Application, thereby effectively allowing Bartlit Beck to seek to collect the sum of Twenty-Seven Million, Three Hundred Sixty-Five Thousand, One Hundred Twenty Dollars ($27,365,120).  A true and correct copy of the Garnishment Order is attached as Exhibit 45 to the Kinoshita First Day Declaration.

"**General Unsecured Claim**" means any Claim that is not an Administrative Claim, a Secured Claim, a Priority Unsecured Claim (including Administrative Claims and Priority Tax Claims), an Intercompany Claim, or a Professional Fee Claim.

"**Global Settlement Agreement**" means that certain *Global Settlement Agreement* entered into by and among the Debtor, FSB and NSA, NSG and NSC, dated July 19, 2023, as approved by the Bankruptcy Court's entry of that Order granting the Compromise Motion.

"**Impaired**" means any Class of Claims or Equity Interests that is impaired within the meaning of Bankruptcy Code section 1124.

"**Initial Distribution Date**" means the date, as determined by the Liquidating Trustee, when the first Distribution to holders of Allowed General Unsecured Claims is made under the Plan; *provided*, *however*, that the Initial Distribution Date may also be the Final Distribution Date if so determined by the Liquidating Trustee.

"**Initial Liquidating Trustee**" means Amanda (Demby) Swift, in her capacity as the Liquidating Trustee of the Liquidating Trust as of the Effective Date.  The Committee selected Ms. Swift as the Initial Liquidating Trustee.

"**Interblock**" means Interblock USA L.C.

"**Interblock Sale**" means that sale, free and clear of all Liens, Claims, and encumbrances, to Interblock, of that subset of the Debtor's Assets (the Debtor's membership interest in NSG and all assets related to the Debtor's RTWC Assets), in exchange for Fourteen Million Dollars ($14,000,000), and the sale and assignment of the Decatur Leasehold and sale of certain miscellaneous property located at the Decatur Leasehold, in exchange for Eight Hundred Twenty Thousand Dollars ($820,000), as more specifically set forth in the Interblock Agreements attached to the Interblock Sale Order.

"**Interblock Sale Order**" means, together, that (a) *Order (A) Approving the Asset Purchase Agreement, (B) Authorizing the Sale of Assets, (C) Authorizing the Assumption and Assignment of Contracts and Leases, and (D) Granting Related Relief* entered on August 15, 2023 [ECF No. 521], approving that certain Asset Purchase Agreement appended as Exhibit A (the "Interblock APA") thereto, and (b) *Order Granting Motion to Approve: (I) Assumption and Assignment of an Unexpired Lease of Non-Residential Real Property (6900 S. Decatur Blvd., Las Vegas, Nevada 89118) Pursuant to 11 U.S.C. § 365; and (II) Sale of Certain Personal Property Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363* entered by the Bankruptcy Court on August 16, 2023 [ECF No. 524], approving that certain Asset Purchase Agreement appended as Exhibit A (together with the Interblock APA, the "Interblock Agreements").

"**Interblock Vehicle Sale**" means that sale, free and clear of all Liens, Claims, and encumbrances, of that subset of the Debtor's Assets to the Bank Group (8 motor vehicles), in exchange for Two Hundred Forty-Five Thousand, Nine Hundred Fifteen Dollars ($245,915), as more specifically set forth in the Interblock Vehicle APA and approved by the Interblock Vehicle Sale Order.

"**Interblock Vehicle Sale Order** " means that certain *Order Approving Sale of Certain Motor Vehicles to Interblock USA, L.C. Free and Clear of All Liens, Claims, and Encumbrances*

*Pursuant to 11 U.S.C. § 363* entered on August 31, 2023 [ECF No. 554], approving that certain Asset Purchase Agreement appended as Exhibit 1 (the "Interblock Vehicle APA") to the Interblock Vehicle Sale Order.

"**Intercompany Claim**" means any Claim, held by any affiliate of the Debtor against the Debtor.

"**Intercompany Receivables**" means any amounts due and owing, by an affiliate of the Debtor, to the Debtor, as of the Distribution Record Date.

"**Interest**" means the same as the term "Equity Interest."

"**June 2022 Purchase Agreement**" means that certain Distributions Sale and Purchase Agreement VII, entered into by and between the Debtor and NSC, effective as of June 29, 2022. As set forth in the Purchase Agreement June 2022, the Debtor sold to NSC the distributions that the Debtor was entitled to receive from NSG. In exchange for a purchase price of Seven Hundred Thousand Dollars ($700,000), the Debtor agreed to pay to NSG those certain distributions (as set forth on that June 2022 Distribution Schedule attached to the June 2022 Purchase Agreement), to which the Debtor is entitled as a member of NSG. If actual distributions to the Debtor are insufficient to pay to NSC the stated distribution amounts listed on that June 2022 Distribution Schedule, the Debtor is responsible for paying such deficiencies to NSC. Upon information and belief, on January 31, 2023, a UCC Financing Statement was recorded with the Nevada Secretary of State to secure all distributions the Debtor was entitled to receive from NSG.

"**Kinoshita First Day Declaration**" means that *Omnibus Declaration of Yugo Kinoshita in Support of the Debtor's Initial Emergency Motions and Related Relief* filed by the Debtor on February 6, 2023 [ECF No. 19].

"**Larson Zirzow**" means Larson & Zirzow, LLC, the Debtor's chosen general bankruptcy counsel and a Retained Professional.

"**Lien**" has the meaning ascribed in Bankruptcy Code section 101(37), including any lien, security interest, pledge, title retention agreement, encumbrance, leasehold, charge, mortgage, deed of trust, assignment of rents, assignment or hypothecation to secure payment of a debt or performance of an obligation, other than, in the case of securities and any other equity ownership interests, any restrictions imposed by applicable United States or foreign securities laws.

"**Liquidating Trust**" means the irrevocable trust created pursuant to the Liquidating Trust Agreement on the Effective Date in accordance with this Plan, the Confirmation Order and the Liquidating Trust Agreement.

"**Liquidating Trust Advisory Board**" means that board or committee (as set forth in the Liquidating Trust Agreement) comprised of holders of Allowed General Unsecured Creditors that either served as a member of the Committee during the Bankruptcy Case, other than Bartlit Beck, or advised the Initial Liquidating Trustee of its desire to serve on the Liquidating Trust Advisory Board and so appointed to serve, effective as of the establishment of the Liquidating Trust on the Effective Date.

SMRH:4890-7774-3491.7
101223

89BG-371272

"**Liquidating Trust Agreement**" means the Liquidating Trust Agreement to be dated as of the Effective Date, the form of which is attached to the Plan, establishing the terms and conditions of the Liquidating Trust.

"**Liquidating Trust Assets**" means the (i) the Causes of Action and any proceeds thereof; (ii) all defenses, offsets, rights of recoupment, rights of disallowance, recharacterization and/or equitable subordination of the Debtor and the Estate with respect to Causes of Action; (iii) any and all real property or personal property remaining unsold as of the Confirmation Date; and (iv) all rights of the Liquidating Trust arising from the Plan itself.

"**Liquidating Trust Reserve**" means an initial Cash Reserve of at least Five Hundred Thousand Dollars ($500,000) of the Debtor's Assets, which shall vest in the Liquidating Trust on the Effective Date of the Plan.

"**Liquidating Trustee**" means the Initial Liquidating Trustee [(Amanda (Demby) Swift)], selected by the Committee, and any successor thereto appointed pursuant to the Liquidating Trust Agreement, in each case acting in the capacity as trustee of the Liquidating Trust.

"**Local Rules**" means the Local Rules of Bankruptcy Practice for the U.S. District Court for the District of Nevada, as now in effect or as the same may be amended from time to time.

"**Main Asset Sales**" means those sales of certain subsets of the Debtor's Assets to the Bank Group, Empire, and Interblock, as set forth in the Bank Group Sale Order, the Empire Sale Order, and the Interblock Sale Order.

"**Nevada State Court**" means the Eighth Judicial District Court, Clark County, Nevada.

"**NextStep**" means, together, NSC and NSG.

"**NextStep Agreements**" means, collectively, the RTWC License Agreement, the RTWC Agreement, the NSG Promissory Note, the June 2022 Purchase Agreement, the September 2022 Purchase Agreement, and the NSG Collateral Assignment.

"**NextStep Complaint**" means that *Complaint for: (1) Avoidance and Recovery of Fraudulent Transfers; (2) Declaratory Relief and Recharacterization; and (3) Disallowance of Claims Pending Avoidance or Repayment* [ECF No. 200/Adv. P. ECF No. 1] filed by the Committee against NextStep, commencing the Committee Action.

"**NextStep Outstanding Balance**" means, in the aggregate, the estimated alleged secured amount due and owing, as of the Petition Date, by the Debtor to NextStep under the NextStep Agreements, or not less than $1,829,940.00 plus all ongoing licensing fees due on the 20th day of each month while the RTWC Tables are still generating revenue, and if not generating revenues, for a specified period of time, in the aggregate, plus interest, default interest, late fees, costs, and attorneys' fees.

"**NSC**" means NextStep Capital, LLC, which the Debtor is informed and believes is owned or controlled, directly or indirectly by Johan Finley and Rich Pennington. Mr. Pennington is a former Director of AGA, but resigned shortly before the Petition Date.

"**NSG**" means NextStep Gaming, LLC, which was an entity that was formed in 2021 to establish an alliance between AGA and NextStep Capital for the purpose of manufacturing, licensing, and sharing revenues in RTWC Tables.  In establishing NSG, AGA contributed to NSG as its capital contribution its rights under the RTWC License Agreement (described below), and NSC contributed to NSG $7,500,000.00 as its own capital contribution.  As of the Petition Date, NSG was owned 35% by AGA, and the remaining 65% by NSC.

"**NSG Collateral**" means all of the Debtor's then-owned and thereafter acquired RTWC Tables not placed into service, as well as all proceeds, products, and books and records related to the foregoing, as well as all of the distributions the Debtor was entitled to receive as a member of NSG Under the NSG Loan & Security Agreement, in which AGA granted to NSG a security interest to secure repayment of its obligations under the NSG Promissory Note.

"**NSG Collateral Assignment**" means that certain Collateral Assignment of Table Games and Revenue Stream dated June 1, 2021, entered into by and between AGA, as assignor, and NSG, as assignee, for the purpose of securing AGA's obligations under the RTWC License Agreement and RTWC Agreement, and to create a security interest in favor of NSG in and to (a) all of AGA's lease agreements with casinos and other gaming establishments for its electronic table games during the term of the RTWC Agreement (the "Leases"), (ii) all of AGA's electronic table games under the leases with customers under the RTWC Agreement (the "Tables"), (iii) all payments due and to become due to AGA under the foregoing, (iv) all of AGA's servers that are installed for the use of the electronic gaming tables under the foregoing, and (v) and to give NSG rights to insurance proceeds from the foregoing.  A true and correct copy of the NSG Collateral Assignment is attached to the Kinoshita First Day Declaration as Exhibit 41.  Upon information and belief, on August 20, 2021, a UCC Financing Statement was recorded securing the obligations under the RTWC Manufacture Agreement and Collateral Assignment.  A series of UCC Financing Statements were filed thereafter to add or change the collateral, gaming equipment, listed therein.

"**NSG Loan & Security Agreement**" means that certain Loan and Security Agreement dated June 1, 2021, by and between AGA, as borrower, and NSG, as lender, for a loan in the original principal amount of $2,000,000, which debt was evidenced by the NSG Promissory Note.  Under the NSG Loan & Security Agreement, AGA granted to NSG a security interest in the NSG Collateral to secure repayment of its obligations under the NSG Promissory Note.  A true and correct copy of the NSG Loan & Security Agreement is attached as Exhibit 42 to the Kinoshita First Day Declaration.  Upon information and belief, on June 16, 2021, as amended on July 20, 2021, NSG filed various UCC-1 financing statement with the Nevada Secretary of State to perfect its security interests granting under the NSG Loan & Security Agreement.

"**NSG Promissory Note**" means that certain promissory note dated June 1, 2021, by and between AGA, as borrower, and NSG, as lender, evidencing AGA's obligation to repay the original principal amount of $2,000,000, on or before April 1, 2024.  A true and correct copy of the NSG Loan & Security Agreement is attached as Exhibit 43 to the Kinoshita First Day Declaration.  On June 16, 2021, a UCC Financing Statement was recorded with the Nevada Secretary of State to secure the obligations owed under the Promissory Note and Loan and Security Agreement.

"**PDS Claim**" means that certain Proof of Claim, assigned no. 83 on the Claims Register, filed by the PDS Entities asserting a Secured Claim of $2,442,562.87, in the aggregate.

"**PDS Entities**" means, collectively, PDS Gaming, LLC ("PDS Gaming"), PDS Gaming-Nevada, LLC ("PDS Nevada"), PDS Gaming-Mississippi, LLC ("PDS Mississippi"), PDS Gaming-Louisiana, LLC ("PDS LA") and PDS Special Purpose 1, LLC ("PDS SP1").

"**PDS Obligation**" means that certain amount NSG paid to the PDS Entities $650,000.00 on account of amounts due and owing by NSG to the PDS Entities under that certain loan agreement between NSG and PDS, on or around June 12, 2023. The total balance due from NSG to the PDS Entities on account of the PDS Obligation as July 19, 2023, was $662,499.82.

"**PDS Stipulation**" means that *Stipulation by and Among the Debtor and the PDS Entities for an Order: (1) Abandoning Property; (2) Rejecting Executory Contracts; (3) Granting Stay Relief, and Other Relief* entered into by and among the Debtor, the Committee, and the PDS Entities, and filed with the Bankruptcy Court on September 15, 2023 [ECF No. 594], and approved by the Bankruptcy Court on September 15, 2023 [ECF No. 601].

"**Person**" means any person or organization created or recognized by law, including any association, company, cooperative, corporation, entity, estate, fund, individual, joint stock company, joint venture, limited liability company, partnership, trust, trustee, unincorporated organization, government or any political subdivision thereof, or any other entity or organization of whatever nature.

"**Petition Date**" means February 1, 2023, which is the date of the commencement of the Debtor's Bankruptcy Case.

"**Plan**" means this liquidating chapter 11 plan (including all exhibits, supplements, appendices and schedules annexed hereto), either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules or any order entered by the Bankruptcy Court.

"**Plan Proponents**" means the Debtor and the Committee, as proponents of the Plan.

"**Plan Supplement**" means the ancillary documents regarding the implementation and effectuation of the Plan, which will be filed on or before the date that is seven (7) calendar days prior to the Voting Deadline, as such documents may be amended and supplemented prior to the Confirmation Hearing in the Plan Proponents' reasonable discretion. The Plan Supplement may include, without limitation, the form of the Liquidating Trust Agreement, the Schedule of Assumed Agreements, the Liquidation Analysis, and additional information relating to tax matters.

"**Potential D&O Defendants**" means certain former or current directors, officers or insiders of the Debtor, including, but not limited to Masumi Fujisawa, Hiromi Okada, Yugo Kinoshita, and Richard Pennington.

"**Priority Tax Claim**" means a Claim of a governmental unit entitled to priority in payment under section 502(i) or section 507(a)(8) of the Bankruptcy Code.

"**Priority Unsecured Claim**" means a Claim of a Creditor entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claims, Administrative Claims and Professional Fee Claims.

"**Pro Rata**" or "**Pro Rata Share**" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class entitled to share in the same recovery as such Allowed Claim under the Plan.

"**Professional Fee Claim**" means a Claim of a Retained Professional for professional fees, expenses and other reimbursable costs incurred by that Retained Professional under Bankruptcy Code section 503(b) and entitled to administrative priority under Bankruptcy Code section 507(a)(2) for expenses incurred and services rendered, subject to award under Bankruptcy Code sections 328, 330, and 331.

"**Proof of Claim**" means any proof of Claim filed with the Bankruptcy Court by the Bar Date for filing proofs of Claim against the Debtor.

"**Province**" means Province, LLC, the Committee's financial advisor and a Retained Professional.

"**Rejection Claim**" means any Claim for monetary damages as a result of the rejection of any prepetition executory contract or unexpired lease, whether rejected pursuant to the Confirmation Order or otherwise.

"**Rejection Claims Bar Date**" means, to the extent not previously established by prior order of the Bankruptcy Court, the first Business Day that is thirty (30) calendar days after the Effective Date.

"**Reserves**" means, together, the reserves necessary to satisfy Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims and Allowed Priority Unsecured Claims (to the extent payable in Cash), unless otherwise agreed by the applicable holder of such Claim.

"**Retained Professional**" means those Persons retained under an order of the Bankruptcy Court in accordance with Bankruptcy Code sections 327, 328, 363 or 1103, as applicable.

"**RTWC**" means Roll to Win Craps.

"**RTWC Agreement**" means that certain RTWC Manufacture & License Agreement dated June 1, 2021, by and between AGA and NSG. Under the RTWC License Agreement NSG appointed the Debtor as the exclusive third-party RTWC Table sublicensee for any jurisdiction in which the Debtor has the necessary gaming approval or otherwise is authorized by the applicable gaming authority to place RTWC Tables. In exchange, among other obligations, the Debtor has monthly payment obligations (including "License Fees" as defined under the RTWC Agreement) to NSG dependent on whether the RTWC Tables are still generating revenue, and if not generating revenues, for a specified period of time. A true and correct copy of the RTWC Agreement is attached as Exhibit 40 to the Kinoshita First Day Declaration. On August 20, 2021, a UCC Financing Statement was recorded securing the obligations under the RTWC Manufacture Agreement and Collateral Assignment. A series of UCC Financing Statements were filed thereafter to add or change the collateral, gaming equipment, listed therein.

"**RTWC License Agreement**" means that certain Intellectual Property License Agreement dated June 1, 2021, as amended and restated on August 15, 2021, by and between AGA and NSG.

SMRH:4890-7774-3491.7
101223
-15-
89BG-371272

Under the RTWC License Agreement and the RTWC Agreement, the Debtor granted to NSG an exclusive license to use certain intellectual property related to the RTWC Tables.  The RTWC License Agreement further provides that, among other things, NSG has the exclusive right to sublicense the intellectual property for the manufacture of the Roll to Win Craps Table Games and use of the Roll to Win Craps Table Game.  True and correct copies of the RTWC License Agreement are attached as Exhibits 39 and 40 to the Kinoshita First Day Declaration.

"**RTWC Tables**" means the proprietary "Roll to Win Craps" enhanced live table game that the Debtor produced, manufactured, and distributed.

"**Schedules**" means the schedules of assets and liabilities and statements of financial affairs filed by the Debtor with the Bankruptcy Court under Bankruptcy Rule 1007, and any amendments and modifications thereto.

"**Schedule of Assumed Agreements**" means that schedule, to be filed as part of the Plan Supplement, setting forth the unexpired executory contracts, to which the Debtor is a party, that the Estate will assume and assign to the Liquidating Trust on the Effective Date of the Plan.  For the avoidance of doubt, any unexpired executory contract or non-residential real property lease <u>not</u> listed on the Schedule of Assumed Agreements shall be deemed rejected as of the Effective Date of the Plan.

"**Schwartz Law**" means Schwartz Law, PLLC, Nevada counsel to the Committee and a Retained Professional.

"**Secured Claim**" means a Claim that is secured within the meaning of and to the extent set forth in Bankruptcy Code section 506(a) and shall not include any Deficiency Amount.

"**September 2022 Purchase Agreement**" means that certain Distributions Sale and Purchase Agreement VII, entered into by and between the Debtor and NSC, effective as of September 29, 2022.  As set forth in the Purchase Agreement June 2022, the Debtor sold to NSC the distributions that the Debtor was entitled to receive from NSG.  In exchange for a purchase price of Six Hundred Thousand Dollars ($600,000), the Debtor agreed to pay to NSG those certain distributions (as set forth on that September 2022 Distribution Schedule attached to the September 2022 Purchase Agreement), to which the Debtor is entitled as a member of NSG.  If actual distributions to the Debtor are insufficient to pay to NSC the stated distribution amounts listed on that September 2022 Distribution Schedule, the Debtor is responsible for paying such deficiencies to NSC.  Upon information and belief, on January 31, 2023, a UCC Financing Statement was recorded with the Nevada Secretary of State to secure all distributions the Debtor was entitled to receive from NSG.

"**Series 2022-A Loan**" means that certain loan, governed by the Series 2022-A Loan Agreement, Series 2022-A Note, and Series 2022-A Security Agreement, each dated on or about August 17, 2022, whereby AGA, as borrower, borrowed from FSB, as original lender, the principal amount of $8,000,000.00, which obligation is secured by the Bank Group Collateral, provided that such security interest was *pari passu* with the prior interests under the Series A-B, C, D, E, F, G, and H Loans as well.  As of the Petition Date, the Debtor understood that FSB apparently remained as lead bank on the Series 2022-A Loan in the amount of $4,000,000.00, and four (4) other banks

were also participants in the remaining balance, including Security State Bank, Commercial Bank, First State Bank, First Bank and Trust Company, and First Central Bank.

"**Series 2022-A Loan Agreement**" means that certain loan agreement entered into by and between AGA, as borrower, and NSA, as original lender, dated August 17, 2022, in the original principal amount of $8,000,000.00. A true and correct copy of the Series 2022-A Loan Agreement is attached as Exhibit 23 to the Kinoshita First Day Declaration.

"**Series 2022-A Note**" means that certain promissory note, dated as of August 17, 2022, evidencing AGA's obligation to repay the principal amount of $8,000,000.00, in connection with the Series 2022-A Loan Agreement. A true and correct copy of the Series 2022-A Note is attached as Exhibit 24 to the Kinoshita First Day Declaration.

"**Series 2022-A Security Agreement**" means that certain security agreement, entered into by and between AGA and NSA, in connection with the Series 2022-A Loan Agreement. A true and correct copy of the Series 2022-A Security Agreement is attached as Exhibit 25 to the Kinoshita First Day Declaration. Upon information and belief, on [•], NSA filed a UCC-1 financing statement with the Nevada Secretary of State to perfect its security interests in and to the Bank Group Collateral as granted in the Series 2022-A Security Agreement.

"**Series A-B Loan**" means that certain loan governed by the Series A-B Loan Agreement, Series A-B Note, and Series A-B Security Agreement, each dated on or about October 30, 2020, whereby AGA, as borrower, borrowed from FSB, as lender, the principal amount of $15,000,000.00, which obligation is secured by the Bank Group Collateral.

"**Series A-B Loan Agreement**" means that certain loan agreement entered into by and between AGA, as borrower, and FSB, as lender, dated October 30, 2020, in the original principal amount of $15,000,000.00. A true and correct copy of the Series A-B Loan Agreement is attached as Exhibit 2 to the Kinoshita First Day Declaration.

"**Series A-B Note**" means that certain promissory note, dated as of October 30, 2020, evidencing AGA's obligation to repay to FSB the principal amount of $15,000,000.00, in connection with the Series A-B Loan Agreement. A true and correct copy of the Series A-B Note is attached as Exhibit 3 to the Kinoshita First Day Declaration.

"**Series A-B Security Agreement**" means that certain security agreement, entered into by and between AGA and FSB, in connection with the Series A-B Loan Agreement. A true and correct copy of the Series A-B Security Agreement is attached as Exhibit 4 to the Kinoshita First Day Declaration. Upon information and belief, on November 2, 2020 (as amended on June 8, 2021), FSB filed a UCC-1 financing statement with the Nevada Secretary of State to perfect its security interests in and to the Bank Group Collateral under the Series A-B Security Agreement.

"**Series C Loan**" means that certain loan, governed by the Series C Loan Agreement, Series C Note, and Series C Security Agreement, each dated on or about January 26, 2021, whereby AGA, as borrower, borrowed from NSA, as original lender, the principal amount of $3,750,000.00, which obligation is secured by the Bank Group Collateral, provided that such security interest was *pari passu* with the prior interests under the Series A-B Loan as well. As of the Petition Date, AGA understood that Northwestern Bank was the sole participant in the Series C Loan.

"**Series C Loan Agreement**" means that certain loan agreement entered into by and between AGA, as borrower, and NSA, as original lender, dated January 26, 2021, in the original principal amount of $3,750,000.00.  A true and correct copy of the Series C Loan Agreement is attached as Exhibit 5 to the Kinoshita First Day Declaration.

"**Series C Note**" means that certain promissory note, dated as of January 26, 2021, evidencing AGA's obligation to repay the principal amount of $3,750,000.00, in connection with the Series C Loan Agreement.  A true and correct copy of the Series C Note is attached as Exhibit 6 to the Kinoshita First Day Declaration.

"**Series C Security Agreement**" means that certain security agreement, entered into by and between AGA and NSA, in connection with the Series C Loan Agreement.  A true and correct copy of the Series C Security Agreement is attached as Exhibit 7 to the Kinoshita First Day Declaration. Upon information and belief, on January 26, 2021 (as amended on June 8, 2021), NSA filed a UCC-1 financing statement with the Nevada Secretary of State to perfect its security interests in and to the Bank Group Collateral as granted in the Series C Security Agreement.

"**Series D Loan**" means that certain loan, governed by the Series D Loan Agreement, Series D Note, and Series D Security Agreement, each dated on or about April 21, 2021, whereby AGA, as borrower, borrowed from NSA, as original lender, the principal amount of $1,000,000.00, which obligation is secured by the Bank Group Collateral, provided that such security interest was *pari passu* with the prior interests under the Series A-B and C Loans as well.  As of the Petition Date, AGA understood that Woodlands National Bank was the sole participant in the Series D Loan.

"**Series D Loan Agreement**" means that certain loan agreement entered into by and between AGA, as borrower, and NSA, as original lender, dated April 21, 2021, in the original principal amount of $1,000,000.00.  A true and correct copy of the Series D Loan Agreement is attached as Exhibit 8 to the Kinoshita First Day Declaration.

"**Series D Note**" means that certain promissory note, dated as of April 21, 2021, evidencing AGA's obligation to repay the principal amount of $1,000,000.00, in connection with the Series C Loan Agreement.  A true and correct copy of the Series D Note is attached as Exhibit 9 to the Kinoshita First Day Declaration.

"**Series D Security Agreement**" means that certain security agreement, entered into by and between AGA and NSA, in connection with the Series D Loan Agreement.  A true and correct copy of the Series D Security Agreement is attached as Exhibit 10 to the Kinoshita First Day Declaration. Upon information and belief, on May 12, 2021 (as amended on June 8, 2021), NSA filed a UCC-1 financing statement with the Nevada Secretary of State to perfect its security interests in and to the Bank Group Collateral as granted in the Series D Security Agreement.

"**Series E Loan**" means that certain loan, governed by the Series E Loan Agreement, Series E Note, and Series E Security Agreement, each dated on or about June 25, 2021, whereby AGA, as borrower, borrowed from NSA, as original lender, the principal amount of $2,000,000.00, which obligation is secured by the Bank Group Collateral, provided that such security interest was *pari passu* with the prior interests under the Series A-B, C, and D Loans as well.  As of the Petition Date, AGA understood that Bank of George was the sole participant in the Series E Loan.

"**Series E Loan Agreement**" means that certain loan agreement entered into by and between AGA, as borrower, and NSA, as original lender, dated June 25, 2021, in the original principal amount of $2,000,000.00.  A true and correct copy of the Series E Loan Agreement is attached as Exhibit 11 to the Kinoshita First Day Declaration.

"**Series E Note**" means that certain promissory note, dated as of June 25, 2021, evidencing AGA's obligation to repay the principal amount of $2,000,000.00, in connection with the Series C Loan Agreement.  A true and correct copy of the Series E Note is attached as Exhibit 12 to the Kinoshita First Day Declaration.

"**Series E Security Agreement**" means that certain security agreement, entered into by and between AGA and NSA, in connection with the Series E Loan Agreement.  A true and correct copy of the Series E Security Agreement is attached as Exhibit 13 to the Kinoshita First Day Declaration. Upon information and belief, on June 29, 2021, NSA filed a UCC-1 financing statement with the Nevada Secretary of State to perfect its security interests in and to the Bank Group Collateral as granted in the Series E Security Agreement.

"**Series F Loan**" means that certain loan, governed by the Series F Loan Agreement, Series F Note, and Series F Security Agreement, each dated on or about September 15, 2021, whereby AGA, as borrower, borrowed from NSA, as original lender, the principal amount of $1,000,000.00, which obligation is secured by the Bank Group Collateral, provided that such security interest was *pari passu* with the prior interests under the Series A-B, C, D, and E Loans as well.  As of the Petition Date, AGA understood that Bank of George was the sole participant in the Series F Loan.

"**Series F Loan Agreement**" means that certain loan agreement entered into by and between AGA, as borrower, and NSA, as original lender, dated September 15, 2021, in the original principal amount of $1,000,000.00.  A true and correct copy of the Series F Loan Agreement is attached as Exhibit 14 to the Kinoshita First Day Declaration.

"**Series F Note**" means that certain promissory note, dated as of September 15, 2021, evidencing AGA's obligation to repay the principal amount of $1,000,000.00, in connection with the Series F Loan Agreement.  A true and correct copy of the Series F Note is attached as Exhibit 15 to the Kinoshita First Day Declaration.

"**Series F Security Agreement**" means that certain security agreement, entered into by and between AGA and NSA, in connection with the Series F Loan Agreement.  A true and correct copy of the Series F Security Agreement is attached as Exhibit 16 to the Kinoshita First Day Declaration. Upon information and belief, on September 21, 2021, NSA filed a UCC-1 financing statement with the Nevada Secretary of State to perfect its security interests in and to the Bank Group Collateral as granted in the Series F Security Agreement.

"**Series G Loan**" means that certain loan, governed by the Series G Loan Agreement, Series G Note, and Series G Security Agreement, each dated on or about October 28, 2021, whereby AGA, as borrower, borrowed from NSA, as original lender, the principal amount of $1,000,000.00, which obligation is secured by the Bank Group Collateral, provided that such security interest was *pari passu* with the prior interests under the Series A-B, C, D, E, and F Loans as well.  As of the Petition Date, AGA understood that Bank of George was the sole participant in the Series G Loan.

"**Series G Loan Agreement**" means that certain loan agreement entered into by and between AGA as borrower, and NSA, as original lender, dated September 15, 2021, in the original principal amount of $1,000,000.00.  A true and correct copy of the Series G Loan Agreement is attached as Exhibit 17 to the Kinoshita First Day Declaration.

"**Series G Note**" means that certain promissory note, dated as of October 28, 2021, evidencing AGA's obligation to repay the principal amount of $1,000,000.00, in connection with the Series G Loan Agreement.  A true and correct copy of the Series G Note is attached as Exhibit 18 to the Kinoshita First Day Declaration.

"**Series G Security Agreement**" means that certain security agreement, entered into by and between AGA and NSA, in connection with the Series G Loan Agreement.  A true and correct copy of the Series G Security Agreement is attached as Exhibit 19 to the Kinoshita First Day Declaration. Upon information and belief, on November 1, 2021, NSA filed a UCC-1 financing statement with the Nevada Secretary of State to perfect its security interests in and to the Bank Group Collateral as granted in the Series G Security Agreement.

"**Series H Loan**" means that certain loan, governed by the Series H Loan Agreement, Series H Note, and Series H Security Agreement, each dated on or about November 23, 2021, whereby AGA, as borrower, borrowed from NSA, as original lender, the principal amount of $1,000,000.00, which obligation is secured by the Bank Group Collateral, provided that such security interest was *pari passu* with the prior interests under the Series A-B, C, D, E, F, and G Loans as well.

"**Series H Loan Agreement**" means that certain loan agreement entered into by and between AGA, as borrower, and NSA, as original lender, dated November 23, 2021, in the original principal amount of $1,000,000.00.  A true and correct copy of the Series H Loan Agreement is attached as Exhibit 20 to the Kinoshita First Day Declaration.

"**Series H Note**" means that certain promissory note, dated as of November 23, 2021, evidencing AGA's obligation to repay the principal amount of $1,000,000.00, in connection with the Series H Loan Agreement.  A true and correct copy of the Series H Note is attached as Exhibit 21 to the Kinoshita First Day Declaration.

"**Series H Security Agreement**" means that certain security agreement, entered into by and between AGA and NSA, in connection with the Series H Loan Agreement.  A true and correct copy of the Series H Security Agreement is attached as Exhibit 22 to the Kinoshita First Day Declaration. Upon information and belief, on November 29, 2021, NSA filed a UCC-1 financing statement with the Nevada Secretary of State to perfect its security interests in and to the Bank Group Collateral as granted in the Series H Security Agreement.

"**Sheppard Mullin**" means Sheppard, Mullin, Richter & Hampton, LLP, lead bankruptcy counsel to the Committee and a Retained Professional.

"**Solicitation Procedures Order**" means the Order conditionally approving the Disclosures contained in the Plan and authorizing the Plan Proponents to solicit acceptances of the Plan, and establishing certain related procedures and deadlines.

"**U.S. Trustee**" means Tracy Hope Davis, the United States Trustee for Region 17, and the Office of the United States Trustee for Region 17.

1      "**U.S. Trustee Fees**" means any fees payable pursuant to 28 U.S.C. § 1930.

2      "**Unimpaired**" means any Class of Claims that is not Impaired within the meaning of
3  Bankruptcy Code section 1124.

4      "**Universal Settlement**" means that certain Settlement Agreement and Release attached as
   Exhibit 1 to the *Debtor's Motion to Authorize and Approve Compromise with Universal
5  Entertainment Corporation Pursuant to Fed. R. Bankr. P. 9019* filed by the Debtor on June 1, 2023
   [ECF No. 343], and approved by the Bankruptcy Court on June 12, 2023 [ECF No. 390].

6
7      "**Vehicle Sales**" means, together, the Interblock Vehicle Sale and the Empire Vehicle Sale.

8      "**Voting Deadline**" means the date and time by which all Ballots to accept or reject the Plan
   must be received in order to be counted under the Solicitation Procedures Order.

9      "**Wynn Litigation**" means that multi-party, multi-billion-dollar lawsuit against Wynn
10  Resorts and its then-CEO, Steve Wynn, in that action styled, *Wynn Resorts Limited v. Okada*, Case
   No. A-12-646701-B, in the Eighth Judicial District Court, Clark County, Nevada.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28